**FILED**

AUG 2 2 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 19 CR ____ **19 CR 669** |
| v. | ) | |
| | ) | Violations: Title 7, United States Code, |
| GREGG SMITH, | ) | Sections 6c(a)(5)(C) and 13(a)(2); |
| MICHAEL NOWAK, and | ) | Title 18, United States Code, Sections |
| CHRISTOPHER JORDAN, | ) | 371, 1343, 1344(1), 1348(1), and 1962(d) |
| | ) | |
| Defendants. | ) | **JUDGE CHANG** |
| | | **MAGISTRATE JUDGE CUMMINGS** |

## INDICTMENT

The SPECIAL MAY 2019 GRAND JURY charges:

### COUNT ONE
(Conspiracy to Conduct or Participate in an Enterprise Engaged in a Pattern of
Racketeering Activity)

At all times relevant to this Indictment, unless otherwise noted:

### Market Background

1.      Precious metals were rare, naturally occurring metals of high economic value. They included gold, silver, platinum, and palladium. These precious metals were commodities that had both investment and industrial uses ranging from jewelry to computer memory chips to catalytic converters in engines.

2.      One way to trade precious metals was by buying and selling "futures contracts." A futures contract was an agreement to buy or sell a particular product (such as gold, for example) at a fixed price but to be delivered and paid for later. In other words, the buyer and seller agreed at the time they entered into the contract on a price for a product to be delivered (by the seller) in exchange for money (to be provided by the buyer) on a future date. Futures contracts were traded on markets

designated and regulated by the United States Commodity Futures Trading Commission ("CFTC").

3. For many years, the predominant method of trading futures contracts was through brokers who physically sat on commodities trading floors or "pits." By the mid-2000s, however, computerized trading through electronic platforms rapidly began to replace pit trading.

4. With the rise of electronic trading, certain traders developed algorithmic trading programs that used mathematical formulas to process market information and place orders at extraordinary speeds. In response, some non-algorithmic (or "manual") traders devised unlawful trading strategies to attempt to gain an unfair edge over algorithmic traders. One of these strategies involved placing orders to buy or sell futures contracts with the intent to cancel those orders before execution, an unlawful practice that became known as "spoofing."

## **Relevant Entities**

5. Bank A, together with its subsidiaries and affiliates, was a global banking and financial services company that was headquartered in New York, New York. Bank A had operations in the United States and abroad, and operated a global commodities trading business that included the trading of precious metals futures contracts and options. Bank A was a financial institution within the definition of Title 18, United States Code, Section 20.

6. Bank A ran one of the world's largest precious metals businesses through its Global Commodities Group. Bank A's precious metals traders worked in

offices in New York, Singapore, and London, England, and operated as part of a single, cohesive global unit or "desk" (the "Precious Metals Desk at Bank A").

7.      Bank B, together with its subsidiaries and affiliates, was a global banking and financial services company that was headquartered in New York, New York. Bank B operated a global commodities trading business that included the trading of precious metals futures contracts. In March 2008, Bank A announced a merger agreement to acquire Bank B, and the acquisition was completed in May 2008.[1] In connection with the acquisition, certain precious metals traders joined Bank A from Bank B.

8.      Bank C, together with its subsidiaries and affiliates, was a global banking and financial services company that was headquartered in Zurich, Switzerland. Bank C also had operations in the United States and operated a global commodities trading business that included the trading of precious metals futures contracts. A branch of Bank C in New York was a financial institution within the definition of Title 18, United States Code, Section 20.

9.      Company D was an investment firm based in New York. Company D operated a global commodities trading business that included the trading of precious metals futures contracts.

10.     The CME Group Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including the Commodity Exchange, Inc. ("COMEX")

---

[1] All dates, times, and numbers in this Indictment are approximate. All times are in Central Standard Time or Central Daylight Time.

and New York Mercantile Exchange, Inc. ("NYMEX"), each of which was a "registered entity" with the CFTC.

11.     Gold and silver futures contracts were traded on COMEX, and platinum and palladium futures contracts were traded on NYMEX. COMEX and NYMEX utilized the "Globex" electronic trading system, which allowed market participants to trade futures contracts on those exchanges from anywhere in the world. The CME Group operated Globex using computer servers located in and around Chicago and Aurora, Illinois.

### Futures Trading Mechanics

12.     Precious metals traders using Globex could place orders in the form of "bids" to buy or "offers" to sell one or more futures contracts at various prices. An order was "filled" or "executed" when a buyer's bid price and a seller's offer price matched for a particular contract.

13.     An "iceberg" order was a type of order that a trader could place on COMEX and NYMEX that did not display the order's full size to other market participants. Only a pre-set portion of an iceberg order was visible at any given time. When the visible portion was filled, the next pre-set portion of the order became visible, and so forth.

### Options

14.     An "option" was a derivative financial product whose value was tied to the value of an underlying asset (such as a physical commodity). An option contract offered the purchaser of the option the right (but not the obligation) to buy or sell the

underlying asset at an agreed-upon price during a certain period of time or on a specific date.

15.    A "barrier" option was a type of option whose value depended on whether or not the underlying asset reached or exceeded a predetermined price during the lifetime of the option. "Barrier-running" was the unlawful practice of maneuvering the market price for the underlying asset *toward* a particular price point to deliberately trigger a barrier option. "Barrier-defending" was the unlawful practice of maneuvering the market price for the underlying asset *away* from a particular price point in order to avoid triggering a barrier option.

### The Enterprise, Defendants, and Co-Conspirators

16.    The Precious Metals Desk at Bank A constituted an "enterprise" within the definition of Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

17.    At various times between May 2008 and August 2016 (the "Conspiracy Period"), each of the defendants, GREGG SMITH, MICHAEL NOWAK, and CHRISTOPHER JORDAN (collectively, the "Defendants"), was an employee of Bank A through its subsidiaries and affiliates, and was employed on, and associated with, the above-described enterprise, the Precious Metals Desk at Bank A. More specifically:

     a.    SMITH was employed as a precious metals trader at Bank B from May 2007 until its acquisition by Bank A in May 2008. For the entirety of the

Conspiracy Period, SMITH was employed as an Executive Director and trader on the Precious Metals Desk at Bank A in New York.

b.     NOWAK began working at Bank A in July 1996. NOWAK supervised and was employed as a Managing Director and trader on the Precious Metals Desk at Bank A for the entirety of the Conspiracy Period. During the Conspiracy Period, NOWAK worked at Bank A's offices in New York and London.

c.     JORDAN began working at Bank A in March 2006. He was employed as a trader on the Precious Metals Desk at Bank A from the beginning of the Conspiracy Period until leaving Bank A in December 2009. JORDAN worked at Bank A's offices in New York and was an Executive Director at the time of his departure. After leaving Bank A, JORDAN worked as a precious metals trader at Bank C's offices in New York from March 2010 until August 2010. Next, from June 2011 until October 2011, JORDAN traded precious metals futures contracts as an employee of Company D in New York.

18.     John Edmonds began working at Bank A in July 2004. He was employed as a clerk and in a back-office operations role supporting Bank A's precious metals traders from the beginning of the Conspiracy Period until May 2009. After that, Edmonds was employed as a trader on the Precious Metals Desk at Bank A until leaving Bank A in August 2017. He was a Vice President at the time of his departure.

19.     Christian Trunz was employed as a precious metals trader at Bank B from July 2007 until its acquisition by Bank A in May 2008. For the entirety of the

Conspiracy Period, Trunz was employed as a trader on the Precious Metals Desk at Bank A. Trunz worked at Bank A's offices in New York until June 2013. He transferred to Bank A's offices in Singapore, and remained there until he transferred to Bank A's offices in London in August 2014. Trunz departed Bank A in August 2019 and was an Executive Director at the time of his departure.

20.     Co-Conspirators ("CC") 1 through 8 were supervisors, salespeople, and traders on the Precious Metals Desk at Bank A's offices in New York, London, and Singapore at various times during the Conspiracy Period.

## The Racketeering Conspiracy

21.     Between May 2008 and August 2016, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the Defendants, together with other individuals known and unknown to the Grand Jury, being persons employed by Bank A and associated with the Precious Metals Desk at Bank A, an enterprise which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts which are indictable under the following statutes:

        a.     Title 18, United States Code, Section 1343 (wire fraud affecting a
    financial institution); and

b.      Title 18, United States Code, Section 1344(1) (bank fraud).

22.     It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## The Purposes of the Racketeering Conspiracy

23.     The purposes of the racketeering conspiracy included the following, among others:

a.      Maximizing trading profits and minimizing trading losses for the Defendants and their co-conspirators, the Precious Metals Desk at Bank A, and Bank A itself through unlawful trading practices;

b.      Promoting and enhancing the racketeering conspiracy and the activities of the Defendants and their co-conspirators; and

c.      Concealing the unlawful activities of the Defendants and their co-conspirators from scrutiny by Bank A, the CME Group, the CFTC, and law enforcement.

## Means and Methods of the Racketeering Conspiracy

24.     The means and methods by which the Defendants and their co-conspirators sought to, and did, achieve the purposes of the racketeering conspiracy included the following:

25.     The Defendants and their co-conspirators placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before

execution, including in an attempt to artificially affect prices and to profit by deceiving other market participants. More specifically:

a.     In thousands of trading sequences, the Defendants and their co-conspirators placed one or more orders for precious metals futures contracts that they intended to execute ("Genuine Orders"). Sometimes, but not always, the Genuine Orders were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time.

b.     During the same trading sequences, the Defendants and their co-conspirators also placed one or more orders that they intended to cancel before execution ("Deceptive Orders") on the opposite side of the market from the Genuine Orders. The Deceptive Orders were not iceberg orders, and so the full order size was visible to other market participants.

c.     For the most part, the Defendants and their co-conspirators placed Deceptive Orders electronically using Globex. At times, however, certain of them (and in particular JORDAN) placed Deceptive Orders through telephone calls to floor brokers in trading pits.

d.     Even prior to May 2008, certain precious metals traders at Bank A, including JORDAN, were trading in this unlawful manner, typically using a single, large Deceptive Order that was many times bigger than the visible portion of the opposite-side Genuine Order.

e.     But when Bank A acquired Bank B in May 2008, SMITH and Trunz brought to Bank A a new style of layering multiple Deceptive Orders at

different prices in rapid succession that, in the aggregate if not individually, were substantially larger than the visible portion of the opposite-side Genuine Order. This new style of "layering," which was more difficult both to execute and to detect, took hold on the Precious Metals Desk at Bank A and was adopted by, among others, NOWAK, Edmonds, CC-1, CC-2, and CC-5.

f. By placing Deceptive Orders, the Defendants and their co-conspirators intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.

g. This false and misleading information was intended to, and at times did, trick other market participants, including competitor financial institutions and proprietary traders, into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded.

h. By placing Deceptive Orders to *buy* precious metals futures contracts, the Defendants and their co-conspirators intended to create the false impression in the market of increased demand in an effort to drive *up* the prices of those futures contracts.

i. By placing Deceptive Orders to *sell* precious metals futures contracts, the Defendants and their co-conspirators intended to create the false impression in the market of increased supply in an effort to drive *down* the prices of those futures contracts.

j. In either situation, the Defendants and their co-conspirators placed Deceptive Orders with the intent to fraudulently and artificially move the price of a given precious metals futures contract in a manner that would increase the likelihood that one or more of their own opposite-side Genuine Orders would be filled by other market participants, allowing the Defendants and their co-conspirators to generate trading profits and avoid losses for themselves and other members of the Precious Metals Desk at Bank A, the Precious Metals Desk itself, and ultimately, Bank A.

k. Once the Defendants and their co-conspirators successfully used their Deceptive Orders to get their Genuine Orders filled (either in whole or in part), they attempted to, and generally did, quickly cancel their Deceptive Orders before they could be executed. Sometimes, however, they were unable to cancel quickly enough, and had to accept unintended (and unwanted) executions of their Deceptive Orders.

26. The Defendants and their co-conspirators defrauded clients of Bank A who had bought or sold barrier options, by trading in a manner that was calculated to push the price of the underlying assets away from the price point at which Bank A

would lose money on the options and toward the price point at which Bank A would profit from the options. More specifically:

a.     The Defendants and their co-conspirators engaged in barrier-*running* by placing orders for precious metals futures contracts in a manner that was intended to deliberately trigger barrier options held by Bank A.

b.     The Defendants and their co-conspirators also engaged in barrier-*defending* by placing orders for precious metals futures contracts in a manner that was intended to deliberately avoid triggering barrier options held by clients of Bank A.

27.     The Defendants and their co-conspirators perpetuated the racketeering conspiracy and shielded their unlawful activities from detection and themselves from discipline by lying to and otherwise deceiving Bank A, the CME Group, and the CFTC about their trading practices. More specifically:

a.     Bank A relied on employee compliance with internal policies that prohibited manipulative, fraudulent, and deceptive trading practices. Employees were required to comply with these policies and to certify their compliance annually.

b.     Throughout the Conspiracy Period, the Defendants and their co-conspirators falsely and fraudulently represented to Bank A in their annual certifications that they were in compliance with all applicable policies promulgated by Bank A.

c.  Beginning in 2011, the Defendants and their co-conspirators also falsely and fraudulently represented to Bank A in their annual certifications that they had reported any known or suspected violations of Bank A's policies, or of any laws or regulations applicable to Bank A's business.

d.  In connection with internal reviews of their trading practices, certain of the Defendants and their co-conspirators knowingly and intentionally made false statements to compliance officers and other employees of Bank A.

e.  Certain of the Defendants and their co-conspirators knowingly and intentionally made false statements to the CME Group and the CFTC in connection with inquiries into the trading practices of the Defendants and their co-conspirators.

## Acts in Furtherance of the Racketeering Conspiracy

28.  In furtherance of the racketeering conspiracy, and to achieve its purposes, the Defendants and their co-conspirators committed and caused to be committed the following acts, among others, in the Northern District of Illinois, Eastern Division, and elsewhere:

29.  SMITH executed the following trading sequences, among others, involving Deceptive Orders:

a.  On May 27, 2008, at 8:39:56.313 a.m., SMITH placed a Genuine Order to sell 7 silver futures contracts at $17.575. Beginning at 8:40:06.041 a.m., SMITH placed 13 layered Deceptive Orders to buy 7

contracts each (91 contracts total) from $17.555 to $17.565. Beginning at 8:40:09.266 a.m., all 7 contracts in SMITH's Genuine Order were filled. Beginning at 8:40:09.935 a.m., SMITH canceled his Deceptive Orders.

b.      On October 20, 2008, at 6:37:35.033 a.m., SMITH placed a Genuine Order to sell 7 gold futures contracts at $800.90. Beginning at 6:38:28.140 a.m., SMITH placed 11 layered Deceptive Orders to buy 7 contracts each (77 contracts total) from $800.50 to $800.80. Beginning at 6:38:29.685 a.m., 6 of the 7 contracts in SMITH's Genuine Order were filled. Beginning at 6:38:30.472 a.m., SMITH canceled his Deceptive Orders.

c.      On February 24, 2009, at 7:35:35.110 a.m., SMITH placed a Genuine Order to sell 7 gold futures contracts at $988.90. Beginning at 7:36:22.305 a.m., SMITH placed 11 layered Deceptive Orders to buy 7 contracts each (77 contracts total) from $988.60 to $988.80. Beginning at 7:36:23.508 a.m., 3 of the 7 contracts in SMITH's Genuine Order were filled. Beginning at 7:36:24.465 a.m., SMITH canceled his Deceptive Orders.

d.      On May 21, 2009, at 8:09:09.512 a.m., SMITH placed a Genuine Order to sell 7 gold futures contracts at $939.90. Beginning at 8:09:10.038 a.m., SMITH placed 8 layered Deceptive Orders to buy 7 contracts each (56 contracts total) from $939.60 to $939.80. Beginning at 8:09:10.409 a.m., all 7 contracts in SMITH's Genuine Order were filled. Beginning at 8:09:11.592 a.m., SMITH canceled his Deceptive Orders.

e.     On November 10, 2009, at 9:28:26.000 a.m., SMITH placed a Genuine Order to buy 7 gold futures contracts at $1,107.70. Beginning at 9:28:43.219 a.m., SMITH placed 13 layered Deceptive Orders to sell 7 contracts each (91 contracts total) from $1,108.10 to $1,107.80. Beginning at 9:28:45.146 a.m., all 7 contracts in SMITH's Genuine Order were filled. Beginning at 9:28:45.500 a.m., SMITH canceled his Deceptive Orders.

f.     On February 11, 2010, at 9:59:54.723 a.m., SMITH placed a Genuine Order to sell 8 gold futures contracts at $1,079.90. Beginning at 9:59:55.517 a.m., SMITH placed 19 layered Deceptive Orders to buy 8 contracts each (152 contracts total) from $1,079.50 to $1,079.80. Beginning at 9:59:58.440 a.m., all 8 contracts in SMITH's Genuine Order were filled. Beginning at 9:59:59.026 a.m., SMITH canceled his Deceptive Orders.

g.     On January 5, 2011, at 7:48:47.809 a.m., SMITH placed a Genuine Order to sell 10 gold futures contracts at $1,375.70. Beginning at 7:48:48.370 a.m., SMITH placed 5 layered Deceptive Orders to buy 10 contracts each (50 contracts total) from $1,375.50 to $1,375.60. Beginning at 7:48:48.825 a.m., all 10 contracts in SMITH's Genuine Order were filled. Beginning at 7:48:49.382 a.m., SMITH canceled his Deceptive Orders.

h.     On November 29, 2011, at 10:16:13.123 a.m., SMITH placed a Genuine Order to sell 5 silver futures contracts at $31.800. Beginning at 10:16:13.850 a.m., SMITH placed 8 layered Deceptive Orders to buy 10 contracts each (80 contracts total) from $31.770 to $31.790. Beginning at

10:16:15.116 a.m., all 5 contracts in SMITH's Genuine Order were filled. Beginning at 10:16:15.591 a.m., SMITH canceled his Deceptive Orders.

i.      On May 10, 2012, at 8:29:52.936 a.m., SMITH placed an iceberg Genuine Order to buy 10 gold futures contracts at $1,597.80. Beginning at 8:30:00.798 a.m., SMITH placed 15 layered Deceptive Orders to sell 10 contracts each (150 contracts total) from $1,598.50 to $1,597.90. Beginning at 8:30:02.294 a.m., all 10 contracts in SMITH's Genuine Order were filled. Beginning at 8:30:03.472 a.m., SMITH canceled his Deceptive Orders.

j.      On July 13, 2012, at 10:00:15.293 a.m., SMITH placed a Genuine Order to sell 5 silver futures contracts at $27.375. Beginning at 10:00:15.886 a.m., SMITH placed 6 layered Deceptive Orders to buy 10 contracts each (60 contracts total) from $27.360 to $27.370. Beginning at 10:00:16.423 a.m., all 5 contracts in SMITH's Genuine Order were filled. Beginning at 10:00:17.106 a.m., SMITH canceled his Deceptive Orders.

k.      On March 5, 2013, at 8:59:38.795 a.m., SMITH placed a Genuine Order to sell 10 gold futures contracts at $1,582.70. Beginning at 8:59:39.254 a.m., SMITH placed 17 layered Deceptive Orders to buy 10 contracts each (170 contracts total) from $1,581.90 to $1,582.60. Beginning at 8:59:41.849 a.m., all 10 contracts in SMITH's Genuine Order were filled. Beginning at 8:59:42.196 a.m., SMITH canceled his Deceptive Orders.

l.      On May 14, 2013, at 10:21:36.511 a.m., SMITH placed an iceberg Genuine Order to sell 3 silver futures contracts at $23.520. Beginning at

10:22:20.339 a.m., SMITH placed 8 layered Deceptive Orders to buy 10 contracts each (80 contracts total) from $23.505 to $23.515. Beginning at 10:22:21.832 a.m., all 3 contracts in SMITH's Genuine Order were filled. Beginning at 10:22:22.191 a.m., SMITH canceled his Deceptive Orders.

  m.   On March 4, 2014, beginning at 7:25:20.414 a.m., SMITH placed a Genuine Order to sell 5 gold futures contracts at $1,334.30. Beginning at 7:25:21.138 a.m., SMITH placed 10 layered Deceptive Orders to buy 10 contracts each (100 contracts total) from $1,334.00 to $1,334.20. Beginning at 7:25:23.067 a.m., all 5 contracts in SMITH's Genuine Order were filled. Beginning at 7:25:23.683 a.m., SMITH canceled his Deceptive Orders.

  n.   On March 7, 2014, beginning at 8:29:30.509 a.m., SMITH placed a Genuine Order to buy 5 silver futures contracts at $20.780. Beginning at 8:30:07.485 a.m., SMITH placed 6 layered Deceptive Orders to sell 10 contracts each (60 contracts total) from $20.805 to $20.795. Beginning at 8:30:07.899 a.m., all 5 contracts in SMITH's Genuine Order were filled. Beginning at 8:30:08.930 a.m., SMITH canceled his Deceptive Orders.

  o.   On October 15, 2014, beginning at 8:54:17.030 a.m., SMITH placed a Genuine Order to buy 5 gold futures contracts at $1,242.80. Beginning at 8:54:31.090 a.m., SMITH placed 8 layered Deceptive Orders to sell 10 contracts each (80 contracts total) from $1,243.50 to $1,243.10. Beginning at 8:54:32.290 a.m., 2 of the 5 contracts in SMITH's Genuine Order were filled. Beginning at 8:54:32.947 a.m., SMITH canceled his Deceptive Orders.

p.    On November 26, 2014, beginning at 11:06:07.942 a.m., SMITH placed a Genuine Order to buy 2 gold futures contracts at $1,198.20. Beginning at 11:06.28.039 a.m., SMITH placed 3 layered Deceptive Orders to sell 10 contracts each (30 contracts total) from $1,198.50 to $1,198.40. Beginning at 11:06:29.553 a.m., 1 of the 2 contracts in SMITH's Genuine Order were filled. Beginning at 11:06:29.663 a.m., SMITH canceled his Deceptive Orders.

q.    On December 1, 2014, beginning at 9:49:20.147 a.m., SMITH placed a Genuine Order to buy 5 gold futures contracts at $1,197.60. Beginning at 9:49:28.241 a.m., SMITH placed 4 layered Deceptive Orders to sell 10 contracts each (40 contracts total) from $1,198.10 to $1,197.80. Beginning at 9:49:28.759 a.m., all 5 contracts in SMITH's Genuine Order were filled. Beginning at 9:49:29.525 a.m., SMITH canceled his Deceptive Orders.

r.    On December 5, 2014, beginning at 7:09:29.133 a.m., SMITH placed a Genuine Order to buy 3 gold futures contracts at $1,205.40. Beginning at 7:09:47.228 a.m., SMITH placed 4 layered Deceptive Orders to sell 10 contracts each (40 contracts total) from $1,205.70 to $1,205.60. Beginning at 7:09:48.364 a.m., all 3 contracts in SMITH's Genuine Order were filled. Beginning at 7:09:48.479 a.m., SMITH canceled his Deceptive Orders.

s.    On January 9, 2015, beginning at 9:03:18.573 a.m., SMITH placed a Genuine Order to sell 10 gold futures contracts at $1,215.80. Beginning at 9:03:19.345 a.m., SMITH placed 8 layered Deceptive Orders to buy 10 contracts each (80 contracts total) from $1,215.20 to $1,215.70.

Beginning at 9:03:21.138 a.m., all 10 contracts in SMITH's Genuine Order were filled. Beginning at 9:03:21.624 a.m., SMITH canceled his Deceptive Orders.

t.      On February 23, 2015, beginning at 7:42:13.441 a.m., SMITH placed a Genuine Order to buy 2 gold futures contracts at $1,200.20. Beginning at 7:43:02.015 a.m., SMITH placed 5 layered Deceptive Orders to sell 10 contracts each (50 contracts total) from $1,200.50 to $1,200.30. Beginning at 7:43:02.603 a.m., both contracts in SMITH's Genuine Order were filled. Beginning at 7:43:03.261 a.m., SMITH canceled his Deceptive Orders.

u.      On March 19, 2015, beginning at 7:35:01.891 a.m., SMITH placed a Genuine Order to sell 4 gold futures contracts at $1,161.50. Beginning at 7:35:02.372 a.m., SMITH placed 7 layered Deceptive Orders to buy 10 contracts each (70 contracts total) from $1,161.20 to $1,161.30. Beginning at 7:35:03.451 a.m., all 4 contracts in SMITH's Genuine Order were filled. Beginning at 7:35:04.046 a.m., SMITH canceled his Deceptive Orders.

v.      On April 17, 2015, beginning at 7:32:57.989 a.m., SMITH placed a Genuine Order to buy 3 gold futures contracts at $1,202.90. Beginning at 7:34:44.056 a.m., SMITH placed 6 layered Deceptive Orders to sell 10 contracts each (60 contracts total) from $1,203.90 to $1,203.70. Beginning at 7:34:44.723 a.m., all 3 contracts in SMITH's Genuine Order were filled. Beginning at 7:34:45.527 a.m., SMITH canceled his Deceptive Orders.

30.     NOWAK executed the following trading sequences, among others, involving Deceptive Orders:

a.     On September 22, 2009, at 7:52:13.329 a.m., NOWAK placed an iceberg Genuine Order to sell 10 gold futures contracts at $1,018.60. Beginning at 7:52:15.993 a.m., NOWAK placed 7 layered Deceptive Orders to buy 10 contracts each (70 contracts total) from $1,018.20 to $1,018.50. Beginning at 7:52:16.935 a.m., all 10 contracts in NOWAK's Genuine Order were filled. Beginning at 7:52:17.120 a.m., NOWAK canceled his Deceptive Orders.

b.     On September 25, 2009, at 7:27:19.234 a.m., NOWAK placed a Genuine Order to sell 10 gold futures contracts at $996.90. NOWAK subsequently was able to fill 2 of those 10 contracts. Beginning at 7:27:24.463 a.m., NOWAK placed 6 layered Deceptive Orders to buy 10 contracts each (60 contracts total) from $996.60 to $996.70. Beginning at 7:27:25.241 a.m., the remaining 8 contracts in NOWAK's Genuine Order were filled. Beginning at 7:27:25.713 a.m., NOWAK canceled his Deceptive Orders.

c.     On November 4, 2010, at 10:10:33.508 a.m., NOWAK placed an iceberg Genuine Order to buy 10 gold futures contracts at $1,380.70. Beginning at 10:10:36.736 a.m., NOWAK placed 10 layered Deceptive Orders to sell 10 contracts each (100 contracts total) from $1,381.40 to $1,380.80. Beginning at 10:10:39.537 a.m., all 10 contracts in NOWAK's Genuine Order were filled. Beginning at 10:10:40.152 a.m., NOWAK canceled his Deceptive Orders.

   d. On December 27, 2010, at 11:31:44.863 a.m., NOWAK placed an iceberg Genuine Order to buy 10 gold futures contracts at $1,381.00. Beginning at 11:31:46.865 a.m., NOWAK placed 6 layered Deceptive Orders to sell 10 contracts each (60 contracts total) from $1,381.40 to $1,381.10. Beginning at 11:31:47.731 a.m., all 10 contracts in NOWAK's Genuine Order were filled. Beginning at 11:31:48.599 a.m., NOWAK canceled his Deceptive Orders.

   e. On April 13, 2011, at 7:54:31.181 a.m., NOWAK placed an iceberg Genuine Order to buy 10 gold futures contracts at $1,461.90. Beginning at 7:54:34.821 a.m., NOWAK placed 12 layered Deceptive Orders to sell 10 contracts each (120 contracts total) from $1,462.70 to $1,462.00. Beginning at 7:54:39.027 a.m., all 10 contracts in NOWAK's Genuine Order were filled. Beginning at 7:54:39.732 a.m., NOWAK canceled his Deceptive Orders.

   f. On April 13, 2011, at 8:18:18.411 a.m., NOWAK placed an iceberg Genuine Order to buy 10 gold futures contracts at $1,462.00. NOWAK subsequently was able to fill 2 of those 10 contracts. Beginning at 8:18:24.656 a.m., NOWAK placed 8 layered Deceptive Orders to sell 10 contracts each (80 contracts total) from $1,462.40 to $1,462.10. Beginning at 8:18:26.076 a.m., the remaining 8 contracts in NOWAK's Genuine Order were filled. Beginning at 8:18:27.055 a.m., NOWAK canceled his Deceptive Orders.

   g. On February 6, 2012, at 7:47:41.128 a.m., NOWAK placed an iceberg Genuine Order to sell 5 gold futures contracts at $1,717.80. Beginning at 7:47:43.409 a.m., NOWAK placed 11 layered Deceptive Orders to buy 5

contracts each (55 contracts total) from $1,716.90 to $1,717.60. Beginning at 7:47:45.349 a.m., all 5 contracts in NOWAK's Genuine Order were filled. Beginning at 7:47:46.527 a.m., NOWAK canceled his Deceptive Orders.

h.      On September 18, 2012, at 9:12:09.458 a.m., NOWAK placed an iceberg Genuine Order to sell 5 gold futures contracts at $1,772.40. Beginning at 9:12:41.986 a.m., NOWAK placed 26 layered Deceptive Orders to buy 5 contracts each (130 contracts total) from $1,771.20 to $1,772.30. Beginning at 9:12:46.390 a.m., all 5 contracts in NOWAK's Genuine Order were filled. Beginning at 9:12:48.034 a.m., NOWAK canceled his Deceptive Orders.

i.      On October 15, 2012, at 8:30:56.097 a.m., NOWAK placed an iceberg Genuine Order to buy 5 gold futures contracts at $1,744.60. NOWAK subsequently was able to fill 2 of those 5 contracts. Beginning at 8:31:07.145 a.m., NOWAK placed 32 layered Deceptive Orders to sell 5 contracts each (160 contracts total) from $1,745.60 to $1,744.70. Beginning at 8:31:15.803 a.m., the remaining 3 contracts in NOWAK's Genuine Order were filled. Beginning at 8:31:18.530 a.m., NOWAK canceled his Deceptive Orders.

j.      On November 1, 2013, at 7:50:23.384 a.m., NOWAK placed a Genuine Order to sell 5 gold futures contracts at $1,313.50. Beginning at 7:50:24.550 a.m., NOWAK placed 7 layered Deceptive Orders to buy 5 contracts each (35 contracts total) from $1,313.00 to $1,313.40. Beginning at 7:50:26.263 a.m., all 5 contracts in NOWAK's Genuine Order were filled. Beginning at 7:50:26.782 a.m., NOWAK canceled his Deceptive Orders.

k.  On October 1, 2013, at 3:07:41.863 p.m., NOWAK placed a Genuine Order to sell 5 gold futures contracts at $1,290.10. Beginning at 3:07:43.253 p.m., NOWAK placed 14 layered Deceptive Orders to buy 5 contracts each (70 contracts total) from $1,289.40 to $1,290.00. Beginning at 3:07:45.708 p.m., all 5 contracts in NOWAK's Genuine Order were filled. Beginning at 3:07:46.503 p.m., NOWAK canceled his Deceptive Orders.

l.  On February 7, 2014, beginning at 8:42:43.173 a.m., NOWAK placed a Genuine Order to sell 5 gold futures contracts at $1,259.20. Beginning at 8:43:35.112 a.m., NOWAK placed 14 layered Deceptive Orders to buy 5 contracts each (70 contracts total) from $1,258.40 to $1,259.10. Beginning at 8:43:38.157 a.m., all 5 contracts in NOWAK's Genuine Order were filled. Beginning at 8:43:38.857 a.m., NOWAK canceled his Deceptive Orders.

m.  On February 7, 2014, at 8:53:12.330 a.m., NOWAK placed a Genuine Order to sell 5 gold futures contracts at $1,260.30. Beginning at 8:53:15.927 a.m., NOWAK placed 9 layered Deceptive Orders to buy 5 contracts each (45 contracts total) from $1,259.50 to $1,260.20. Beginning at 8:53:17.381 a.m., all 5 contracts in NOWAK's Genuine Order were filled. Beginning at 8:53:18.315 a.m., NOWAK canceled his Deceptive Orders.

n.  On March 3, 2014, at 8:02:17.997 a.m., NOWAK placed a Genuine Order to sell 5 gold futures contracts at $1,348.20. Beginning at 8:02:19.360 a.m., NOWAK placed 6 layered Deceptive Orders to buy 5 contracts each (30 contracts total) from $1,347.90 to $1,348.10. Beginning at 8:02:21.529 a.m., all

5 contracts in NOWAK's Genuine Order were filled. Beginning at 8:02:22.257 a.m., NOWAK canceled his Deceptive Orders.

31. JORDAN executed the following trading sequences, among others, involving Deceptive Orders:

a. On September 29, 2009, at 7:49:53.973 a.m., JORDAN placed an iceberg Genuine Order to buy 15 silver futures contracts at $16.055. JORDAN subsequently was able to fill 5 of those 15 contracts. At 7:49:58.613 a.m., JORDAN placed a Deceptive Order to sell 105 contracts at $16.060. Beginning at 7:49:58.624 a.m., the remaining 10 contracts in JORDAN's Genuine Order were filled. At 7:49:59.575 a.m., JORDAN canceled his Deceptive Order.

b. On September 29, 2009, at 12:17:10.707 p.m., JORDAN placed an iceberg Genuine Order to buy 15 silver futures contracts at $16.190. At 12:18:28.091 p.m., JORDAN placed a Deceptive Order to sell 105 contracts at $16.195. Beginning at 12:18:28.103 p.m., 13 of the 15 contracts in JORDAN's Genuine Order were filled. At 12:18:29.096 p.m., JORDAN canceled his Deceptive Order.

c. On October 15, 2009, at 7:01:19.564 a.m., JORDAN placed an iceberg Genuine Order to buy 15 silver futures contracts at $17.440. At 7:01:40.679 a.m., JORDAN placed a Deceptive Order to sell 105 contracts at $17.445. Beginning at 7:01:40.701 a.m., all 15 contracts in JORDAN's Genuine Order were filled. At 7:01:41.639 a.m., JORDAN canceled his Deceptive Order.

d.      On October 15, 2009, at 9:32:33.976 a.m., JORDAN placed an iceberg Genuine Order to buy 14 silver futures contracts at $17.615. At 9:32:36.224 a.m., JORDAN placed a Deceptive Order to sell 105 contracts at $17.620. Beginning at 9:32:36.248 a.m., all 14 contracts in JORDAN's Genuine Order were filled. At 9:32:37.180 a.m., JORDAN canceled his Deceptive Order.

e.      On October 15, 2009, at 10:04:05.991 a.m., JORDAN placed an iceberg Genuine Order to buy 15 silver futures contracts at $17.690. At 10:04:15.382 a.m., JORDAN placed a Deceptive Order to sell 105 contracts at $17.695. Beginning at 10:04:15.418 a.m., 11 of the 15 contracts in JORDAN's Genuine Order were filled. At 10:04:16.152 a.m., JORDAN canceled his Deceptive Order.

f.      On October 19, 2009, at 9:45:19.150 a.m., JORDAN placed an iceberg Genuine Order to buy 15 silver futures contracts at $17.535. At 9:45:21.288 a.m., JORDAN placed a Deceptive Order to sell 105 contracts at $17.540. Beginning 9:45:21.344 a.m., 11 of the 15 contracts in JORDAN's Genuine Order were filled. At 9:45:21.883 a.m., JORDAN canceled his Deceptive Order.

g.      On October 26, 2009, at 11:42:32.530 a.m., JORDAN placed an iceberg Genuine Order to buy 20 silver futures contracts at $17.365. At 11:42:44.391 a.m., JORDAN placed a Deceptive Order to sell 105 contracts at $17.370. Beginning at 11:42:44.421 a.m., 13 of the 20 contracts in JORDAN's

Genuine Order were filled. At 11:42:45.184 a.m., JORDAN canceled his Deceptive Order.

h.  On November 10, 2009, at 10:59:35.131 a.m., JORDAN placed an iceberg Genuine Order to sell 25 silver futures contracts at $17.250. At 10:59:40.540 a.m., JORDAN placed a Deceptive Order to buy 500 contracts at $17.245. Beginning at 10:59:40.554 a.m., 16 of the 25 contracts in JORDAN's Genuine Order were filled. At 10:59:41.488 a.m., JORDAN canceled his Deceptive Order.

32.  CC-1 executed the following trading sequences, among others, involving Deceptive Orders:

a.  On January 22, 2013, at 4:29:15.679 a.m., CC-1 placed a Genuine Order to buy 5 silver futures contracts at $32.020. At 4:29:20.273 a.m., CC-1 placed a Deceptive Order to sell 100 contracts at $32.030. Beginning at 4:29:20.276 a.m., all 5 contracts in CC-1's Genuine Order were filled. At 4:29:21.148 a.m., CC-1 canceled his Deceptive Order.

b.  On March 8, 2013, at 8:55:39.396 a.m., CC-1 placed an iceberg Genuine Order to sell 15 silver futures contracts at $28.880. At 8:55:45.692 a.m., CC-1 placed a Deceptive Order to buy 100 contracts at $28.865. Beginning at 8:55:45.909 a.m., all 15 contracts in CC-1's Genuine Order were filled. At 8:55:46.503 a.m., CC-1 canceled his Deceptive Order.

c.  On October 21, 2013, at 4:04:49.057 a.m., CC-1 placed an iceberg Genuine Order to buy 17 gold futures contracts at $1,317.10. At

4:07:02.498 a.m., CC-1 placed a Deceptive Order to sell 100 contracts at $1,317.50. Beginning at 4:07:02.500 a.m., all 17 contracts in CC-1's Genuine Order were filled. At 4:07:03.466 a.m., CC-1 canceled his Deceptive Order.

d.     On December 10, 2013, at 1:59:22.386 a.m., CC-1 placed an iceberg Genuine Order to sell 20 silver futures contracts at $19.970. At 1:59:26.901 a.m., CC-1 placed a Deceptive Order to buy 100 contracts at $19.960. Beginning at 1:59:26.902 a.m., all 20 contracts in CC-1's Genuine Order were filled. At 1:59:27.729 a.m., CC-1 canceled his Deceptive Order.

e.     On January 14, 2014, at 9:05:57.063 a.m., CC-1 placed an iceberg Genuine Order to buy 20 silver futures contracts at $20.415. CC-1 subsequently was able to fill 10 of those 20 contracts. At 9:06:52.127 a.m., CC-1 placed a Deceptive Order to sell 100 contracts at $20.425. Beginning at 9:06:52.225 a.m., the remaining 10 contracts in CC-1's Genuine Order were filled. At 9:06:53.048 a.m., CC-1 canceled his Deceptive Order.

33.     CC-2 executed the following trading sequences, among others, involving Deceptive Orders:

a.     On November 18, 2009, at 10:34:48.576 a.m., CC-2 placed an iceberg Genuine Order to sell 50 gold futures contracts at $1,147.60. CC-2 subsequently was able to fill 15 of those 50 contracts. Beginning at 10:39:06.836 a.m., CC-2 placed 12 layered Deceptive Order to buy 50 contracts each (600 contracts total) from $1,146.80 to $1,147.30. Beginning at 10:39:09.799 a.m., 34 of the remaining 35 contracts in CC-2's Genuine Order

were filled. Beginning at 10:39:13.807 a.m., CC-2 canceled his Deceptive Orders.

b.      On June 23, 2010, at 9:40:58.636 a.m., CC-2 placed a Genuine Order to sell 20 silver futures contracts at $18.400. At 9:44:43.562 a.m., CC-2 placed a Deceptive Order to buy 100 contracts at $18.375. Beginning at 9:45:04.205 a.m., all 20 contracts in CC-2's Genuine Order were filled. At 9:45:05.921 a.m., CC-2 canceled his Deceptive Order.

c.      On June 23, 2010, at 9:49:54.615 a.m., CC-2 placed a Genuine Order to sell 20 silver futures contracts at $18.420. At 9:54:00.010 a.m., CC-2 placed a Deceptive Order to buy 100 contracts at $18.400. Beginning at 9:54:03.994 a.m., all 20 contracts in CC-2's Genuine Order were filled. At 9:54:16.119 a.m., CC-2 canceled his Deceptive Order.

d.      On July 2, 2010, at 5:28:29.942 a.m., CC-2 placed an iceberg Genuine Order to sell 50 gold futures contracts at $1,212.70. Beginning at 5:38:00.156 a.m., CC-2 placed 9 layered Deceptive Orders to buy 50 contracts each (450 contracts total) from $1,211.90 to $1,212.20. Beginning at 5:38:02.714 a.m., all 50 contracts in CC-2's Genuine Order were filled. Beginning at 5:38:04.751 a.m., CC-2 canceled his Deceptive Orders.

e.      On February 15, 2011, at 3:37:09.983 a.m., CC-2 placed a Genuine Order to sell 50 gold futures contracts at $1,372.60. Beginning at 3:40:24.440 a.m., CC-2 placed 6 layered Deceptive Orders to buy 50 contracts each (300 contracts total) from $1,372.00 to $1,372.10. Beginning at

3:40:27.703 a.m., all 50 contracts in CC-2's Genuine Order were filled. Beginning at 3:40:31.881 a.m., CC-2 canceled his Deceptive Orders.

34.     On May 27, 2008, in an electronic chat, CC-3 informed NOWAK that SMITH "just bid it up to. . . sell." At approximately the same time, SMITH was engaged in the trading sequence involving Deceptive Orders alleged in Paragraph 29(a) above.

35.     On February 24, 2009, in an electronic chat, Trunz had the following conversation with CC-7:

| | |
|---|---|
| Trunz: | so you know its gregg bidding up on the futures trying to get some off |
| CC-7: | sweet mate |
| Trunz: | Incase you were watching some large bids come into market |
| CC-7: | appreesh |
| CC-7: | that worked ! |

At approximately the same time, SMITH was engaged in the trading sequence involving Deceptive Orders alleged in Paragraph 29(c) above.

36.     On September 24, 2009, in an electronic chat, CC-3 had the following conversation with CC-4:

| | |
|---|---|
| CC-3: | I offered a lot of sil switches 100 to 200 a switch. Spoofed locals aftewr number and hopefully mr s h a q |
| CC-4: | good man |

37.     On November 18, 2009, in an electronic chat, CC-2 informed NOWAK: "I'm going to sell some gold up here no massive need to be long 50k." At approximately the same time, CC-2 was engaged in the trading sequence involving Deceptive Orders alleged in Paragraph 33(a) above.

38. On June 16, 2011, in an electronic chat, JORDAN made statements to Edmonds about traders who used algorithms: "they r so friggin annoying. i havent tried to play any games yet but assuming if i need to get something big done itll be easy to get em. does that still seem to work?"

39. On September 16, 2010, JORDAN was interviewed by the CFTC in connection with a CFTC inquiry into the manipulation of silver prices. During the interview, JORDAN knowingly and intentionally gave false answers to questions from a CFTC investigator.

40. On October 17, 2013, SMITH was interviewed by the CME Group in connection with a CME Group inquiry into SMITH's trading practices. During the interview, SMITH knowingly and intentionally gave false answers to questions from a CME Group investigator.

41. On the following dates, the Defendants made false and fraudulent representations to Bank A when they signed annual compliance attestations to Bank A that stated:

> I hereby affirm that I have read, understand, and am in compliance with the provisions of the [Bank A] Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me[.]
>
> . . .
>
> I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me[.]

| Trader | Date |
| --- | --- |
| SMITH | June 16, 2009; August 16, 2010 |
| NOWAK | June 25, 2008; May 26, 2009; June 14, 2010 |
| JORDAN | September 23, 2008; July 24, 2009 |

42.    On the following dates, the Defendants made false and fraudulent representations to Bank A when they signed annual compliance attestations to Bank A that stated:

> I hereby affirm that I have read, understand, and am in compliance with the provisions of the [Bank A] Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me[. . . .] I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me[.]

> I affirm that I have reported any violations of the Code, internal firm policies, or laws or regulations applicable to the firm's business which I know of or suspect[. . . .]

| Trader | Date |
|---|---|
| SMITH | May 27, 2011; July 18, 2012; July 17, 2013; August 13, 2014; August 10, 2015; July 20, 2016 |
| NOWAK | May 11, 2011; June 1, 2012; June 21, 2013; August 18, 2014; July 8, 2015; August 5, 2016 |

All in violation of Title 18, United States Code, Section 1962(d).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT TWO
(Conspiracy to Commit Price Manipulation, Bank Fraud, Wire Fraud Affecting a Financial Institution, Commodities Fraud, and Spoofing)

43.    The allegations in Paragraphs 1 through 15, 17 through 20, and 25 through 42 above are re-alleged and incorporated as if fully stated herein.

44.    Between May 2008 and August 2016, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants GREGG SMITH, MICHAEL NOWAK, and CHRISTOPHER JORDAN willfully and knowingly conspired with each other, and with other individuals known

and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

        a.      Wire fraud affecting a financial institution, that is, to knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted writings, signs, signals, pictures, and sounds by means of wire communication in interstate and foreign commerce for the purpose of executing the scheme and artifice to defraud, all affecting one or more financial institutions, including Bank A and other financial institutions, as well as other participants in the precious metals futures markets, in violation of Title 18, United States Code, Section 1343;

        b.      Bank fraud, that is, to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, including Bank A and other financial institutions who were participants in the precious metals futures markets, in violation of Title 18, United States Code, Section 1344(1);

        c.      Commodities fraud, that is, to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, that is, gold, silver, platinum, and palladium futures contracts, in violation of Title 18, United States Code, Section 1348(1);

d.  Price manipulation, that is, to knowingly and with the intent to create an artificial price, by acting with the purpose and conscious object of causing and effecting a price and price trend in the market that does not reflect the legitimate forces of supply and demand, manipulate the price of one or more commodities for future delivery (namely, gold, silver, platinum, and palladium futures contracts), on and subject to the rules of a registered entity, including COMEX and NYMEX, in violation of Title 7, United States Code, Section 13(a)(2); and

e.  Spoofing, that is, to knowingly engage in trading, practice, and conduct on and subject to the rules of a registered entity, including COMEX and NYMEX, that was "spoofing," that is bidding and offering with the intent, at the time the bid and offer was placed, to cancel the bid and offer before execution, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

## Purposes of the Conspiracy

45.  The purposes of the conspiracy included the following, among others:

a.  Maximizing trading profits and minimizing losses for the Defendants and their co-conspirators, the Precious Metals Desk at Bank A, and Bank A itself through unlawful trading practices;

b.  Promoting and enhancing the conspiracy and the activities of the Defendants and their co-conspirators; and

       c.     Concealing the unlawful activities of the Defendants and their co-conspirators from scrutiny by Bank A, the CME, the CFTC, and law enforcement.

## Manner and Means of the Conspiracy

46.    The manner and means by which the Defendants and their co-conspirators sought to accomplish and did accomplish the purposes of the conspiracy included the following:

47.    The allegations in Paragraphs 25 through 27 above are re-alleged and incorporated as if fully stated herein.

## Overt Acts

48.    In furtherance of the conspiracy, and to achieve its purposes, the Defendants and their co-conspirators committed and caused to be committed the following overt acts, among others, in the Northern District of Illinois, Eastern Division, and elsewhere:

49.    The allegations in Paragraphs 29 through 42 above are re-alleged and incorporated as if fully stated herein.

All in violation of Title 18, United States Code, Section 371.

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT THREE
(Attempted Price Manipulation)

50.    The allegations in Paragraphs 1 through 15, 17 through 20, 25, 26, and 29 above are re-alleged and incorporated as if fully stated herein.

51. From January 2008 until June 2015, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, GREGG SMITH, while a precious metals trader at Banks A and B, did knowingly and with the intent to create an artificial price, that is, acting with the purpose and conscious object of causing and effecting a price and price trend in the market that does not reflect the legitimate forces of supply and demand, attempt to manipulate the price of a commodity for future delivery (namely, gold, silver, platinum, and palladium futures contracts), on and subject to the rules of a registered entity, including COMEX and NYMEX.

52. In furtherance thereof, SMITH did commit, and cause to be committed, the overt acts alleged in Paragraph 29 above, among others, in the Northern District of Illinois, Eastern Division, and elsewhere.

All in violation of Title 7, United States Code, Section 13(a)(2).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT FOUR
### (Attempted Price Manipulation)

53. The allegations in Paragraphs 1 through 15, 17 through 20, 25, 26, and 30 above are re-alleged and incorporated as if fully stated herein.

54. From May 2008 until April 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, MICHAEL NOWAK, while a supervisor and precious metals trader at Bank A, did knowingly and with the intent to create an artificial price, that is, acting with the purpose and conscious object of causing and effecting a price and price trend

in the market that does not reflect the legitimate forces of supply and demand, attempt to manipulate the price of a commodity for future delivery (namely, gold, silver, platinum, and palladium futures contracts), on and subject to the rules of a registered entity, including COMEX and NYMEX.

55.     In furtherance thereof, NOWAK did commit, and cause to be committed, the overt acts alleged in Paragraph 30 above, among others, in the Northern District of Illinois, Eastern Division, and elsewhere.

All in violation of Title 7, United States Code, Section 13(a)(2).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT FIVE
(Bank Fraud)

56.     The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 29, and 40 through 42 above are re-alleged and incorporated as if fully stated herein.

57.     Beginning in May 2008 and continuing until June 2015, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, GREGG SMITH, while a precious metals trader at Bank A, knowingly and with the intent to defraud executed and attempted to execute a scheme and artifice to defraud one or more financial institutions, including Bank A and other financial institutions who were participants in the precious metals futures markets.

All in violation of Title 18, United States Code, Section 1344(1).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT SIX
(Bank Fraud)

58.     The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 30, 34, 37, 41, and 42 above are re-alleged and incorporated as if fully stated herein.

59.     Beginning in May 2008 and continuing until April 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, MICHAEL NOWAK, while a supervisor and precious metals trader at Bank A, knowingly and with the intent to defraud executed and attempted to execute a scheme and artifice to defraud one or more financial institutions, including Bank A and other financial institutions who were participants in the precious metals futures markets.

All in violation of Title 18, United States Code, Section 1344(1).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT SEVEN
(Bank Fraud)

60.     The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 31, 38, 39, and 41 above are re-alleged and incorporated as if fully stated herein.

61.     Beginning in January 2008 and continuing until October 2011, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, CHRISTOPHER JORDAN, while a precious metals trader at Banks A and C and Company D, knowingly and with the intent to defraud executed and attempted to execute a scheme and artifice to defraud one or

more financial institutions, including Banks A and C and other financial institutions who were participants in the precious metals futures markets.

All in violation of Title 18, United States Code, Section 1344(1).

The SPECIAL MAY 2019 GRAND JURY further charges:

### COUNT EIGHT
(Wire Fraud Affecting a Financial Institution)

62. The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 29, and 40 through 42 above are re-alleged and incorporated as if fully stated herein.

63. Beginning in May 2008 and continuing until June 2015, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, GREGG SMITH, while a precious metals trader at Bank A, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted certain writings, signs, signals, pictures, and sounds by means of wire communication in interstate and foreign commerce for the purpose of executing the scheme and artifice to defraud, including the Deceptive Orders alleged in Paragraph 29 above, all affecting one or more financial institutions, including Bank A and other financial institutions, as well as other participants in the precious metals futures markets.

All in violation of Title 18, United States Code, Section 1343.

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT NINE
(Wire Fraud Affecting a Financial Institution)

64.     The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 30, 34, 37, 41, and 42 above are re-alleged and incorporated as if fully stated herein.

65.     Beginning in May 2008 and continuing until April 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, MICHAEL NOWAK, while a supervisor and precious metals trader at Bank A, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted certain writings, signs, signals, pictures, and sounds by means of wire communication in interstate and foreign commerce for the purpose of executing the scheme and artifice to defraud, including the Deceptive Orders alleged in Paragraph 30 above, all affecting one or more financial institutions, including Bank A and other financial institutions, as well as other participants in the precious metals futures markets.

All in violation of Title 18, United States Code, Section 1343.

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT TEN
(Wire Fraud Affecting a Financial Institution)

66.   The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 31, 38, 39, and 41 above are re-alleged and incorporated as if fully stated herein.

67.   Beginning in January 2008 and continuing until October 2011, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, CHRISTOPHER JORDAN, while a precious metals trader at Banks A and C and Company D, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted certain writings, signs, signals, pictures, and sounds by means of wire communication in interstate and foreign commerce for the purpose of executing the scheme and artifice to defraud, including the Deceptive Orders alleged in Paragraph 31 above, all affecting one or more financial institutions, including Banks A and C and other financial institutions, as well as other participants in the precious metals futures markets.

All in violation of Title 18, United States Code, Section 1343.

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT ELEVEN
(Commodities Fraud)

68.     The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 29, and 40 through 42 above are re-alleged and incorporated as if fully stated herein.

69.     From May 20, 2009, until June 2015, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, GREGG SMITH, while a precious metals trader at Bank A, knowingly and with the intent to defraud executed and attempted to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, that is, gold, silver, platinum, and palladium futures contracts.

All in violation of Title 18, United States Code, Section 1348(1).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT TWELVE
(Commodities Fraud)

70.     The allegations in Paragraphs 1 through 15, 17 through 20, 25 through 27, 30, 34, 37, 41, and 42 above are re-alleged and incorporated as if fully stated herein.

71.     From May 20, 2009, until April 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, MICHAEL NOWAK, while a supervisor and precious metals trader at Bank A, knowingly and with the intent to defraud executed and attempted to execute

a scheme and artifice to defraud a person in connection with a commodity for future delivery, that is, gold, silver, platinum, and palladium futures contracts.

All in violation of Title 18, United States Code, Section 1348(1).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT THIRTEEN
(Spoofing)

72.     The allegations in Paragraphs 1 through 15, 17 through 20, 25, and 29 above are re-alleged and incorporated as if fully stated herein.

73.     From July 16, 2011, until June 2015, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, GREGG SMITH, while a precious metals trader at Bank A, knowingly engaged in trading, practice, and conduct on and subject to the rules of a registered entity, including COMEX and NYMEX, that was "spoofing," that is, bidding and offering with the intent, at the time the bid and offer was placed, to cancel the bid and offer before execution, by causing to be transmitted, to a CME Group server, orders for gold, silver, platinum, and palladium futures contracts.

All in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

The SPECIAL MAY 2019 GRAND JURY further charges:

## COUNT FOURTEEN
(Spoofing)

74.     The allegations in Paragraphs 1 through 15, 17 through 20, 25, and 30 above are re-alleged and incorporated as if fully stated herein.

75.     From July 16, 2011, until April 2014, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant, MICHAEL NOWAK, while a

42

supervisor and precious metals trader at Bank A, knowingly engaged in trading, practice, and conduct on and subject to the rules of a registered entity, including COMEX and NYMEX, that was "spoofing," that is, bidding and offering with the intent, at the time the bid and offer was placed, to cancel the bid and offer before execution, by causing to be transmitted, to a CME Group server, orders for gold, silver, platinum, and palladium futures contracts.

All in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

The SPECIAL MAY 2019 GRAND JURY further charges:

## CRIMINAL FORFEITURE ALLEGATION ONE

76. The allegations in Count One of this Indictment are re-alleged and incorporated as if fully stated herein for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Sections 1963(a)(1) and (3).

77. Upon conviction of the felony racketeering conspiracy offense charged in Count One of this Indictment, the Defendants shall forfeit to the United States any and all right, title, and interest they have in any property, real and personal, which the Defendants have acquired or maintained in violation of Title 18, United States Code, Section 1962, or which constitutes, or is derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

78. If any of the above-described forfeitable property, as a result of any act or omission of the Defendants, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond

the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other substitute property of the Defendants up to the value of the forfeitable property described above.

All pursuant to Title 18, United States Code, Sections 1962, 1963(a)(1) and (3), and 1963(m).

## CRIMINAL FORFEITURE ALLEGATION TWO

79.    The allegations in Counts Five through Ten of this Indictment are re-alleged and incorporated as if fully stated herein for the purpose of alleging forfeiture to the United States pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

80.    Upon conviction of one or more of the felony fraud offenses alleged in Counts Five through Ten of this Indictment, any of the Defendants convicted of such offense(s) shall forfeit to the United States any and all right, title, and interest they have in any property, real and personal, which constitutes, or is derived from, any proceeds obtained, directly or indirectly, from violations of Title 18, United States Code, Sections 1343 or 1344(1).

81.    If any of the above-described forfeitable property, as a result of any act or omission of the Defendants, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been

44

commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other substitute property of the Defendants up to the value of the forfeitable property described above.

All pursuant to Title 18, United States Code, Section 981(a)(1), as incorporated by Title 28, United States Code, Section 2461(c), and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

A TRUE BILL:

_____

FOREPERSON

_____
ROBERT A. ZINK
Chief, Fraud Section

_____
Avi Perry
Matthew F. Sullivan
Trial Attorneys, Fraud Section

Criminal Division
U.S. Department of Justice