**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

v.

CHRISTOPHER JORDAN

Case No. 19-cr-00669

Hon. Edmond E. Chang

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT CHRISTOPHER JORDAN'S MOTION TO SEVER**

James J. Benjamin, Jr.
Parvin D. Moyne
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Street
Suite 5350
Chicago, Illinois 60654

*Counsel for Christopher Jordan*

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................1

II.      BACKGROUND ...................................................................................................2
       A.      Allegations in the Indictment ..............................................................2
               1.      Allegations regarding Spoofing ................................................4
               2.      Allegations regarding Barrier Options......................................5
               3.      Allegations of Lying ................................................................5
       B.      Information From Discovery Productions .............................................7
               1.      Alleged Spoofing Sequences Identified by the Government .......7
               2.      Electronic Communications and Witness Testimony..................8
               3.      Evidence of Internal and Regulatory Inquiries After Mr. Jordan's Departure from Bank A .............................................9
       C.      Charges in the Indictment ..................................................................11

III.      ARGUMENT: MR. JORDAN SHOULD BE TRIED SEPARATELY PURSUANT TO RULE 14(a) ...............................................................................12
       A.      Applicable Law ..................................................................................12
       B.      A Severance is Warranted Because of the Complexity of this Case and the Disparity of the Evidence..........................................................15
       C.      A Severance is Warranted Because of Particular Evidentiary Problems Associated with a Joint Trial ..............................................................19
               1.      Evidence Relating to Mr. Jordan's Departure from Bank A ......19
                      a.      Evidence to be offered by Mr. Jordan ..........................21
                      b.      Evidence to be offered by Mr. Smith ............................26
               2.      Evidence of Mr. Jordan's Statements to FBI Agents in November 2018.........................................................................28
                      a.      Applicable Law ............................................................29
                      b.      Discussion ....................................................................31
                            i.      Mr. Jordan's Statement to the Agents Inculpates Mr. Smith and Mr. Ruffo in Spoofing-Related Activity ..........31
                           ii.      Mr. Jordan's Statement to the Agents Inculpates Mr. Nowak Regarding Barrier Options ....................................34
                          iii.      Mr. Jordan Would Likely Object to any Material Redactions or Alterations of his Statement to the FBI to Address *Bruton* Problems .......................................36

IV.      CONCLUSION....................................................................................................37

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

*Bruton v. United States*,
   391 U.S. 123 (1968) ................................................................. 14, 28, 29

*CFTC v. Sarvey*,
   No. 08 C 192, 2012 WL 426746 (N.D. Ill. Feb. 10, 2012) (Kendall, J.) ............................... 27

*Gray v. Maryland*,
   523 U.S. 185 (1998) ................................................................. 29

*Krulewitch v. United States*,
   336 U.S. 440 (1949) ................................................................. 17, 18

*Richardson v. Marsh*,
   481 U.S. 200 (1987) ................................................................. 29

*Smith v. United States*,
   568 U.S. 106 (2013) ................................................................. 11

*United States v. Andrews*,
   754 F. Supp. 1161 (N.D. Ill. 1990) (Aspen, J.), *set aside in part on other*
   *grounds*, 754 F. Supp. 1197 (N.D. Ill. 1990) .............................................. 12, 15, 18

*United States v. Bouzanis*,
   No. 00 Cr. 1065, 2003 WL 22143278 (N.D. Ill. Sept. 16, 2003) (Lefkow, J.) ...................... 31

*United States v. Brinkley*,
   No. 2:18-cr- 21, 2019 WL 4278971 (N.D. Ind. Sept. 10, 2019) ...................................... 18, 19

*United States v. Caliendo*,
   910 F.2d 429 (7th Cir. 1990) ................................................................. 13

*United States v. Carman*,
   No. 02 CR 464, 2004 WL 1638231 (N.D. Ill. July 16, 2004) (Guzman, J.) ........................... 13

*United States v. Delatorre*,
   522 F. Supp. 2d 1034 (N.D. Ill. 2007) (Castillo, J.) ................................................. 12

*United States v. Dial*,
   757 F.2d 163 (7th Cir. 1985) ................................................................. 27

*United States v. Duncan*,
   No. 05-80025, 2011 WL 2446479 (E.D. Mich. June 4, 2011) ........................................ 26, 36

*United States v. Farano*,
749 F.3d 658 (7th Cir. 2014) ..........................................................................13

*United States v. Gallo*,
668 F. Supp. 736 (E.D.N.Y. 1987) ..................................................................15

*United States v. Glennon*,
No. 05 CR 408, 2005 U.S. Dist. LEXIS 43983 (N.D. Ill. Dec. 19, 2005)
(Grady, J.) ...............................................................................................13, 18

*United States v. Green*,
648 F.3d 569 (7th Cir. 2011) .....................................................................29, 30

*United States v. Hernandez*,
330 F.3d 964 (7th Cir. 2003) .....................................................................29, 30

*United States v. Hoover*,
246 F.3d 1054 (7th Cir. 2001) ........................................................................30

*United States v. Jett*,
908 F.3d 252 (7th Cir. 2018) .....................................................................13, 18

*United States v. Ludke*,
No. 16-CR-175, 2018 WL 1378759 (E.D. Wis. Mar. 19, 2018), *report and
recommendation adopted*, 2018 WL 2059556 (E.D. Wis. May 2, 2018)...................31, 34, 36

*United States v. Perez*,
No. 2:13-cr-111, 2016 U.S. Dist. LEXIS 100154 (N.D. Ind. Aug. 1, 2016) .................. *passim*

*United States v. Southland Corp.*,
760 F.2d 1366 (2d Cir. 1985)..........................................................................11

*United States v. Stoecker*,
920 F. Supp. 876 (N.D. Ill. 1996) (Gettleman, J.) ...........................................14, 18

*United States v. Troutman*,
546 F. Supp. 2d 610 (N.D. Ill. 2008) (Castillo, J.) ...........................................14, 18

*United States v. West*,
790 F. Supp. 2d 687 (N.D. Ill. 2011) (Kennelly, J.) ........................................ *passim*

*Zafiro v. United States*,
506 U.S. 534 (1993)....................................................................................... *passim*

**Statutes**

7 U.S.C. § 6c(a)(5)(C)..........................................................................1, 11, 12

7 U.S.C. § 13(a)(2)..............................................................................1, 11, 12

18 U.S.C. § 371 ..................................................................................................11

18 U.S.C. § 1343 ................................................................................................11

18 U.S.C. § 1344(1) ...........................................................................................11

18 U.S.C. § 1348(1) .................................................................................1, 11, 12

18 U.S.C. § 1962(d) ...........................................................................................11

18 U.S.C. § 3282(a) .....................................................................................11, 12

18 U.S.C. § 3301(b) .....................................................................................11, 12

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ...........................................................10

**Other Authorities**

CFTC Notice of Proposed Order and Request for Comment, Effective Date for Swap Regulation, 76 Fed. Reg. 35,372 (June 17, 2011) .........................10

Fed. R. Crim. P. 14 ..............................................................................1, 12, 18, 37

Fed. R. Evid. 403 ..................................................................................20, 25, 27

Fed. R. Evid. 801(c)(2) .......................................................................................21

Fed. R. Evid. 803(3) ...........................................................................................21

Fed. R. Evid. 803(6) ...........................................................................................21

Press Release, CFTC Closes Investigation Concerning the Silver Markets, CFTC Release No. 6709-13 (Sept. 25, 2013), https://www.cftc.gov/PressRoom/PressReleases/6709-13 .................................6

*United States v. Flotron*, No. 3:17-cr-00220 (JAM), Dkt. No. 178 (D. Conn. Apr. 3, 2018) ..........................................................................................................27

*United States v. Vorley*, No. 18 Cr. 35, Dkt. Nos. 168-3, 168-5 (N.D. Ill. Feb. 25, 2020) (Tharp, J.) ...........16

iv

# I. PRELIMINARY STATEMENT

Pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure, Defendant Chris Jordan respectfully submits this memorandum of law in support of his motion for a severance. Consistent with Rule 14(a) and the Supreme Court's decision in *Zafiro v. United States*, 506 U.S. 534 (1993), Mr. Jordan should be tried separately, for two reasons.[1]

*First*, severance is warranted to ensure that Mr. Jordan receives a fair trial given the complexity of the charges in this case and the disparity in evidence between Mr. Jordan and his co-defendants. Mr. Jordan is a minor player in this sprawling RICO conspiracy case. He left Bank A in December 2009. This was early in the "Conspiracy Period" described in the Superseding Indictment ("Indictment"), which is alleged to have begun in March 2008 and to have extended all the way until August 2016. Mr. Jordan was not involved in the events that occurred at Bank A during the six-and-a-half-year period after his departure. In a joint trial, however, he and his counsel would be forced to sit idly during many days or weeks of evidence from that time period. Moreover, because Mr. Jordan left Bank A nearly ten years before the Indictment was filed, he was not charged (and, given the statute of limitations, he could not lawfully have been charged) with a number of the substantive offenses that have been filed against his co-defendants: commodities fraud in violation of 18 U.S.C. § 1348(1), attempted price manipulation in violation of 7 U.S.C. § 13(a)(2), and spoofing in violation of 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2). In a joint trial, Mr. Jordan would be prejudiced as the jury attempted to navigate highly complex jury instructions, important parts of which would be inapplicable to him.

---

[1] Pursuant to Local Criminal Rule 12.1 and this Court's Individual Procedures for Motion Practice, counsel for Mr. Jordan conferred with the government about this motion via telephone on May 22, 2020. The government indicated that it opposes the motion.

1

*Second*, Mr. Jordan and his co-defendants would suffer unfair prejudice at a joint trial because of evidence that would be inadmissible if Mr. Jordan were tried separately. This includes evidence relating to Mr. Jordan's departure from Bank A in late 2009 – under contentious circumstances – as well as inculpatory statements that Mr. Jordan made about his co-defendants during a surprise "show up" interview by FBI agents in November 2018. Some of this evidence would be offered by Mr. Jordan, some would be offered by his co-defendants, and some would be offered by the government; but all of it would likely be subject to objection by one or more parties. With separate trials for Mr. Jordan and his co-defendants, the Court could better manage evidentiary issues while avoiding unfair prejudice that would jeopardize each defendant's right to a fair trial.

## II.     BACKGROUND

### A.  Allegations in the Indictment

The focus of this case is the Precious Metals Desk at Bank A, which is alleged to have been a racketeering enterprise under the RICO statute. Indictment ¶ 17. The Indictment alleges that the defendants and their co-conspirators, while employed on the Precious Metals Desk, conspired to engage in a pattern of racketeering activity by engaging in two forms of purportedly fraudulent activity: (a) placing orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution; i.e. spoofing; and (b) trading in a manner to push the price of underlying assets in a direction that would cause Bank A to make money on "barrier option" contracts between the bank and unspecified counterparties. *Id*. ¶¶ 16, 26-27. The Indictment further alleges that the defendants and their co-conspirators "perpetuated the racketeering conspiracy and shielded their unlawful activities from detection and themselves from discipline by lying to and otherwise deceiving Bank A, the CME Group, and the CFTC about their trading practices." *Id.* ¶ 28.

2

The Indictment alleges that the defendants worked at Bank A at "various times" between March 2008 and August 2016 (the "Conspiracy Period"). *Id.* ¶ 18. Co-defendants Gregg Smith, Michael Nowak, and Jeffrey Ruffo are alleged to have been employed at Bank A (and presumably to have been participants in the alleged RICO conspiracy) throughout the entirety of the eight-and-a-half-year Conspiracy Period. *Id.* ¶¶ 18(a)-(c). The same is true for two cooperating witnesses identified by name in the Indictment, John Edmonds and Christian Trunz. *Id.* ¶¶ 19-20. By contrast, Mr. Jordan is alleged to have left Bank A in December 2009 – very early in the Conspiracy Period – after which he traded briefly at two other firms, identified in the Indictment as Bank C and Company D, before leaving finance altogether. *Id.* ¶ 18(d).[2]

The Indictment alleges that in June 2011 – some 18 months after he left Bank A – Mr. Jordan participated in an electronic chat with cooperating witness John Edmonds, one of his former colleagues at Bank A, and made the following statement about algorithms: "they r so friggin annoying. I haven't tried to play any games yet but assuming if I need to get something big done itll be easy to get em. does that still seem to work?" Indictment ¶ 39. Apart from this communication, the Indictment does not allege that Mr. Jordan remained in contact with any of the co-defendants or alleged co-conspirators after he left Bank A in December 2009.

---

[2] According to the Indictment, Mr. Jordan worked at Bank C from March 2010 – August 2010 and at Company D from June 2011 – October 2011. *See* Indictment ¶ 18(d). The Indictment does not charge Mr. Jordan with engaging in any unlawful trading after he left Company D in October 2011. *See id.* ¶¶ 63, 69 (charging Mr. Jordan with substantive counts of bank fraud and wire fraud affecting a financial institution based on conduct through October 2011). After leaving Company D, Mr. Jordan stopped working in finance. In approximately 2013, he co-founded Brawl House, a fitness business in Mountainside, New Jersey focusing on combat sports, CrossFit, and yoga. Brawl House ceased operations in 2017, and Mr. Jordan has not had regular employment since then. *See* Declaration of James J. Benjamin, Jr. ("Benjamin Decl."), ¶ 3. Additional information about Mr. Jordan's personal circumstances is contained in a sealed declaration filed with this motion. *See* Sealed Declaration of James J. Benjamin, Jr. ("Benjamin Sealed Decl."), ¶¶ 21-24.

### 1. Allegations regarding Spoofing

The Indictment alleges that Mr. Jordan engaged in specific spoofing sequences over a seven-week period during his employment at Bank A, from September 29, 2009 until November 10, 2009. *Id.* ¶ 32. By contrast, Defendants Gregg Smith and Michael Nowak, along with certain co-conspirators, are alleged to have engaged in specific spoofing sequences for a longer time period, reaching back further in time and extending for many years after Mr. Jordan's departure from Bank A. *See id.* ¶ 30 (alleging that Mr. Smith engaged in spoofing at Bank A during a seven-year period, from May 2008 through April 2015); *id.* ¶ 31 (same allegation for Mr. Nowak during a four-and-a-half-year period, from September 2009 through March 2014); *id.* ¶ 33 (same allegation for CC-1 during a one-year period, from January 2013 through January 2014); *id.* ¶ 34 (same allegation for CC-2 during a fifteen-month period, from November 2009 through February 2011).[3]

The Indictment alleges that one motive for spoofing at Bank A was to "service and benefit key clients, including Hedge Funds E and F, which were important sources of revenue and market intelligence for the Precious Metals Desk." *Id.* ¶ 26(l). As alleged in the Indictment, defendant Jeffrey Ruffo, a salesperson at Bank A, covered Hedge Funds E and F. *Id.* ¶ 18(c). When Ruffo received orders to buy or sell precious metals from these clients, he would allegedly pass them to defendant Gregg Smith who, "with Ruffo's knowledge and encouragement," allegedly engaged in spoofing to obtain better execution prices for the benefit of the clients. *Id.* ¶ 26(l). The Indictment identifies two specific Gregg Smith trading sequences that are related to orders from Hedge Funds E and F: one in December 2011 and the other in January 2012. *Id.* ¶¶

---

[3] As alleged in the Indictment, these instances are not exclusive. *See, e.g.*, *id.* ¶ 32 (alleging that Mr. Jordan engaged in eight specific trading sequences between September 29, 2009 and November 10, 2009, "among others").

30(i) and 30(j).  Both of these sequences occurred after Mr. Jordan's departure from Bank A.
Mr. Jordan is not alleged to have played any role with respect to Hedge Funds E or F.

### 2.  Allegations regarding Barrier Options

With respect to barrier options, the Indictment contains very little information and no
detail whatsoever.  The Indictment does not indicate which of the defendants or their co-
conspirators allegedly engaged in fraudulent activity regarding barrier options, nor does it
contain any other particulars (*e.g.* dates, times, counterparties, contract terms, underlying assets,
or specific trading activity).  Mr. Jordan did not have responsibility for barrier options trading at
Bank A, and the Indictment does not contain any particularized allegation that he engaged in
unlawful conduct regarding barrier options.

### 3.  Allegations of Lying

According to the Indictment, Mr. Jordan allegedly made false statements in two different
contexts:  (a) in 2008 and 2009, when he signed compliance attestations for Bank A in which he
stated, without elaboration, that he was in compliance with the bank's Code of Conduct, and (b)
in 2010, when he answered two specific questions at the end of a lengthy deposition during a
CFTC investigation of alleged long-term suppression of the prices of silver futures (the "CFTC
Silver Investigation"):

> Q.    While you were working at [Bank A], did you ever engage in trading for
>       the purpose of influencing the price on COMEX?
>
> A.    No.
>
> ***
>
> Q.    Did you ever show a bid or offer on Globex that you didn't intend to
>       execute?
>
> A.    Only if it, I would only cancel something if I changed my mind or if it was
>       put in error, but no.

5

Indictment ¶ 41.[4]

Separately, the Indictment alleges that co-defendants Smith, Nowak, and Ruffo made other false statements that are unrelated to Mr. Jordan. For example, the Indictment alleges that co-defendants Smith, Nowak, and Ruffo made "false and fraudulent representations to Bank A" by signing Bank A's compliance certifications between 2011 and 2016, during a time period when the bank required its employees to affirmatively report any suspected violations. *See* Indictment ¶¶ 28(c), 44. However, Mr. Jordan had already left Bank A before these certifications were submitted and, as alleged, before the affirmative reporting obligation came into effect. In addition, the Indictment alleges that in 2013, the CME conducted "an inquiry into Smith's trading practices" and that, during that inquiry, Smith "knowingly and intentionally gave false answers to questions from a CME Group investigator . . . ." *Id*. ¶ 42. However, the CME inquiry into Smith's trading practices occurred many years after Chris Jordan's departure from Bank A, and Mr. Jordan had no involvement in it. *See id*. Finally, the Indictment alleges that "[i]n connection with internal reviews of their trading practices, certain of the Defendants and their co-conspirators knowingly and intentionally made false statements to compliance officers

---

[4] These two questions formed a tiny part of the record of Mr. Jordan's testimony in the CFTC Silver Investigation, which lasted for two days and spans 426 pages. Benjamin Decl., ¶ 4. Moreover, and as the public record makes clear, the Silver Investigation was a separate investigation that predated the investigation that led to the pending criminal charges and covered a different subject matter. In a 2013 press release announcing the closure of the Silver Investigation, the CFTC stated that it had received complaints from members of the public which "generally asserted that because the prices for retail silver products, such as coins and bullion, had increased, the price of silver futures contracts should have also experienced an increase" and that "the large shorts in the silver market were responsible for lower futures prices." Press Release, CFTC Closes Investigation Concerning the Silver Markets, CFTC Release No. 6709-13 (Sept. 25, 2013), https://www.cftc.gov/PressRoom/PressReleases/6709-13. In the same press release, the CFTC stated that the agency "only rarely comments publicly on whether it has opened or closed any particular investigation," but that because "this particular investigation was confirmed in September 2008, the CFTC deemed it appropriate to inform the public that the investigation is no longer ongoing. Based upon the law and evidence as they exist at this time, there is not a viable basis to bring an enforcement action with respect to any firm or its employees related to our investigation of silver markets." *Id*.

and other employees of Bank A." *Id.* ¶ 28(d).  The Indictment provides no further details about the time of, or participants in, the internal reviews or the substance of the alleged false statements, and we have no reason to believe that this amorphous allegation references conduct that occurred during Mr. Jordan's employment at Bank A.

### B.  Information From Discovery Productions

The vast majority of the discovery materials, anticipated evidence, and allegations are unrelated to Chris Jordan and the time he worked at the Precious Metals Desk of Bank A.  Based on our review of the voluminous discovery materials produced to date, we anticipate that the government will seek to offer extensive material that is unrelated to Mr. Jordan.  This evidence will likely include trading data, electronic communications, witness testimony, and evidence of internal and regulatory inquiries that occurred during the more-than-six-year portion of the Conspiracy Period that post-dates Mr. Jordan's departure from Bank A.  As described below, there are significant quantitative and qualitative differences in the evidence relating to Mr. Jordan as compared to his co-defendants and the cooperating witnesses.

### 1.  Alleged Spoofing Sequences Identified by the Government

On December 20, 2019, the government provided defense counsel with a spreadsheet containing 54,456 sequences of alleged spoofing activity that, according to the government, "underlie the charges in the superseding indictment."  Benjamin Decl., ¶ 5.[5]  The spreadsheet contains, *inter alia*, the date of each sequence along with information to identify the individual trader.  Out of the 54,456 trading sequences identified by the government, Mr. Jordan was responsible for approximately 2,021 (3.7%), while Messrs. Smith and Nowak collectively were

---

[5] These trading sequences are solely associated with alleged spoofing.  To date the government has provided no information regarding any allegedly fraudulent trading instances associated with barrier options.

responsible for 41,749 (77%, of which 70% were attributable to Mr. Smith and 7% were attributable to Mr. Nowak).[6]  If the sequences are sorted by date instead of by trader, approximately 36,722 sequences not associated with Mr. Jordan (67%) occurred in 2010 or subsequent years, after Mr. Jordan left Bank A.  *Id.*

We also anticipate that the evidence will show important qualitative differences in the nature of the alleged spoofing activity by Mr. Jordan, as opposed to his co-defendants.  The Indictment alleges that after Bank A acquired Bank B in May 2008, defendant Gregg Smith and cooperating witness Christian Trunz "brought to Bank A a new style of layering multiple Deceptive Orders at different prices in rapid succession . . . ."  Indictment ¶ 26(e).  The Indictment states that "[t]his new style of 'layering,' which was more difficult both to execute and to detect, took hold on the Precious Metals Desk at Bank A and was adopted by, among others, Nowak, Edmonds, CC-1, CC-2, and CC-5."  *Id.*  Absent from the allegations, however, is any suggestion that Mr. Jordan engaged in this "new style of layering," and the discovery materials confirm that Mr. Jordan did not engage in layering.[7]  In short, much of the trading-related evidence to be offered at trial will have no connection to Mr. Jordan.

### 2.  Electronic Communications and Witness Testimony

To date, the government has produced more than 21 million pages of electronic discovery, but the vast majority of these documents appear to be unrelated to Mr. Jordan.  Based

---

[6] According to the government's spreadsheet, Mr. Smith was responsible for 38,146 instances and Mr. Nowak was responsible for 3,603 instances.  The two cooperating witnesses identified by name in the Indictment, Christian Trunz and John Edmonds, were collectively responsible for 8,717 instances (16%).

[7] On October 30, 2018, the government's case agent, FBI Special Agent Jonathan Luca, submitted an affidavit to a magistrate judge sitting in the Southern District of New York in support of an application to seize and search voluminous electronic communications stored by Bloomberg, L.P.  In the affidavit, Special Agent Luca described a trading analysis conducted by an unidentified data analytics firm retained by the government.  As described by Special Agent Luca, the government's analytics firm found zero episodes of suspected layering involving Mr. Jordan, but tens of thousands of such instances collectively involving Mr. Smith, Mr. Nowak, Mr. Trunz, and Mr. Edmonds.  *See* Benjamin Decl., ¶ 6.

on our preliminary review, Mr. Jordan's name (or permutations thereof) appear in documents comprising approximately 445,000 pages (2% of the total). Benjamin Decl., ¶ 7. Approximately 20.7 million pages are coded with metadata containing a date field. If the documents are evaluated in terms of time frame, the vast majority of these – approximately 19.3 million pages, or 93% – are dated on or after January 1, 2010, when Mr. Jordan was no longer at Bank A. *Id*.

With respect to witness testimony, the government has produced reports on FBI Form FD-302 and/or grand jury testimony for a total of 33 witnesses. Based on our review of the discovery, 26 of the 33 witnesses (79%) have not provided any substantive information about Mr. Jordan, and most of the other seven witnesses have primarily given information about the behavior of one or more co-defendants, not Mr. Jordan. Benjamin Decl., ¶ 8.

As noted above, the Indictment quotes a portion of an electronic chat communication between Mr. Jordan and John Edmonds from June 2011. *See* Indictment ¶ 39. The discovery materials show that Mr. Jordan and Mr. Edmonds remained on friendly terms for a period of time after Mr. Jordan's departure from Bank A, and that they participated in Bloomberg chats in certain discrete time periods during 2010 and 2011, in which they discussed market conditions, trading ideas, gossip, and personal anecdotes. To the extent that any of these post-2009 Edmonds-Jordan communications are relevant to the charges in the Indictment, we expect such evidence to be relatively limited in scope and separate from the ongoing activities on the Precious Metals Desk after Mr. Jordan's departure.

### 3. Evidence of Internal and Regulatory Inquiries After Mr. Jordan's Departure from Bank A

The effective date of the Dodd-Frank Act is an important milestone in the chronology of events underlying this case. In Dodd-Frank, Congress amended the Commodity Exchange Act to add a new provision prohibiting three enumerated "disruptive practices," one of which was

spoofing (defined by the statute as "bidding or offering with the intent to cancel the bid or offer before execution"). Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 747, 124 Stat. 1376, 1739 (July 21, 2010). The effective date of this new provision was July 16, 2011. *Id*. § 754; *see also* CFTC Notice of Proposed Order and Request for Comment, Effective Date for Swap Regulation, 76 Fed. Reg. 35,372 (June 17, 2011). Prior to Dodd-Frank, there was no statute or rule explicitly prohibiting spoofing, and Bank A's compliance policies and training materials did not specifically address it. As one would expect, Bank A amended its compliance policies and training materials to address spoofing after the statute's effective date. At trial, we expect to offer evidence of Bank A's compliance policies and training materials, both before and after Dodd-Frank, to make the point that neither law nor Bank A policy specifically addressed spoofing until well after Mr. Jordan had left the bank.

At a joint trial, however, we anticipate that the government will offer evidence of post-Dodd-Frank events that extend far beyond the evolution of Bank A's compliance policies and training materials. In particular, based on the Indictment and discovery materials, we expect that the government will offer evidence of post-Dodd-Frank internal and regulatory inquiries that occurred after Mr. Jordan's departure from Bank A and in which Mr. Jordan played no part. For example, the Indictment refers to a CME inquiry into Gregg Smith's trading practices in 2013, *see* Indictment ¶ 42, as well as unspecified "internal reviews" of the trading practices of certain defendants and alleged co-conspirators, during which these individuals are alleged to have "knowingly and intentionally made false statements to compliance officers and other employees of Bank A." *Id*. ¶ 28(d). In addition, discovery materials contain detailed information about a 2014 CME investigation into trading activity of CC-1, which led to internal discussions among the traders on the Precious Metals Desk and Bank A compliance personnel, and which eventually

10

resulted in CC-1's separation from Bank A. All of these events occurred after the effective date of Dodd-Frank and after Mr. Jordan's departure from Bank A.

### C. Charges in the Indictment

Mr. Jordan and his three co-defendants are jointly charged in Count One (RICO conspiracy in violation of 18 U.S.C. § 1962(d)) and Count Two (criminal conspiracy in violation of 18 U.S.C. § 371). The conspiracy charged in Count Two includes five objects: (1) wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343; (2) bank fraud, in violation of 18 U.S.C. § 1344(1); (3) commodities fraud, in violation of 18 U.S.C. § 1348(1); (4) commodity price manipulation, in violation of 7 U.S.C. § 13(a)(2); and (5) spoofing, in violation of 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2). Indictment ¶ 46. Because Mr. Jordan left Bank A in 2009, and in light of evidence that we expect to be presented at trial, we anticipate raising defenses associated with the statute of limitations with respect to the conspiracy counts. This will require specific jury instructions applicable only to Mr. Jordan.[8]

In addition to the two conspiracy counts, the Indictment contains a total of twelve substantive counts, each of which is applicable to one and only one defendant. Mr. Jordan is charged in Count Seven (bank fraud in violation of 18 U.S.C. § 1344(1)) and Count Ten (wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343), each of which carries a

---

[8] Mr. Jordan was indicted on August 22, 2019. Given the five-year statute of limitations for RICO conspiracy, *see Smith v. United States*, 568 U.S. 106, 111 n.4 (2013), the six-year statute of limitations for conspiracy to commit commodities fraud, 18 U.S.C. § 3301(b), and the five-year statute of limitations for conspiracy to commit commodity price manipulation and spoofing, *see* 18 U.S.C. § 3282(a), the last dates within the limitations period were, respectively, August 22, 2014 (RICO conspiracy), August 22, 2013 (conspiracy to commit commodities fraud), and August 22, 2014 (conspiracy to commit commodity price manipulation and spoofing). *See United States v. Southland Corp.*, 760 F.2d 1366, 1374 (2d Cir. 1985) (discussing application of statute of limitations where varying limitations periods applied to conspiracy to commit different objects of the charged conspiracy). By then, however, Mr. Jordan had already been gone from Bank A for many years, and evidence to be presented at trial will establish the facts and circumstances regarding his withdrawal.

ten-year statute of limitations. Messrs. Smith and Nowak, while also charged with bank fraud and wire fraud affecting a financial institution, are separately charged with three additional offenses with shorter limitations periods: commodities fraud (18 U.S.C. § 1348(1)), attempted price manipulation (7 U.S.C. § 13(a)(2)), and spoofing (7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2)). *See* 18 U.S.C. §§ 3301(b) (six-year limitations period for commodities fraud) and 3282(a) (default five-year limitations period). Mr. Jordan was not charged with these latter offenses, each of will each require its own detailed jury instructions at trial.

### III. ARGUMENT: MR. JORDAN SHOULD BE TRIED SEPARATELY PURSUANT TO RULE 14(a)

#### A. Applicable Law

Pursuant to Rule 14(a), "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . , the court may . . . sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Rule 14(a) "must be read against the backdrop of Rule 2, which provides that the Federal Rules of Criminal Procedure 'are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.'" *United States v. Delatorre*, 522 F. Supp. 2d 1034, 1046 (N.D. Ill. 2007) (Castillo, J.) (quoting *United States v. Andrews*, 754 F. Supp. 1161, 1170 (N.D. Ill. 1990) (Aspen, J.), *set aside in part on other grounds*, 754 F. Supp. 1197 (N.D. Ill. 1990)). Motions for severance are committed to the discretion of the district court. *See Zafiro*, 506 U.S. at 541 ("Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts").

"There is a preference in the federal system for joint trials of defendants who are indicted together," *id.* at 537, especially in situations where the defendants are charged with conspiracy.

12

*See United States v. Jett*, 908 F.3d 252, 276 (7th Cir. 2018); *United States v. Caliendo*, 910 F.2d 429, 437 (7th Cir. 1990). However, this preference is not always determinative, and severance should be ordered if there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also United States v. Glennon*, No. 05 CR 408, 2005 U.S. Dist. LEXIS 43983, at *3 (N.D. Ill. Dec. 19, 2005) (Grady, J.) ("The key is whether 'justice requires' a separate trial"); *United States v. Carman*, No. 02 CR 464, 2004 WL 1638231, at *5 (N.D. Ill. July 16, 2004) (Guzman, J.) ("[I]n deciding severance motions, district courts must weigh the public interest in judicial efficiency and economy that would result from a joint trial, against the possibility of prejudice to any particular defendant.").

In *Zafiro*, the Supreme Court identified two scenarios in which severance may be warranted. *First*, a court should order severance "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." 506 U.S. at 539. Consistent with *Zafiro*, the Seventh Circuit has noted that separate trials may be warranted "in a complex case with many defendants some of whom might only be peripherally involved in the alleged wrongdoing. The danger is that the bit players may not be able to differentiate themselves in the jurors' minds from the stars." *United States v. Farano*, 749 F.3d 658, 661 (7th Cir. 2014) (emphasis and internal citations omitted).

13

The second scenario recognized in *Zafiro* occurs when a particular piece of evidence is admissible and probative with respect to one defendant, but inadmissible and prejudicial with respect to another. In such a situation, severance is necessary if the evidentiary issue cannot be resolved by redactions or limiting instructions. *See Zafiro*, 506 U.S. at 539 ("Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. *See Bruton v. United States*, 391 U.S. 123 (1968). Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial."). This situation can arise if the government seeks to offer a defendant's statements to law enforcement that would prejudice a co-defendant and cannot satisfactorily be anonymized under *Bruton*, but it can also encompass other situations, such as when one defendant wishes to offer evidence that would be unfairly prejudicial with respect to a co-defendant. *See United States v. Perez*, No. 2:13-cr-111, 2016 U.S. Dist. LEXIS 100154, at *4–6 (N.D. Ind. Aug. 1, 2016) (severance granted when defendant wished to offer his own out-of-court statement to establish withdrawal from conspiracy, but statement caused substantial prejudice for co-defendant and could not be redacted satisfactorily); *United States v. Troutman*, 546 F. Supp. 2d 610, 615-16 (N.D. Ill. 2008) (Castillo, J.) (granting severance in part because co-defendant's statement would implicate movant, statement could not be redacted, and admissibility of statement under hearsay exception for co-conspirator statements was uncertain); *United States v. Stoecker*, 920 F. Supp. 876, 886 (N.D. Ill. 1996) (Gettleman, J.) (granting severance in part because of 404(b) evidence that would be admissible against co-defendants but not the movant).

As set forth below, severance is warranted in the instant case based upon both of the scenarios identified in *Zafiro*.

**B. A Severance is Warranted Because of the Complexity of this Case and the Disparity of the Evidence**

As a minor player in this highly complex, multi-year RICO conspiracy prosecution, Chris Jordan should be severed to avoid the prejudice that he would suffer from the extensive, intricate, and technical evidence and legal instructions that are relevant only to his co-defendants. Mr. Jordan left Bank A in December 2009, in the early stages of the protracted, eight-and-a-half-year Conspiracy Period. A separate trial against him would be relatively straightforward and focused. In a joint trial, however, Mr. Jordan, his counsel, and the jury would be forced to contend with voluminous evidence that is focused not on Chris Jordan but on others: other people, other trading styles, other trading records, other expert analysis, other products, other time periods, other investigations, and other legal theories and charges. At the end of the case, the jury would be required to remember and apply numerous limiting instructions as they worked their way through what will be an extremely complex set of legal instructions, including for substantive offenses applicable to the co-defendants but not Mr. Jordan. *See Andrews*, 754 F. Supp. 2d at 1176-77 (complex RICO jury instructions and numerous "intricate limiting instructions" on particular pieces of evidence would create a task for the jury "akin to solving a hideously complicated puzzle"); *United States v. Gallo*, 668 F. Supp. 736, 750 (E.D.N.Y. 1987) (noting challenges faced by the jury in applying "the highly technical and counter-intuitive RICO conspiracy elements to a great range of disparate predicate conspiracies and events").

The evidence that would likely be inadmissible and prejudicial as to Chris Jordan in a separate trial, but nevertheless admitted at a joint trial, would include the following:

- *Evidence regarding alleged spoofing activity by persons other than Mr. Jordan.* Mr. Jordan's trading accounts for less than 4% of the total number of alleged spoofing sequences identified by the government, while 92% of the sequences are attributable to co-defendants and cooperating witnesses who remained employed at Bank A

through the end of the Conspiracy Period in 2016.[9]  Based on the sworn affidavit of the government's case agent, a "layering" pattern appears in the trading of the co-defendants and co-conspirators, but not Mr. Jordan.  At trial, we anticipate that the government and each of the defendants will offer extensive evidence about the trading and market data, as well as inferences that should or should not be drawn from it.  We anticipate that this evidence will be voluminous, dense and technical.[10]  Given the massive volume and complexity of the trading data that will be presented in this case, there is a real risk that the jury will be unable to maintain a separate and individualized focus on the evidence pertaining to Mr. Jordan, from both a quantitative and qualitative perspective, as it is inundated with reams of data and sophisticated expert analysis.

- *Evidence regarding Hedge Funds E and F*.  The Indictment alleges that co-defendant Gregg Smith engaged in spoofing in order to provide a benefit to "key clients" of Bank A covered by co-defendant Jeff Ruffo, specifically Hedge Funds E and F.  Indictment ¶ 26(l).  Evidence regarding these hedge funds is expected to be presented during the government's case in chief; indeed, it appears to be the sole basis on which Mr. Ruffo, a salesperson who never actually traded himself, was added into the case in the Superseding Indictment.  This portion of the government's evidentiary presentation will not pertain to Mr. Jordan, but it will cause prejudicial spillover in a joint trial and will further complicate the jury's job of making an individualized assessment with respect to him.

- *Evidence of allegedly fraudulent trading activity regarding barrier options that was carried out by persons other than Mr. Jordan*.  The Indictment alleges that the defendants defrauded clients of Bank A by engaging in open-market trading in relation to barrier-option contracts.  Although the Indictment provides scant information about these allegations, and the government has provided no meaningful supplemental information in discovery or by way of particulars, we assume that the government will be required to present detailed evidence regarding the terms of the underlying option contracts, the nature of the allegedly fraudulent trading, any relevant contextual information, and evidence of criminal intent.[11]  Chris Jordan was not responsible for barrier options, and the Indictment does not allege that he engaged in particular conduct regarding these products.  Once again, however, he will suffer from prejudicial spillover as the jury struggles to process and keep track of extensive and technical evidence.

---

[9] The remaining sequences (1,687 instances, or 3.1%) are primarily attributable to a cooperating witness who worked at Bank B but did not move to Bank A.

[10] In *United States v. Vorley*, No. 18 Cr. 35 (N.D. Ill.) (Tharp, J.), another spoofing case pending in this district, the government served pretrial disclosures stating its intention to call no fewer than four expert witnesses at trial.  *See Vorley*, Dkt. Nos. 168-3, 168-5 (filed Feb. 25, 2020).  The scope of the instant case is substantially more complex than *Vorley* in terms of time frame, number of alleged spoofing sequences, number of defendants and alleged co-conspirators, and legal theories.

[11] The discovery material produced by the government includes dense, technical presentations by Bank A's counsel and experts regarding barrier options.  Even a cursory review of these presentations makes clear that the trial evidence regarding barrier options will be complex.

- *Evidence of alleged false statements and misrepresentations by persons other than Mr. Jordan.* The Indictment alleges two sets of relatively simple alleged false statements by Chris Jordan: (1) generic compliance attestations from 2008 and 2009, in which he affirmed in general terms that he was in compliance with Bank A's code of conduct; and (2) brief testimony at the end of a long CFTC deposition that occurred in a separate investigation nine years before the Indictment was filed. At a separate trial, these alleged false statements could be addressed in a simple and straightforward manner. In a joint trial, however, the jury would hear evidence of extensive additional alleged false statements by the co-defendants in the years after Mr. Jordan left Bank A. This includes further compliance attestations after Dodd-Frank, during a time when Bank A affirmatively required its employees to report any suspected misconduct, as well as alleged false testimony by Gregg Smith in a CME investigation that we understand was focused specifically on spoofing and unspecified false statements to Bank A's compliance officers. This evidence, though inadmissible against Mr. Jordan, would essentially function as supplemental 404(b) evidence and would undermine Mr. Jordan's right to have the jury evaluate the allegations of false statements solely on the basis of evidence that is admissible with respect to him.

- *Evidence of events and conversations after Mr. Jordan's departure from Bank A and relating to persons other than Mr. Jordan.* Finally, although we have little insight into the government's intended evidentiary presentation at trial, we know that only a small fraction of the documentary record and likely witness testimony pertains to Mr. Jordan. As noted above, based on our preliminary analysis, only about 2% of the documents produced to date include Mr. Jordan's name, and most of the witnesses did not provide the government with substantive information regarding Mr. Jordan. The evidence at trial will include many events and incidents that occurred after Mr. Jordan's departure from Bank A, including, for example, internal discussions following the adoption of Dodd-Frank and the amendments to Bank A's compliance policies, as well as separate CME investigations of alleged spoofing by Smith and CC-1. This evidence is irrelevant and inadmissible with respect to Mr. Jordan, but it would cause substantial prejudicial spillover and, in combination with the other evidence, would jeopardize Mr. Jordan's right to a fair trial.

In his famous concurrence in *Krulewitch v. United States*, 336 U.S. 440 (1949), Justice Robert Jackson noted the challenges of a large-scale conspiracy trial: "the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about . . . ." *Id.* at 453. As Justice Jackson emphasized, there can be a real risk of guilt by association: "A co-defendant in a conspiracy trial occupies an

17

uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *Id*. at 454. Here, Chris Jordan occupies the "uneasy" seat of a co-defendant facing a joint trial at which the government will present extensive evidence and legal theories that are relevant to his co-defendants, but not to him.

Rule 14(a) stands as a bulwark against this sort of prejudice. Decisions regarding severance are highly fact-dependent and are committed to the sound discretion of the district court. *Zafiro*, 506 U.S. at 541; *see also Jett*, 908 F.3d at 275 ("District judges have 'wide discretion in determining when the prejudice of joinder outweighs the benefits of a single trial.'") (internal citations omitted); *Troutman*, 546 F. Supp. 2d at 615 ("The trial court has broad discretion to grant or deny a motion for severance."); *Glennon*, 2005 U.S. Dist. LEXIS 43983, at *3 (case law does not establish "a hard and fast set of facts which must exist before a severance is warranted" and the "test is a broad one").

Here, we respectfully submit that severance is necessary in order to ensure that the jury makes "a reliable judgment about [Mr. Jordan's] guilt or innocence" based solely on evidence that is admissible and probative with respect to him, and not based on evidence pertaining to others. *Troutman*, 546 F. Supp. 2d at 615–17 (granting severance because limiting instructions would not be sufficient to avoid prejudice against peripheral defendant in light of gross disparity in evidence); *see also Andrews*, 754 F. Supp. at 1177 (ordering severance because of highly complex allegations and gross disparity in evidence among defendants); *Stoecker*, 920 F. Supp. at 886 (granting severance because of a gross disparity in evidence); *Glennon*, 2005 U.S. Dist. LEXIS 43983, at *4–5 (granting severance because of spillover prejudice for which limiting instructions were inadequate); *United States v. Brinkley*, No. 2:18-cr- 21, 2019 WL 4278971, at

*2 (N.D. Ind. Sept. 10, 2019) (granting severance, despite conspiracy charge, because joint trial presented "a substantial risk of guilt simply by association" in light of disparity in evidence).

### C. A Severance is Warranted Because of Particular Evidentiary Problems Associated with a Joint Trial

In addition, and more specifically, severance is warranted to avoid thorny evidentiary problems associated with two particular categories of evidence: (1) documents and testimony relating to Mr. Jordan's departure from Bank A in late 2009; and (2) statements that Mr. Jordan made about his co-defendants during an uncounseled interview by FBI agents in November 2018. As outlined below, the issues associated with these items of evidence could be managed relatively easily in separate trials, but they would present significant problems at a joint trial.

### 1. Evidence Relating to Mr. Jordan's Departure from Bank A

In May 2006, having spent twelve years working at other banks in New York, Mr. Jordan joined Bank A as the main spot trader for gold and silver. At Bank A, Mr. Jordan worked with other members of the precious metals trading business, including Michael Nowak (his supervisor and the main precious metals options trader) and John Edmonds (a clerk and subsequently a junior trader). In May 2008, as a result of the financial crisis, Bank A acquired Bank B, which had previously had its own precious metals trading business. The members of the Bank B precious metals desk included Gregg Smith, the main spot trader for gold and silver, as well as Christian Trunz (precious metals ETF trader) and Jeff Ruffo (salesperson). *See generally* Indictment ¶¶ 7, 18-20.

We expect the evidence to show that, after the merger, there was friction on the newly-combined Precious Metals Desk, especially between Mr. Jordan and Mr. Smith. Mr. Smith was given primary responsibility for trading gold – by far the most important precious metal – and Mr. Jordan was relegated to the less important job of trading silver. Mr. Jordan resented this

reassignment, and over time the climate on the desk grew increasingly tense. The issues were exacerbated due to personality clashes between Mr. Jordan and Mr. Smith, as well as accusations by Mr. Smith that Mr. Jordan had engaged in improper "front-running" of Mr. Smith's transactions. Mr. Jordan denied those allegations.

As reflected in trading records produced in discovery, Mr. Jordan's last day of trading at Bank A was November 11, 2009. Discovery materials indicate that a number of issues ultimately led to Mr. Jordan's termination, including: (a) concerns that Mr. Jordan had violated management's directive by continuing to trade gold futures at times when Mr. Smith was in the market; (b) a view by management that Bank A did not need two spot precious metals traders; and (c) concerns that Mr. Jordan did not immediately report an unrelated incident of suspected insider trading by members of a separate proprietary trading group at Bank A. Benjamin Decl., ¶¶ 4, 9; Benjamin Sealed Decl., ¶ 7. On or around December 18, 2009, Mr. Jordan signed a Release Agreement in favor of Bank A. As reflected in this agreement, the terms of Mr. Jordan's separation included severance pay, severance-related benefits, career services, and a "special discretionary payment" of $200,000. Benjamin Decl., ¶ 10. According to Bank A's HR records, Mr. Jordan's official termination date was December 25, 2009. There is no indication in Mr. Jordan's employment file that he was subject to discipline at Bank A. Benjamin Sealed Decl., ¶ 20.

At trial, we expect Mr. Jordan and Mr. Smith to offer different evidence relating to the friction on the Precious Metals Desk and Mr. Jordan's departure from Bank A. Such evidence would create substantial issues under Rule 403 at a joint trial. However, the issues would largely if not entirely disappear if Mr. Jordan were tried separately.

### a.  Evidence to be offered by Mr. Jordan

On behalf of Mr. Jordan, we expect to offer evidence of the toxic relationship between Mr. Jordan and Mr. Smith during the time that they worked together at Bank A, as well as Mr. Jordan's anger and resentment toward Mr. Smith and others at Bank A, including Mr. Nowak and Mr. Ruffo, after Mr. Jordan's employment was terminated.  In particular, we expect to offer evidence that Mr. Smith accused Mr. Jordan of engaging in wrongdoing on the Precious Metals Desk that had nothing to do with spoofing or barrier options; that Mr. Jordan denied the allegations; that Mr. Jordan was terminated shortly after Mr. Smith made the allegations; that Mr. Jordan believed that one reason for his termination from Bank A was Mr. Smith's accusations of wrongdoing; that the termination was on the terms described above (due to redundancy, without discipline, and including severance, a $200,000 special payment, and career services); and that after his termination, Mr. Jordan openly expressed his disdain for his former colleagues and his disassociation with them.  We will offer this evidence to rebut the government's allegation that Mr. Jordan knowingly and intentionally participated in a conspiracy involving Mr. Smith and certain other members of the Precious Metals Desk.  The evidence will also support an alternative argument that, even if the government can establish a conspiracy, Mr. Jordan's participation ended no later than his termination from Bank A in late 2009.

We expect to offer the foregoing evidence, *inter alia*, through the testimony of anticipated government witnesses John Edmonds, Christian Trunz, and a former Bank A compliance officer ("Individual A"), as well as Bloomberg communications which will be admissible as business records and which will be offered to establish Mr. Jordan's state of mind.  *See* Fed. R. Evid. 801(c)(2), 803(3), 803(6).[12]  The discovery material contains the following information:

---

[12] As we continue to review discovery and prepare for trial, we of course reserve the right to identify additional witness testimony and documentary evidence to support Mr. Jordan's defenses.

- As reflected in a 302 dated October 3, 2018, John Edmonds told the government that "Smith and Jordan did not get along. Smith accused Jordan of front running client orders. Jordan was ultimately fired for issues related to front running." Later in the 302, Edmonds stated that he had "heard Jordan was accused of front running which ultimately led to him being fired. Jordan sold silver ahead of a client order in gold. Since the market prices of silver and gold correlated, it was considered front running. Edmonds learned of this through conversations with Smith after it occurred." In a subsequent interview reflected in a 302 dated June 6, 2019, Edmonds stated that he "was unsure why Jordan was fired from [Bank A], he just got up from his desk and was gone. Nothing much was said and it was unclear what the reason was. When Jordan was asked about it Edmonds said Jordan told them it was as a result of Smith but nothing in detail." Benjamin Sealed Decl., ¶¶ 14–15.

- As reflected in a 302 dated October 7, 2019, Christian Trunz told the government that "Jordan getting fired was because of the tension between him and Smith." Trunz elaborated later in the 302: "The relationship between Smith and Jordan did not play out well. There was an issue between them about trading when the other was in the market. For example Jordan was not to be trading gold when Smith was trading in the market. Smith was not to be trading silver when Jordan was trading in the market. You did not want to get in the way of the executing trader. If Smith had to buy 50,000 ounces of gold for an account [Bank A] did not want the impression of a small order looking like front running against the client order. Trunz explained it as pencils down and let Smith trade." Benjamin Sealed Decl., ¶ 17.

- As reflected in a 302 dated August 26, 2019 Individual A told the government: "Jordan was fired because he was as dumb as a bucket of rocks. Jordan was given a job to do by Nowak. Jordan was told to trade silver and Smith would trade gold. [Individual A] knew from speaking with Nowak. There were a number of occasions where both Smith and Jordan were in the market at the same time, cross trading with one another and stepping on each other's feet while trading the same products. Jordan would do what he wanted. Trading in gold and not listening to Nowak which eventually led to Nowak firing Jordan. [Individual A] had conducted a review of how many times Jordan continued to trade gold after being told to no longer trade the product. Jordan was ultimately fired for insubordination." Benjamin Sealed Decl., ¶ 8.

- On April 23, 2010, after Mr. Jordan had begun working at Bank C, he participated in a Bloomberg chat with a friend who was employed as a trader at another financial institution ("Individual B"). In this chat, Mr. Jordan expressed anger and indignation about his departure from Bank A and Mr. Smith in particular:

  *Chris Jordan*: . . . i have very strong opinions, smitty better hope he never walks by me on a street / because it will be go time

  *Individual B*: gotcha bro. . . .

22

*Chris Jordan*:  i know u guys r close so whatever, but to me hes a snake

*Individual B*:  yeah i hear you bro.  dont worry we aint that close.  and nothig would ever get back.  . . .

*Chris Jordan*:  every dog has his day, he will get his trust me, caught him red handed accussing me of front running blah, thats how the whole thing went donmt, but trust me he better stay far away from me, and ruffo too for that matter

*********

*Chris Jordan*:  it just made me feel dirty, the whole experience

*********

*Chris Jordan*:  . . . i was up 9 bux, anmd then the shole sh t went down, but i saw greggs true colors, kissed my b early then accussed me of smthg ridiculous, i dunno, i hate even thinkin abt it

*********

*Chris Jordan*:  . . . i actually like jeff and gregg never [CC-3], but they are nothing more than snakes in the grass, and like i said u tell smitty to stand clear of me cuz he will get worked if i see him.  no joke / i meant i "liked gregg and jeff" past tense / WORKED ahah

*Individual B*:  yeah i hear you bro.  must hae been a complete shitshowe there . . .

*Chris Jordan*:  was very tough on me, cuz the one thing i always been is a man of my word and to be accused of front running gregg was so outta left field, but when the whole compliance thing went down someone had to take the fall, and ur talking to him.  Benjamin Sealed Decl., ¶ 9.[13]

- On April 29, 2010, Mr. Jordan and Individual B returned to the same topic, and Mr. Jordan once again used blunt language to express his disdain for his former colleagues at Bank A:

  *Chris Jordan*:  [Smith] is the worst, worse than the old days, seriously felt ill sitting near him,.  i felt dirty

  *********

---

[13] Non-standard spelling, punctuation, and formatting in this and other Bloomberg chats quoted herein are contained in the original documents.  In the excerpts quoted herein, separate but adjacent comments are joined together and denoted by a back slash ("/").  Omissions are denoted by ellipsis or asterisks.

*Chris Jordan*: [Nowak is] a punk / sori i have some strong feelings abtv that place . . .

\*\*\*\*\*\*\*\*\*

*Chris Jordan*: yeah it was great for a while. put it this way mike came to all my kids bday parties and i his, and after the whole fiasco he didnt call me – 4 months and although what happened sucked i thot he was a friend, so thats my view

*Individual B*: i gotcha youbro. yeah that sux. thing i can sense is all those guys out for themselves.

*Chris Jordan*: yep, i gave people too much credit, whatever, still have a v bad taste in my mouth from it . . . . Benjamin Sealed Decl., ¶ 10.

- On June 8, 2010, Mr. Jordan expressed harshly negative views about Gregg Smith, Christian Trunz, and CC-3 in a Bloomberg chat with John Edmonds:

  *Chris Jordan*: bibi [CC-3] / enjoy the boat, i hope it sinks

  *John Edmonds*: hahaaa im dying here

  *Chris Jordan*: christian needs to get beaten too by the wy / what a chump / pls tell him i said that

  *John Edmonds*: lol yeah ill be sure tio

  *Chris Jordan*: im serious / p u n k

  \*\*\*\*\*\*\*\*\*

  *Chris Jordan*: rich kid + zero talent, sucks up to [CC-3], nice career chump. Benjamin Sealed Decl., ¶ 11.

- Two days later, on June 10, 2010, Mr. Jordan expressed similar sentiments in a Bloomberg chat with Mr. Edmonds:

  *John Edmonds*: smitty saying his kid is better than strasburg

  *Chris Jordan*: he beeter never walk past me on a nyc street / and christian too

  *John Edmonds*: hahah . . .

  *Chris Jordan*: chumps, i hope his and [CC-3's] boats collide this summer in the hamptons. Benjamin Sealed Decl., ¶ 12.

The foregoing evidence – including the colorful language that Mr. Jordan employed in the Bloomberg chats with Individual B and Mr. Edmonds – is critical for Mr. Jordan's defense at trial.[14]  We do not know what if any position the government or the co-defendants will take on the admissibility of the foregoing evidence, particularly in light of the fact that the government has not yet provided its *Santiago* proffer.  However, from the perspective of one or more co-defendants, there are obvious Rule 403 issues with the prejudicial portions of the chats in which Mr. Jordan describes Mr. Smith as a "snake" and a "snake in the grass"; says that Mr. Smith is "the worst," that Mr. Jordan "seriously felt ill sitting near him," and that Mr. Nowak is a "punk"; states that Mr. Smith's accusations and the ensuing experience at Bank A "made me feel dirty"; threatens to physically assault Mr. Smith in the event of a meeting ("smitty better hope he never walks by me on the street / because it will be go time"; "he better stay far away from me, and ruffo too for that matter"; "u tell smitty to stand clear of me cuz he will get worked if i see him / . . . WORKED"); and expresses the hope that Mr. Smith and CC-3 would suffer a maritime disaster.

At a joint trial, the Court would face the difficult task of reconciling Mr. Jordan's right to present his defense, including the deeply personal language quoted above, with one or more co-defendants' right to avoid unfair prejudice, which could require the exclusion of such evidence. However, if Mr. Jordan were granted a severance, these issues would be avoided.  *See Zafiro*, 506 U.S. at 539 (severance is appropriate "if essential exculpatory evidence that would be

---

[14] With respect to the accusations made by Mr. Smith against Mr. Jordan, we anticipate seeking an *in limine* ruling, pursuant to Fed. R. Evid. 403, that the term "front-running" should be replaced, in testimony and in the chats with Individual A, by a generic reference to "improper trading."  We likewise anticipate seeking a cautionary instruction this alleged "improper trading" did not include spoofing or anything relating to barrier options, and that Mr. Smith's accusations should not be considered as evidence to support the charges in the Indictment.  The reasons for this anticipated *in limine* motion are summarized *infra* at 27-28.

available to a defendant tried alone were unavailable in a joint trial"); *Perez*, 2016 U.S. Dist. LEXIS 100154, at *4–6 (severance granted when defendant wished to offer his own out-of-court statements, but they caused substantial prejudice for co-defendant and could not be redacted satisfactorily).

### b. Evidence to be offered by Mr. Smith

We understand that Mr. Smith also intends to offer evidence regarding the friction with Mr. Jordan, but that the contours and nature of Mr. Smith's proffered evidence are somewhat different. We understand that Mr. Smith intends to offer evidence that he affirmatively told supervisors and compliance that he believed Mr. Jordan had engaged in front-running and that, as both Mr. Smith and Mr. Jordan understood, compliance conducted a review of trading activity by both Mr. Jordan and Mr. Smith. This evidence will rebut the existence of a conspiracy as well as the government's allegations that Mr. Smith acted with criminal intent.[15]

We understand that, as part of this evidentiary presentation, Mr. Smith intends to identify the specific nature of the behavior that he flagged for compliance; *i.e.* front-running. We further understand that, from Mr. Smith's perspective, this detail is important in order to convey to the jury that Mr. Smith's report to compliance concerned a serious matter, which in turn is relevant to Mr. Smith's mental state as well as the existence or non-existence of a conspiracy. From Mr. Smith's perspective, the detail also will explain why compliance would need to conduct a review of trading activity of both Mr. Jordan and Mr. Smith, in order to evaluate Mr. Smith's allegation.

---

[15] We understand that Mr. Smith intends to present this evidence, *inter alia*, via testimony from anticipated government witnesses and documents which will be admissible as business records of Bank A. If the Court wishes to see a more detailed proffer of the evidence that Mr. Smith intends to offer in this regard, we understand that Mr. Smith's counsel is prepared to provide this information in an *ex parte* filing. *See United States v. Duncan*, No. 05-80025, 2011 WL 2446479, at *2–3 (E.D. Mich. June 4, 2011) (authorizing *ex parte* proffer of evidence by defendant seeking severance in order to protect defendant's trial strategy).

However, Mr. Jordan will object to any reference to "front-running," pursuant to Fed. R. Evid. 403, on grounds of unfair prejudice, confusion, and delay. Although the precise definition of "front-running" is complex and its implications can vary depending on the context and the relationship between the parties involved, *see United States v. Dial*, 757 F.2d 163, 168–69 (7th Cir. 1985) (trading ahead by a fiduciary without disclosure constitutes "a scheme to defraud in a rather classic sense" and falls within mail and wire fraud statutes); *see also CFTC v. Sarvey*, No. 08 C 192, 2012 WL 426746, at *4 (N.D. Ill. Feb. 10, 2012) (Kendall, J.) (trading ahead by a broker constitutes fraud under the Commodity Exchange Act), Mr. Jordan would be subjected to substantial unfair prejudice if the jury were to learn that one of his co-workers had accused him of front-running, especially when the predicate acts of the charged RICO conspiracy are bank fraud and wire fraud affecting a financial institution. If the jury were permitted to hear this specific accusation, a mini-trial would ensue, as Mr. Jordan would be required to litigate the merits (or lack thereof) of Mr. Smith's accusations. This would be extremely difficult given the passage of time, and in any event would result in a waste of time and a substantial risk of confusion and unfair prejudice.

In *United States v. Flotron*, which arose from alleged spoofing on the precious metals desk at UBS, the trial judge granted the defendant's *in limine* motion, pursuant to Rule 403, to exclude evidence of alleged front-running. *United States v. Flotron*, No. 3:17-cr-00220 (JAM) (D. Conn. Apr. 3, 2018), Dkt. No. 178, at 1 ("The prejudicial effect of this evidence concerning separate wrongful activity substantially outweighs its probative value, especially in view of the fact that the evidence of the alleged conduct does not factually overlap with the charged offense"). The same analysis applies here.

In sum, at a joint trial the Court would be forced to choose between watering down the evidence of accusations of front-running to be offered by Mr. Smith, on one hand, and risking substantial unfair prejudice, confusion and delay if Mr. Jordan were forced to defend against this allegation, on the other. At separate trials, however, the issue would be moot. *See Zafiro*, 506 U.S. at 539; *Perez*, 2016 U.S. Dist. LEXIS 100154, at *7–9.

### 2. Evidence of Mr. Jordan's Statements to FBI Agents in November 2018

On November 18, 2018, FBI agents visited Mr. Jordan at his parents' home in Mountainside, New Jersey, and conducted a surprise, uncounseled interview. Agents took notes during the interview of Mr. Jordan, and subsequently prepared a six-and-a-half-page interview report on FBI Form FD-302. *See* Benjamin Sealed Decl., ¶ 7. As reflected in the 302, Mr. Jordan made inculpatory statements with respect to co-defendants Gregg Smith, Mike Nowak and Jeff Ruffo.

The government has informed us that it intends to offer Mr. Jordan's statements at trial. In a pre-motion telephone call, the government acknowledged that some of Mr. Jordan's statements about his co-defendants would create an issue under *Bruton v. United States*, 391 U.S. 123 (1968), but expressed the view that the *Bruton* issues could be addressed via redactions or substitutions. We invited the government to identify the specific measures that it believed would be appropriate, but the government declined to do so. As outlined below, we have carefully reviewed the Jordan 302, and we respectfully submit that redactions or substitutions would not be workable. [16] Accordingly, severance is necessary.

---

[16] We nonetheless request that the government be required to promptly disclose its intended redaction of any portion of Mr. Jordan's statement that refers or relates to the co-defendants. Messrs. Smith, Nowak and Ruffo join in that request, so that they may be heard in a timely manner, as necessary, concerning the adequacy of the government's proposal to protect their rights.

a.    **Applicable Law**

In *Bruton*, the Supreme Court held that a defendant's Sixth Amendment right to confront and cross-examine adverse witnesses is violated if a non-testifying co-defendant's confession is received in evidence at a joint trial, and the confession inculpates the defendant.  In such a situation, the Court held, a cautionary instruction to the effect that the confession is admissible only against the co-defendant, and not against the defendant, is inadequate to protect the defendant's Constitutional rights.  *Bruton*, 391 U.S. at 137.

In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Court found no *Bruton* violation where the co-defendant's confession had been redacted to omit any reference to the defendant's existence.  In *Gray v. Maryland*, 523 U.S. 185 (1998), however, the Court found a Sixth Amendment violation where the jury heard a redacted version of the co-defendant's confession in which the defendant's name was replaced by a blank space or the word "deleted."  Although the redactions required the jury to draw an inference to connect the confession to the defendant, the court found a violation because the linkage to the defendant was direct and obvious.  *Id.* at 196 ("The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.").

Under Seventh Circuit precedent, a court considering whether a co-defendant's statement passes muster under *Bruton* must assess whether the statement, as redacted, "'obviously' refer[s] to the defendant."  *United States v. Green*, 648 F.3d 569, 575 (7th Cir. 2011); *see also United States v. Hernandez*, 330 F.3d 964, 973 (7th Cir. 2003).  In this regard, the reviewing court should consider whether "the redactions create a 'one-to-one correspondence between the inserted terms and the co-defendants at issue.'"  *United States v. West*, 790 F. Supp. 2d 687, 690

29

(N.D. Ill. 2011) (Kennelly, J.) (quoting *Hernandez*, 330 F.3d at 973); *see also Green*, 648 F.3d at 545 (discussing whether substitutions were sufficiently obvious to create a "one-to-one correspondence between the statement and the defendant"); *United States v. Hoover*, 246 F.3d 1054, 1059 (7th Cir. 2001) (same). In doing so, a court must undertake a fact-intensive inquiry. "This determination, focusing on the minutiae of the substituted word or phrase and surrounding context, is not always easy to make. A district court's evaluation becomes especially difficult when the defendant's identity can be established through other evidence offered at trial." *Green*, 648 F.3d at 575 (internal citations omitted).

In conducting a *Bruton* analysis, a court must look beyond the "four corners" of the co-defendant's statement itself, and must consider how the jury would interpret the statement in context, including the way that counsel will describe the case in their opening statements. *West*, 790 F. Supp. 2d at 691 ("[A] court does not consider a redacted statement in isolation. Rather, it can and should consider the surrounding circumstances in determining whether the redacted statement impermissibly identifies a non-testifying co-defendant."); *see also Hoover*, 246 F.3d at 1059 ("Very little evidence is incriminating when viewed in isolation; even most confessions depend for their punch on other evidence. To adopt a four-corners rule would be to undo *Bruton* in practical effect."). In *West*, the court found that the jury would draw a link between the co-defendants' redacted statements and the defendants "even were the statements the first item of evidence introduced at trial. By that point, both sides will have framed the case in their opening statements." *Id*. at 691-92.

If the court determines that a jury would easily connect the redacted statement to the defendant, either the confession is inadmissible or severance is required to avoid a Sixth Amendment violation. *See id.* at 690 (even with redactions, "one can easily determine [the

30

defendants'] identities with only a cursory understanding of the case"); *United States v. Bouzanis*, No. 00 Cr. 1065, 2003 WL 22143278, at *6 (N.D. Ill. Sept. 16, 2003) (Lefkow, J.) ("Based on the proposed redacted statement, the jury could easily identify 'Individual A' as George Palivos."); *United States v. Ludke*, No. 16-CR-175, 2018 WL 1378759, at *3 (E.D. Wis. Mar. 19, 2018) ("[G]iven the specific allegations in this case, despite the redaction, the statement obviously refers directly to Ludke . . . ."), *report and recommendation adopted*, 2018 WL 2059556, at *3 (E.D. Wis. May 2, 2018); *Perez*, 2016 U.S. Dist. LEXIS 100154, at *6 ("This is the kind of one-to-one correspondence between the person implicated in a statement and the defendant that has been found to offend *Bruton*."); *see also Zafiro*, 506 U.S. at 539 (severance is warranted in the event of a *Bruton* issue).

### b. Discussion

As set forth in the 302 prepared by the interrogating agents, Mr. Jordan made a number of inculpatory statements with respect to Gregg Smith, Jeff Ruffo, and Michael Nowak. Mr. Jordan's statements contain specific and particularized details that will create an obvious linkage to each of the three defendants. With respect to Mr. Smith and Mr. Ruffo, the inculpatory statements focus on spoofing; with respect to Mr. Nowak, the inculpatory statements focus on barrier options. Given the particularity of Mr. Jordan's statements, any attempt to redact them to avoid the references to the defendants would be futile. Moreover, Mr. Jordan would likely object to any redactions intended to address *Bruton* issues.

### i. Mr. Jordan's Statement to the Agents Inculpates Mr. Smith and Mr. Ruffo in Spoofing-Related Activity

Mr. Jordan's 302 contains the following language that inculpates Mr. Smith and Mr. Ruffo in spoofing-related activity:

███████████████████████████████████████████



Benjamin Sealed Decl., ¶ 7. This statement matches up with the government's specific, unique allegations regarding Mr. Smith and Mr. Ruffo, such that any attempt at redactions would fail. This is clear from the face of the Indictment and from the anticipated testimony of two of the government's cooperating witnesses.

As noted above, the Indictment alleges that Mr. Smith, along with Mr. Trunz, brought to Bank A "a new style of layering multiple Deceptive Orders at different prices in rapid succession that, in the aggregate if not individually, were substantially larger than the visible portion of the opposite-side Genuine Order. This new style of 'layering,' which was more difficult both to execute and to detect, took hold on the Precious Metals Desk . . . ." Indictment ¶ 26(e).

Moreover, as alleged in the Indictment, achieving better transaction prices for Hedge Fund E was a motive for the spoofing activity undertaken by Mr. Smith.  Indictment ¶ 26(l).  As set forth in the Indictment, Mr. Ruffo was the Bank A salesperson who covered Hedge Fund E.  *Id.* ¶ 18(c).  He is alleged to have directed Hedge Fund E's precious metals orders to Mr. Smith who, in turn, is alleged to have engaged in spoofing "with Ruffo's knowledge and encouragement."  Indictment ¶ 26(l).



Benjamin Sealed Decl., ¶¶ 13–19.  Given these idiosyncratic and unique details, and the fact that

they closely parallel Mr. Jordan's statement and figure prominently in the government's spoofing

allegations, any effort at redaction would be unavailing.  As in *West*, the jury would be able to

connect Mr. Jordan's statements to Mr. Smith and Mr. Ruffo "with only a cursory understanding

of the case," after the opening statements of counsel.  790 F. Supp. 2d at 690.  Accordingly, a

severance is warranted.  *See id.* at 691–92; *Ludke*, 2018 WL 1378759, at *3; *Perez*, 2016 U.S.

Dist. LEXIS 100154, at *6.

### ii. Mr. Jordan's Statement to the Agents Inculpates Mr. Nowak Regarding Barrier Options

Separately, Mr. Jordan's 302 contains the following language that inculpates Mr. Nowak

with respect to barrier options:



Benjamin Sealed Decl., ¶ 7.  In light of the allegations in the Indictment and the anticipated

testimony of John Edmonds, these statements create a "one-to-one correspondence" with Mr.

Nowak.  *See West*, 790 F. Supp. 2d at 690.

The Indictment defines a barrier option as "a type of option whose value depended on whether or not the underlying asset reached or exceeded a predetermined price during the lifetime of the option," and alleges that the defendants and their co-conspirators "defrauded clients of Bank A who had bought or sold barrier options, by trading in a manner that was calculated to push the price of the underlying assets away from the price point at which Bank A would lose money on the options and toward the price point at which Bank A would profit from the options." Indictment ¶¶ 16, 27. Mr. Jordan's statement about trading in connection with barrier options is clearly relevant to these allegations, as is the anticipated testimony of Mr. Edmonds.



As with the spoofing-related accusations against Mr. Smith and Mr. Ruffo, the jury would easily connect Mr. Jordan's statements about barrier options to Mr. Nowak, creating an insoluble *Bruton* problem that

requires severance. *See West*, 790 F. Supp. 2d at 690–92; *Ludke*, 2018 WL 1378759, at *3; *Perez*, 2016 U.S. Dist. LEXIS 100154, at *6.

### iii. Mr. Jordan Would Likely Object to any Material Redactions or Alterations of his Statement to the FBI to Address *Bruton* Problems

As outlined above, we believe that it would be futile to attempt to redact or otherwise alter Mr. Jordan's statement to the FBI in light of the specific and particularized references to his co-defendants. However, even if such redactions or alterations could be fashioned, it is likely that Mr. Jordan would object. In order to present Mr. Jordan's defense at trial, it is necessary for the jury to be told about Mr. Jordan's statement to the FBI organically, without artificial redactions or alterations to address *Bruton* problems. This is necessary to refute Mr. Jordan's participation in the charged conspiracy, as outlined above, and for other compelling but confidential strategic reasons that we can describe in an *ex parte* submission if requested by the Court. *See Ludke*, 2018 WL 1378759, at *3 (finding that government's proposed redaction was unworkable in part because it interfered with confessing defendant's "right to present a defense as it excludes potentially exculpatory information"). *Duncan*, 2011 WL 2446479, at *2–3 (authorizing *ex parte* proffer of evidence by defendant seeking severance in order to protect defendant's trial strategy).

## IV. CONCLUSION

For the foregoing reasons, Mr. Jordan respectfully requests that the Court order a severance, pursuant to Fed. R. Crim. P. 14(a), and that he be tried separately from his co-defendants.

Dated: May 26, 2020                     Respectfully submitted,


  /s/ James J. Benjamin, Jr.        
James J. Benjamin, Jr.
Parvin D. Moyne
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Street
Suite 5350
Chicago, Illinois 60654
(312) 450-6700

*Counsel for Christopher Jordan*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2020, I caused a copy of the foregoing Memorandum of Law in Support of Defendant Christopher Jordan's Motion to Sever to be filed with the Clerk of the Court through the CM/ECF system, which will provide notice of the filing to all counsel of record.

 /s/ James J. Benjamin, Jr.
James J. Benjamin, Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000

*Counsel for Christopher Jordan*