## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

       v.

CHRISTOPHER JORDAN

Case No. 19-cr-00669

Hon. Edmond E. Chang

## DEFENDANT CHRISTOPHER JORDAN'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A JUDGMENT OF ACQUITTAL UNDER RULE 29

James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Drive
Suite 5350
Chicago, Illinois 60654
(312) 450-6700

*Counsel for Christopher Jordan*

## PRELIMINARY STATEMENT

On behalf of our client, Christopher Jordan, we respectfully submit this motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. As set forth below, the trial evidence was insufficient for a rational juror to conclude beyond a reasonable doubt that Mr. Jordan: (a) knowingly participated in a "scheme to defraud" within the meaning of the wire fraud statute; (b) made a false statement to trading counterparties; and (c) acted with the criminal intent to defraud.[1]

## LEGAL STANDARD

Under Fed. R. Crim. P. 29, a court must set aside the verdict and enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction." *See* Fed. R. Crim. P. 29(a); *see also* Fed. R. Crim. P. 29(c). A judgment of acquittal is warranted when, viewing the evidence in the light most favorable to the government, no rational trier of fact could conclude that the government proved the elements of the crime beyond a reasonable doubt. *United States v. Garcia*, 919 F.3d 489, 496-97 (7th Cir. 2019); *United States v. Mohamed*, 759 F.3d 798, 803 (7th Cir. 2014); *see also United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013) ("[T]he height of the hurdle depends directly on the strength of the government's evidence."). Where, as here, the government's case relies on circumstantial evidence and inferences, a court must ensure that "each link in the chain of inferences [is] sufficiently strong to avoid a lapse into speculation," in order to protect against a conviction based on mere speculation. *See Garcia*, 919 F.3d at 503 (citing *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001)). "Circumstantial evidence that leads only to a 'strong suspicion that someone is involved in a criminal activity is no substitute for proof

---

[1] If the Court denies this motion, or conditionally grants the motion pursuant to Fed. R. Crim. P. 29(d), Mr. Jordan respectfully requests a new trial pursuant to Fed. R. Crim. P. 33, for the reasons set forth herein and in his separately-filed motion for a new trial (the "Rule 33 Motion"). In this memorandum of law, "GX" refers to government exhibits that were received at trial; "DX" refers to defense exhibits that were received at trial; and "[date] Tr." refers to proceedings at the trial in this case.

of guilt beyond a reasonable doubt.'" *See id.* at 503 (citing *Piaskowski*, 256 F.3d at 692).

## ARGUMENT

**I.    The Government Failed to Prove that Mr. Jordan Knowingly Participated in a "Scheme to Defraud" Within the Meaning of the Wire Fraud Statute**

At trial, the government was required to prove, beyond a reasonable doubt, that Mr. Jordan knowingly devised or participated in a "scheme to defraud," which was defined in the jury instructions "as a scheme that (1) is intended to deceive or cheat another and (2) is intended to obtain money or property from the alleged victims or cause the potential loss of money or property to the alleged victims by means of materially false or fraudulent pretenses, representations, or promises." 12/7/22 Tr. 1307; *see also* ECF No. 804 at 20. This language reflects the foundational requirement, in all federal property fraud cases, that "[t]he government must show that the scheme to defraud was aimed at some form of money or property." *United States v. Kelerchian*, 937 F.3d 895, 909 (7th Cir. 2019); *see also Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) ("The wire fraud statute . . . prohibits only deceptive 'schemes to deprive [the victim of] money or property.'") (brackets in original) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)).

Viewing the trial evidence in the light most favorable to the government, the evidence was insufficient to prove that Mr. Jordan carried out a deceptive scheme to deprive his trading counterparties of money or property. Even assuming *arguendo* that the government's evidence was sufficient to prove that trading counterparties may have drawn incorrect inferences about the balance of supply and demand based on Mr. Jordan's spoof orders, *see* 12/5/22 Tr. 999-1000 (Varner); *id*. 1057-59 (Venkataraman), and that the spoof orders induced at least one counterparty "to trade at prices we wouldn't trade at normally," *id*. 1004 (Varner), it was undisputed that when the counterparties accepted Mr. Jordan's orders, they got exactly what they bargained for: valid CME futures contracts, bought or sold, at a given price, for a given quantity. *See id*. 1041-42

2

(Varner) (in the context of a specific episode, confirming that Mr. Jordan purchased the contracts that Quantlab's algorithm offered to sell, and that Mr. Jordan did not "try to renegotiate or back out of this trade"); *id*. at 1044-45 (same); *see also* 12/1/22 Tr. 319 (Scheerer) (orders on the CME are immediately executable and, if matched in Globex, they are executed); 12/6/22 Tr. 1114-15 (Venkataraman) (if a counterparty traded against one of Mr. Jordan's spoof orders, they "would get exactly what Chris Jordan was offering to sell").  As Professor Venkataraman testified on cross-examination, trading on the futures exchange is a commercial transaction, in which both sides receive the benefit of their bargain:

> Q.  So let's imagine two market participants, A and B.  Ok?  Are you with me?
>
> A.  Yes.
>
> Q.  Maybe they're human traders, maybe they're algorithms.  Doesn't matter.  Let's say A enters an order on the offer side to sell 100 gold futures contracts at a price of 1289 per ounce.  Okay?
>
> A.  Okay.
>
> Q.  And let's say B sees that offer resting on the exchange and decides that looks like a good price, I would like to buy those 100 gold futures contracts at that price.  Okay?
>
> A.  Okay.
>
> Q.  If B enters an order to buy that matches A's order to sell, a transaction is done, correct?
>
> A.  That's right.
>
> Q.  A has sold 100 gold futures contracts at a price of $1289 per ounce, correct?
>
> A.  Um-hmm.  That's right.
>
> Q.  And B has purchased 100 gold futures contracts at that same price, correct?
>
> A.  That's correct?

3

Q. This is a commercial transaction, correct?

A. Yes.

Q. Both sides have received the benefit of their bargain, correct?

A. Yes.

12/6/22 Tr. 1116-17.

There was no testimony or evidence that any of Mr. Jordan's trading counterparties ever lost money as a result of his spoof orders. Based on the evidence that was presented to the jury, the transaction prices at issue in this case were the result of the independent judgment of Mr. Jordan's sophisticated transaction counterparties who decided—on their own accord—to transact at the prices that were reflected in Mr. Jordan's bids and offers. *See* 12/5/22 Tr. 1033 (Varner) ("Q. The algorithm's programmed to consider what to do with information and decide whether or not to buy or sell? A. Yes."); 12/6/22 Tr. 1103-04 (Venkataraman) ("Q. Each trader has to assess whether or not to trade based on the information that is displayed in the order book, correct? A. Yes. Q. That requires judgment? A. Yes."). At most, viewing the evidence in the light most favorable to the government, Mr. Jordan's spoofing deprived counterparties of information—his subjective intention to cancel the orders—that could have informed their economic decision-making about whether to buy or sell futures contracts, and at what price.

This theory of federal property fraud, known as the "right to control" theory, took root in the Second Circuit in the 1990s, *see* Tai H. Park, *The 'Right to Control' Theory of Fraud: When Deception Without Harm Becomes a Crime*, 43 Cardozo L. Rev. 135 (2021), and was later accepted (at least to some degree) by the Seventh Circuit. *See Kelerchian*, 937 F.3d at 909-914; *cf. United States v. Walters*, 997 F.2d 1219, 1226 n.3 (7th Cir. 1993) (criticizing the theory). However, the theory is currently living on borrowed time.

In *United States v. Ciminelli*, No. 21-1170, the Supreme Court granted certiorari to consider

4

whether the "'right to control' theory of fraud—which treats the deprivation of complete and accurate information bearing on a person's economic decision as a species of property fraud—states a valid basis for liability under the federal wire fraud statute, 18 U.S.C. § 1343." Brief for Pet'r, *Ciminelli*, at i (Aug. 29, 2022). In its merits brief in *Ciminelli*, the government confessed error and conceded that the "right to control" theory is "incorrect." Brief for Resp't, *Ciminelli*, at 24 (Oct. 2022). During the oral argument held on November 28, 2022, numerous Justices discussed the likelihood of a reversal and a rejection of the right to control theory in light of the government's confession of error. *See, e.g.*, Tr. of Oral Arg., *Ciminelli*, at 8-9 (Justice Kavanaugh: "So, if we could just write an opinion saying the right-to-control theory is no longer good for the reasons you've stated and even the government acknowledges, that's the end of it? Mr. Dreeben: That would be fine with us, Justice Kavanaugh . . ."); *id*. at 38 (Justice Gorsuch: "I do admire the government's concession of -- of error here, and I appreciate the candor with which you -- you've made it."); *id*. at 51 (Justice Sotomayor: "The core of the right-to-control theory is that a prosecution is allowed to show a deprivation of property simply by showing a deprivation of economically valuable information. You've disavowed that, correct? Mr. Feigin: Your Honor, read simply that broadly, yes."). In light of *Ciminelli*, we respectfully submit that the evidence at trial was insufficient to establish, beyond a reasonable doubt, that Mr. Jordan participated in a "scheme to defraud" within the meaning of the wire fraud statute.

## II. The Government Failed to Prove That Mr. Jordan Made a False Statement to Trading Counterparties

It is undisputed that Mr. Jordan never made any direct statement, false or otherwise, to a trading counterparty. 12/5/22 Tr. 1016 (Varner); *id.* 1041-42 (same); *id.* 1044-45 (same). This was an impossibility given that trading on the CME is anonymous. 12/1/22 Tr. 298 (Scheerer); 12/5/22 Tr. 1036-37 (Varner). Mr. Jordan's only communications regarding his orders were

through his placement of orders on the CME, and the only information Mr. Jordan affirmatively conveyed about his orders were the four pieces of information that were required to place an order: (i) the desired product or commodity, (ii) whether the order was to buy or sell, (iii) the order price, and (iv) the quantity of contracts in the order. *See* 12/1/22 Tr. 273 (Scheerer); *id*. 298 (same) *id.* 327-28 (same). It is also undisputed that, when a counterparty accepted one of Mr. Jordan's offers, he delivered exactly what he represented in his order—he never tried to back out, renegotiate, or claim the counterparty misunderstood what he promised. 12/5/22 Tr. 1041-42 (Varner); *id*. 1044-45 (same); 12/1/22 Tr. 319 (Scheerer); 12/6/22 Tr. 1114-15 (Venkataraman).

The government's theory was that Mr. Jordan nevertheless made an "implied representation" about his intent to trade his orders and that this representation was false because Mr. Jordan subjectively intended to cancel his orders before execution. In support of this theory, the government called several witnesses who testified that orders placed on the CME convey an implicit intent to trade, and that traders have "always" been prohibited from placing orders that convey "false" information about supply and demand. 12/2/22 Tr. 705-09 (King); *id.* 715-16 (same); *id.* 758-60 (Catana); 12/5/22 Tr. 924-27, 930-33 (Middleton). However, even taking the evidence in the light most favorable to the government, the evidence was insufficient to establish that Mr. Jordan knowingly made a materially false representation, even implicitly, because the government's proof was insufficient to establish that, in 2009 and 2010, the CME required traders to place orders with a genuine intent to trade.[2]

To establish that Mr. Jordan made an implicit misrepresentation, the government was

---

[2] We acknowledge that the Seventh Circuit has held that manual spoof orders can constitute actionable implied misrepresentations within the meaning of the wire fraud statute, *see United States* v. *Chanu*, 40 F.4th 528, 541 (7th Cir. 2022), *cert. denied*, 2023 WL 350010 (U.S. Jan 23, 2023), but we hereby preserve our argument that *Chanu* was wrongly decided. Moreover, the evidence at Mr. Jordan's trial was insufficient to support the jury verdict even under *Chanu* for the reasons set forth herein.

required to prove that, in 2009 and 2010, the CME prohibited placing orders with the intent to cancel before execution. Only if such a rule existed, and was widely understood in the market, would it be rational for a counterparty to have assumed that an order placed on the CME implicitly reflected a genuine interest to trade. At trial, this was a hotly contested issue and the government's evidence fell short of the threshold necessary to sustain a conviction. The government called a witness from the CME, Erin Middleton, who testified that in 2009 and 2010, CME Rule 432 required traders to place orders with the intent to trade. 12/5/22 Tr. 920-21. On cross-examination, however, Ms. Middleton acknowledged that the text of Rule 432 says nothing about spoofing or placing orders with the intent to trade, nor does the phrase "bona fide" (or Ms. Middleton's definition of that phrase) appear anywhere in Rule 432. *Id.* 955-56, 986. In addition, Ms. Middleton conceded that the CME did not publicly state that Rule 432 applied to spoofing until 2012, long after Mr. Jordan had stopped trading for a financial institution.[3] *Id*. 973-81. In light of these evidentiary gaps, it was speculative for the jury to conclude that, in fact, spoofing was understood to be against the CME rules in 2009 and 2010.

For his part, Professor Venkataraman testified that orders convey implicit information regarding a trader's intent to buy or sell, and that spoof orders convey false information because the trader intends to cancel the order before execution. *Id.* 1055, 1057. However, Professor Venkataraman did not cite any CME rule to support this claim, nor did he testify that spoof orders were understood to convey false "implicit" information *in 2009 and 2010,* when Mr. Jordan was trading. Travis Varner testified that Quantlab's algorithms were programmed to assume that any

---

[3] As discussed in Mr. Jordan's Rule 33 Motion, the Court's exclusion of a limited set of bank compliance and CME documents that post-dated Dodd-Frank prevented defense counsel from adequately impeaching the testimony of Ms. Middleton and the compliance witnesses, resulting in a distorted presentation of evidence to the jury. But even so, the government's evidence did not prove that CME rules were understood to prohibit spoofing in 2009 and 2010.

order placed on the CME was "bona fide" and that spoof orders conveyed "false signals" related to supply and demand. *Id.* 1002, 1004, 1010. However, like Professor Venkataraman, Mr. Varner did not cite any basis for the algorithm's assumption and when pressed, conceded he was utterly unfamiliar with the CME rules that were in place in 2009 and 2010. *Id.* 1037 ("Q. And you testified that there was a CME rule that required all orders to be, quote, 'bona fide.' Do you recall that testimony? A. Yes. Q. And to be clear, are you testifying that such a rule existed in 2009 and 2010? A. I'm not a rule expert."); *id.* 1038 ("Q. Are you familiar with the text of CME Rule 432? A. No. Q. So are you aware -- I take it then that you're not aware that the Rule 432 does not include the phrase 'bona fide,' correct? A. I don't know what the Rule 403 says or 40 -- I don't know the rule. Q. 432. A. I don't know the rule."). Finally, compliance witnesses Mark Catana and David King, from JPMorgan and Credit Suisse, respectively, testified that bank policies prohibited traders from placing orders with the intent to cancel them before execution during the period of Mr. Jordan's employment at their respective banks. 12/2/22 Tr. 760-61 (Catana); *id.* 710 (King). But the policies they cited said nothing about the CME rules and provided only vague, high level guidance prohibiting market manipulation as well as a series of prohibitions of specific trading practices (e.g. wash trading, parking, and painting the tape), none of which was relevant to spoofing.

At best, the government's evidence established that generalized language of CME Rule 432 and bank compliance policies could potentially be interpreted to encompass a prohibition on spoof orders—if one were to adopt a broad reading with the benefit of hindsight—but that is insufficient to establish beyond a reasonable doubt that CME Rule 432 *actually was understood in 2009 and 2010* to prohibit traders from placing executable, at-risk orders if the trader had the subjective intent to cancel the order before execution.

### III.    The Government Failed to Prove Beyond a Reasonable Doubt That Mr. Jordan Acted with the Requisite Intent to Defraud

We respectfully submit that the Court should set aside the jury's verdict because the government did not introduce evidence that proved, beyond a reasonable doubt, that Mr. Jordan acted with the intent to defraud when he traded in 2009 and 2010. Because the government was unable to offer any direct evidence of Mr. Jordan's intent, its case relied on:  (i) unsupported inferences derived from the opinion testimony of individuals with no personal knowledge of Mr. Jordan's state of mind during the relevant time period and (ii) mischaracterizations of Mr. Jordan's *post hoc* statements to Agent Luca and the CFTC.

As discussed above, the government failed to prove, beyond a reasonable doubt, that spoofing was clearly prohibited in 2009 and 2010. They relied on CME Rule 432 and compliance materials from JPMorgan or Credit Suisse—none of which used the word "spoofing" or clearly described the practice—and the testimony of witnesses who never met Mr. Jordan. The government did not call a single witness who ever spoke to Mr. Jordan about his contemporaneous understanding of the CME rules or compliance policies at JPMorgan and Credit Suisse.

Mr. King had no knowledge as to Mr. Jordan's understanding of Credit Suisse's compliance policies during the relevant time period, and did not recall anyone on Credit Suisse's compliance team ever speaking to Mr. Jordan about spoofing. *See* 12/2/22 Tr. 733-34. Similarly, Mr. Catana had no knowledge as to Mr. Jordan's understanding of JPMorgan's compliance policies during the relevant time period, and did not recall:  (i) ever interacting with Mr. Jordan; (ii) anyone on JPMorgan's compliance team ever speaking to Mr. Jordan about spoofing or offering Mr. Jordan any opinion or interpretation of JPMorgan's compliance materials; or (iii) ever participating in any compliance training where Mr. Jordan was present. *Id.* 796, 12/5/22 Tr. 816; *see also id.* 833, 837, 843, 862.

9

Despite this, both Mr. King and Mr. Catana offered hindsight opinions and interpretations that spoofing was prohibited during the charged trading period. But these opinions and interpretations were insufficient to support a finding beyond a reasonable doubt that Mr. Jordan acted with the requisite intent to defraud, because there was no evidence that *Mr. Jordan* held these same opinions and interpretations. Mr. King testified that Credit Suisse compliance materials prohibited placing a "non-bona fide order," but this term was not defined or explained to Mr. Jordan. *See* 12/2/22 Tr. 705-06, 708-09, 715, 738-39. Mr. King admitted that the term "spoofing" did not appear in any of the compliance materials the government introduced, and that there was no language in any compliance material that explained what spoofing was. *Id.* 732. Similarly, Mr. Catana opined that spoofing was always prohibited under JPMorgan's compliance policies. *See id.* 760, 762. But the policies did not define or describe spoofing, and there was no evidence that anyone from JPMorgan compliance ever discussed spoofing with Mr. Jordan. *See id.* 795-99.

Notably, the evidence did show that Mr. Jordan understood compliance materials when they were clear and specific, as with wash trading, which was listed as an example of impermissible trading in JPMorgan's compliance materials. *See* GX 95 (2009 JPMorgan policy); 12/5/22 Tr. 903 (Catana). On multiple occasions, Mr. Jordan self-reported possible inadvertent instances of wash trading to a JPMorgan compliance officer, and provided specific details about the price, quantity, and product of the possible wash trading. *See* DX 66 (12/12/08 email); DX 67 (1/30/09 email); DX 70 (10/6/09 email); DX 71 (10/13/09 email); DX 72 (10/15/09 email). That Mr. Jordan proactively invited scrutiny into his trading undermined the government's argument that he acted with the intent to defraud, especially because the government introduced trading sequences that took place on, or very close to, days on which Mr. Jordan self-reported. *See* GX 75, Nos. 5-27 (trading sequences in October 2009). It would have been irrational for Mr. Jordan to invite scrutiny

into his trading activity if he actually understood that spoofing was prohibited by JPMorgan's policies.

As discussed *supra*, the government similarly failed to carry its burden with respect to its argument that the broadly-worded provisions of CME Rule 432 were understood to prohibit spoofing in 2009 and 2010. Erin Middleton, who was in college in 2009 and 2010 and had no contemporaneous knowledge of Rule 432, *see* 12/5/22 Tr. 954-55, nonetheless opined that Rule 432 was understood to prohibit spoofing during the relevant time period. *See id.* 924; 930-32; 934-35. But on cross examination, Ms. Middleton acknowledged that, like the compliance materials, Rule 432 had no specific language or reference to spoofing. *See id.* 955-56, 960-61.

The CME made its first public statement that Rule 432 prohibited spoofing in January 2012, in the Notice of Disciplinary Action against Charles Martell, but that notice was issued long after Mr. Jordan had stopped trading precious metals futures contracts. *See* DX 40 (Martell Notice of Disciplinary Action); 12/5/22 Tr. 979-80. In sum, the JPMorgan and Credit Suisse compliance materials, Rule 432, and the accompanying opinion testimony from Mr. King, Mr. Catana, and Ms. Middleton failed to prove, beyond a reasonable doubt, that during the relevant time period, Mr. Jordan understood that spoofing was prohibited.

Given the weaknesses in the evidence regarding Rule 432 and bank compliance policies, the government's case depended heavily on Agent Luca's carefully curated description of portions of Mr. Jordan's unrecorded interview with the FBI. The government relied on a small subset of Mr. Jordan's statements to the FBI, after strategically omitting critical surrounding exculpatory statements that provided indispensable context, and argued to the jury that Mr. Jordan "confessed" to the charged offense. *See* 12/7/22 Tr. 1313-15, 1319-20, 1333-34, 1383 (government's closing argument). But even assuming *arguendo* that the exclusion of the exculpatory portions of the

11

statements was correct under the Federal Rules of Evidence—a proposition with which we strongly disagree, as argued in our Rule 33 motion—the evidence of Mr. Jordan's statements to the FBI was still insufficient to sustain the jury's verdict.

According to Agent Luca, Mr. Jordan provided three reasons why he spoofed: (i) to mislead the market, (ii) to outperform algorithms, and (iii) to get good fills for Ray Eyles, his boss at JPMorgan. *See* 12/2/22 Tr. 560-61. The second and third reasons are insufficient to establish criminal intent; being better than the algorithmic traders and doing a good job for Mr. Eyles were part of Mr. Jordan's job. *See id.* 564-65. Agent Luca also testified that Mr. Jordan stated that he spoofed in order to "mislead the market," *see* 12/1/22 Tr. 506, but this contention was uncorroborated by contemporaneous notes, which do not include the phrase "mislead the market." *Id.* 567-68 (Agent Luca). Moreover, "misleading the market" is not equivalent to fraudulent intent because of the absence of any clear rules prohibiting spoofing in 2009 and 2010, and because it was commonplace and acceptable for traders to camouflage their intentions and strategies to gain advantage in the competitive world of futures trading. *See, e.g.*, 12/1/22 Tr. 357-67 (Scheerer); 12/5/22 Tr. 1020-22, 1028-30 (Varner). The suggestion that Mr. Jordan's statement to Agent Luca establishes criminal intent is further belied by Mr. Jordan's openness and transparency about his trading strategy. According to Agent Luca, Mr. Jordan "readily admitted that he spoofed." *See id.* 562. Mr. Jordan likewise openly described his spoofing strategy in contemporaneous Bloomberg chats with Mr. Eyles, the global head of precious metals trading at JPMorgan, and Matthew Neill, a trader at another firm. *See* GX 5-8; *see also* 12/2/22 Tr. 676, 678-80, 682-85 (Agent Luca). This openness is inconsistent with criminal intent.

The government also relied on snippets of Mr. Jordan's September 2010 CFTC deposition, *see* 12/7/22 Tr. 1320-21, but the evidence was insufficient for a rational jury to find that Mr. Jordan

intentionally lied about spoofing during the CFTC deposition. As Agent Luca acknowledged, the CFTC never asked Mr. Jordan whether he engaged in spoofing, whether he entered bids or offers with the intent to cancel them before execution, or whether he engaged in the government's four-step pattern, *see* 12/2/22 Tr. 642, 652, and the specific excerpts relied upon by the government did not prove an intentional false statement by Mr. Jordan. As to one of the CFTC's questions emphasized by the government—which asked whether Mr. Jordan ever traded "for the purpose of influencing the price" on the exchange—Mr. Jordan's negative answer was fully consistent with other record evidence that he traded for the purpose of getting good fills for his boss, Mr. Eyles. *See* GX 56 at DOJ-0008239920-921. Another CFTC question—which asked whether Mr. Jordan ever entered orders that he "did not intend to execute"—could reasonably have been understood as asking whether Mr. Jordan ever entered orders with an intent to back away from the transaction if a counterparty's order matched against his order. *See* 12/2/22 Tr. at 653-56 (Agent Luca). And a third CFTC question—which asked if Mr. Jordan ever observed "flash orders" in the market— was plagued by a confusing and compound definition of "flash orders." *See* GX 56 at DOJ-0008239922; 12/2/22 Tr. 645-48 (Agent Luca).

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Jordan's motion and vacate Mr. Jordan's conviction for wire fraud affecting a financial institution.

Dated: January 30, 2022

Respectfully submitted,

*/s/ James J. Benjamin Jr.*
James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Drive
Suite 5350
Chicago, IL 60654
(312) 450-6700

*Counsel for Christopher Jordan*

14