UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 19 CR 669 |
| | : | |
| CHRISTOPHER JORDAN | : | Hon. Edmond E. Chang |
| | : | |
| Defendant. | : | **REDACTED VERSION** |

**United States' Sentencing Memorandum**

The defendant, Christopher Jordan, manipulated the gold and silver futures markets and defrauded other market participants hundreds of times over several years. His intent was to deceive other precious metals traders and push market prices in whatever direction that benefited him, which undermined the public's confidence in the integrity of the financial markets. The United States respectfully submits that a term of imprisonment is both appropriate and necessary because of the seriousness of the offense and the need to promote general deterrence. Taking these and other factors into account, including sentences imposed in other spoofing cases, such as the non-custodial sentences received by two cooperators in the broader JPMorgan case, the government respectfully recommends that the Court impose a below-Guidelines custodial sentence, to be followed by a period of supervised release.

**I.     Sentencing Guidelines Calculations**

The United States Probation Office issued a Presentence Investigation Report ("PSR") for the defendant on April 5, 2023. Probation determined that the base offense level was 7 pursuant to U.S.S.G. § 2B1.1(a)(1). With respect to the applicable loss figure, Probation tethered its calculation to the deferred prosecution agreement

("DPA") between JPMorgan and the government that arose, in part, from the defendant's unlawful trading activity. *See* DPA, *United States v. JPMorgan Chase & Co.*, 3:20-CR-174, ECF No. 2 (D. Conn. Sept. 29, 2020). Specifically, Probation concluded that the defendant's spoofing episodes resulted in JPMorgan compensating victim traders in amounts totaling $28,920, which corresponds to a 4-level enhancement for loss pursuant to U.S.S.G. § 2B1.1(b)(1)(C). On specific offense characteristics, Probation applied a two-level enhancement for more than 10 victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A), and did not apply an enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). Probation also applied a two-level increase under U.S.S.G. § 3B1.3 because the defendant used a special skill to commit the offense and a two-level increase under U.S.S.G. § 3C1.1 for obstruction of justice. As a result, Probation calculated a total offense level of 17, which for Criminal History Category II results in a Guidelines imprisonment range of 27 to 33 months.

For the reasons stated below, the government objects to the following aspects of the PSR: (1) the overall loss calculation for the defendant and the methodology used to calculate loss; and (2) Probation's rejection of the sophisticated means enhancement.

### A.    Scope of Criminal Conduct and Loss Calculations

Professor Venkataraman's declaration (attached as Exhibit A) sets forth the scope of the defendant's unlawful trading activity as well as the associated harm to the precious metals futures market—the loss calculation. As discussed below, the Court should adopt the analysis in Prof. Venkatraman's declaration as the Court

calculates loss under the Sentencing Guidelines and considers the appropriate sentence in this case. In the *Bases* and *Vorley* cases in this District, which involved substantially similar unlawful trading activity, both courts found that Prof. Venkataraman's methodology for calculating loss was appropriate. *See* Order at 35, *United States v. Bases*, 18 CR 48, ECF No. 734 (N.D. Ill. Mar. 6, 2023) (the "*Bases* Order") (concluding that "Venkataraman's calculations are accurate, reliable, and a reasonable estimate of the loss inflicted by the Defendants' fraudulent conduct"); Sentencing Tr. 16:02-03, 21:09-10, *United States v. Vorley*, 18 CR 35, ECF No. 400 (N.D. Ill. June 21, 2021) (the "*Vorley* Sentencing Tr.") (finding Prof. Venkataraman's loss analysis provided "a reasonable estimate of intended loss from the spoofing scheme" and his methodology was "sufficiently reliable to support an estimate of the losses caused or intended by the defendants"). Nothing about the defendant's offense conduct in this case warrants a different result.

## B. The Court Should Adopt Prof. Venkataraman's Loss Calculation Because It Is Reliable and Supported by the Trial Evidence

In his declaration, Prof. Venkataraman calculates the loss suffered by other market participants from the defendant's trading activity that followed the four-step spoofing pattern. Ex. A at 3-4; *see United States v. Coscia*, 866 F.3d 782, 801 n.84 (7th Cir. 2017) (noting that "any trade executed in Mr. Coscia's artificial market involved a transaction at a skewed price—*i.e.*, any party trading on the opposite side of the market from his small orders necessarily lost money"). To begin his loss analysis, Prof. Venkataraman first identified "transactions that occurred while the Spoof Orders were active in the visible order book." Ex. A at 10. His objective was "to

calculate losses incurred by market participants who bought while the Defendant's Spoof Orders to buy were active (which increased the perception of buying interest) and participants who sold while Defendant's Spoof Orders to sell were active (which increased the perception of selling interest)." *Id.*; *see also id.* (explaining that "Spoof Orders distort the visible buying and selling interest in the market" and thereby "can induce other traders to raise/lower their bid/offer price quotes or to cross the bid-offer spread when they otherwise would not have").

### 1.    Unadjusted Market Loss Calculation

To calculate losses, using CME trade data, Prof. Venkataraman compared the prices at which other market participants traded while the defendant's spoof orders were in the market, to the prices "at which they would have been able to trade in the absence of the Defendant's Spoof Orders," which Prof. Venkataraman calls the "But-For Trade Prices." *Id.* at 11-12. As explained in his declaration, the best available indication of the "But-For Trade Prices" are the "last observed bid and ask prices immediately before the placement of the first Spoof Order in each Spoofing Sequence." *Id.* at 11. The But-For Trade Price, therefore, is the "last observed best bid price for buy-side Spoof Orders and the last observed best ask price for sell-side Spoof Orders." *Id.*; *see also Bases* Order at 29 (finding Prof. Venkataraman provided "reasonable explanations" for using the best bid or offer price immediately prior to a spoofing sequence).

Prof. Venkataraman's methodology allowed him to measure with precision at least some of the concrete effects of the defendant's unlawful activity:

> For each transaction that occurred while the Spoof Orders were active, I calculate the difference between the price at which the execution actually occurred ("Actual Trade Price") and the corresponding But-For Trade Price. This price difference is a measure of the additional mark-up, or the higher cost (or potentially, benefit) of trading for market participants on the Spoof Order side of the transaction while the Spoof Orders were active. Specifically, when the Actual Trade Price is "worse" (*i.e.*, higher for buyers and lower for sellers) than the But-For Trade Price, the participants incurred a higher cost relative to the state of the market before the Spoof Order was placed. Conversely, when the Actual Trade Price is "better" (*i.e.*, lower for buyers and higher for sellers) than the But-For Trade Price, the participants recognized a benefit. To arrive at the "Unadjusted Market Loss" associated with an individual transaction, I multiply the price differential by the transacted quantity. I aggregate this measure across all transactions executed by market participants while Spoof Orders are active to arrive at a total Unadjusted Market Loss estimate across all Spoofing Sequences.

Ex. A at 11-12. Applying this methodology, Prof. Venkataraman concluded that the total Unadjusted Market Loss for "market participants on the Spoof Order side based on all transactions observed while the Spoof Orders are active is over $384,900," which included market participants consisting of 645 unique traders trading through 130 unique firms.[1] *Id*. at 14.

To account for the potential impact of external factors on the market loss amount, Prof. Venkataraman modeled two approaches: (1) using a "Matched Control Period" to "account for the fact that some participants may have been willing to increase/decrease their order's limit price," and (2) calculating the "Rate of Spread-

---

[1] The number of unique traders and firms was determined using the "tag 50" and "firm" codes in the CME trade data.

Crossing" to identify market participants who would "cross the bid-offer spread to trade at a worse price even in the absence of Spoof Orders." *Id*. at 15.

### 2. Adjustment for But-For Cost of Trading Matched Control Period

The first method "identifies a matched control period of trading and estimates a But-For cost of trading for market participants on the Spoof Order side for trades observed in the control period." *Id*. at 16. Then, the "But-For cost of trading in the matched control period is deducted from the Unadjusted Market Loss" and the "remaining amount is the 'Adjusted Market Loss' and represents the abnormal cost of trading that is attributable to the Defendant's Spoof Orders." *Id*. This approach provides an "an estimate of the 'normal' cost of trading of market participants around the time of a Spoofing Sequence, absent the placement of the Spoof Order," and then "calculate[s] the difference between the total Unadjusted Market Loss of the Spoofing Sequences and the total But-For cost of trading during the control period," to obtain an "Adjusted Market Loss" estimate. *Id*. at 17-18. Under this first method, the Adjusted Market Loss amount is $349,381. *Id*. at 19.

### 3. Alternative Adjustment Method: Rate of Spread-Crossing

The second method compares "the rate at which market participants on the same side as the Defendant's spoof orders crossed the bid-offer spread while the spoof orders were active to the rate of spread crossing in a control period immediately before the spoof orders were placed." *Id*. at 5. This change in the rate of spread-crossing indicates the "the impact of the spoofing pressure on the trading activities of other market participants." *Id*. In his declaration, Prof. Venkataraman explains:

> Market participants incur trading costs primarily when they cross the bid-offer spread to trade. For example, a market participant who intends to buy gold futures contracts could place a resting limit order at the best bid. By crossing the spread to trade at the best offer, which is at a higher price, this market participant incurs a cost. . . . [S]poofing, and the misleading appearance of supply/demand it introduces, can induce market participants to cross the spread and incur the associated costs.

*Id.* at 20. To measure the impact of the defendant's spoof orders under this method, Prof. Venkataraman "calculate[s] the 'rate of spread-crossing' as the per-second number of contracts traded by market participants on the Spoof Order side who crossed the spread" and then compares that to the "spread-crossing rate during a control period immediately prior to the Spoofing Sequence" in order to "measure the impact of the Spoof Orders on spread crossing activity." *Id.* at 21. This loss calculation methodology identifies spread-crossing trades during a Spoofing Sequence by comparing the transaction price to the best quotes prevailing before the Spoofing Sequence, which considers the impact of the Spoof Order on the bid-ask spread during a given Spoofing Sequence (thereby fully capturing the market harm arising from the Spoof Order's price impact). Accordingly, any transaction that occurs during the Spoofing Sequence and fills at a less favorable price than the But-For price is identified as "spread-crossing."

The results of these calculations show that, when "compared to the control period before the placement of the Spoof Orders, the rate of spread-crossing for orders on the Spoof Order side increases in the first 0.5 seconds after the Spoof Orders are placed and remains elevated for the duration of the Spoof Orders." *Id.* at 23. Prof.

Venkataraman attributes the "difference between the elevated rate of spread-crossing during the Spoofing Sequences and the normal rate of spread-crossing observed during the control period" to the defendant's spoof orders. *Id*. at 24. Then removing from the Unadjusted Market Loss the normal rate of spread-crossing, Prof. Venkataraman calculates an "Alternative Adjusted Market Loss" of $337,332. *Id*. at 24.

### 4. The Adjusted Market Loss Calculations Are Reasonable and Conservative Estimates of Loss

The two approaches that Prof. Venkataraman modeled yielded results between $337,332 and $349,381. *Id*. at 26. The United States respectfully submits that this calculation, at a minimum, provides the Court with a "reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(c); *see also United States v. Natour*, 700 F.3d 962, 976 (7th Cir. 2012) ("The district court's loss calculation . . . need only be a reasonable estimate of the loss." (quotation marks omitted)). Prof. Venkataraman's methodology to identify the relevant spoofing sequences is fully consistent with the trial evidence and approach used in other cases, and his loss calculation is amply documented, *see* Ex. A at 6-9, grounded in methodology that is common in the field of economics, *see* Ex. A at 2-4, consistent with the Seventh Circuit's view of market loss in *Coscia*, *see* 866 F.3d at 801 & n.84, was found to be reasonable by the District Courts in *Vorley* and *Bases*, and logically accounts for external factors and variables that could impact the results. *See Bases* Order at 12 ("All that is required is that the government establish it is more likely than not that the additional trades were unlawful and that [Prof.] Venkataraman's estimate is a reasonable approximation of the loss.")

In addition, Prof. Venkataraman's analysis is based on conservative assumptions that "likely understate total market harm" for several reasons. Ex. A at 26. First, Prof. Venkataraman only calculated losses to other market participants while the defendant's spoof orders were active in the market and "did not attempt to capture the potential lingering effect of the Spoof Orders after they are canceled, when market participants may still be responding to the pressure created by the Spoof Orders." *Id*. Next, he also only calculated losses "incurred by market participants on the Spoof Order side for their orders that were executed," but did not "account for orders that were resting on the Spoof Order side before the Spoof Orders were placed and that subsequently lost the opportunity to get fills due to the pressure created by the Spoof Orders." *Id*. at 27. Finally, Prof. Venkataraman's analysis did not consider "other non-futures markets where prices correlate with precious metals futures, such as exchange-traded funds ('ETFs'), options, or individual stocks whose performance is directly tied to precious metals," nor did he quantify the long-term effects of spoofing that degrades the liquidity and price discovery functions of the financial markets. *Id*. at 27-28.

As between the Adjusted Market Loss and Alternative Adjusted Market Loss amounts, the United States respectfully submits that the Court should find the loss amount to be the lower of these sums, *i.e.*, $337,332. *See United States v. Gumila*, 879 F.3d 831, 836 (7th Cir. 2018) (approving district court's loss calculation when more conservative option of loss estimates was used). Nonetheless, under any of the loss amounts for the defendant, 12 levels should be added for loss under U.S.S.G.

§ 2B1.1(b)(1)(G).

### C. The Loss Figures in the PSR Are Not Based on the Appropriate Metric

In the PSR, Probation acknowledges Prof. Venkataraman's declaration and does not take issue with the market loss analysis contained therein, but nevertheless concludes that it should not be the basis to calculate loss under § 2B1.1. *See* PSR ¶¶ 33-38, 43-46. Instead, Probation states that the victim compensation payments made in connection with JPMorgan's DPA are "a direct and tangible metric for the actual losses inflicted on other market participants." *Id*. ¶ 46. For the reasons discussed above, the United States respectfully disagrees with Probation's view and believes that Prof. Venkataraman's loss analysis is the more appropriate metric to determine the applicable loss amount in this case.[2]

### D. Probation Correctly Applied a "Special Skill" Enhancement or, in the Alternative, Should Apply the Sophisticated Means Enhancement

The government agrees with Probation's application of a two-level enhancement under U.S.S.G. § 3B1.3 for the defendant's use of a special skill to commit the offenses. As noted in the PSR, the defendant "was educated in the field of economics and was employed for several years as a precious metals trader for global financial institutions" and his "skills in affecting market prices through spoofing

---

[2] To the extent Probation believes that the amount JPMorgan paid as part of the victim compensation amount in its DPA is the more appropriate metric for actual losses inflicted on market participants in this case, the amount should not be limited to the amount that has been paid out in victim compensation claims. Whether or not a market participant has submitted a claim for victim compensation under the DPA and that claim has been processed and paid out is not the right metric for loss because it is underinclusive.

constitute special skills not possessed by members of the general public." PSR ⁋ 54. Therefore, it is appropriate to apply the special skill enhancement under U.S.S.G. § 3B1.3 for the defendant.

To the extent the Court does not apply the special skill enhancement, an additional two-point enhancement should be applied pursuant to U.S.S.G. § 2B1.1(b)(10)(C) for the defendant's use of sophisticated means in furtherance of the fraudulent scheme. "Sophisticated means" includes "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B). Here, the sophisticated means enhancement should apply for at least two reasons.

First, in *Vorley*, when considering manipulative trading that was substantially similar to the defendant's, Judge Tharp determined that it involved the use of sophisticated means because, among other reasons, "[a] market manipulation scheme . . . itself required a sophisticated understanding of the markets and how they work. It involved techniques in order entry designed to disguise spoofing orders and making them more effective, such as layering ten-lot orders." *Vorley* Sentencing Tr. 22:25-23:09.

Second, the defendant's manipulative trading scheme was designed to trick high-frequency traders who used high-speed algorithms to process market data and trade thousands of times faster than human beings—and his scheme worked. *See, e.g.*, Tr. 506:19-507:16, 565:05-21, 710:08-15, 1004:03-18, 1057:14-18. Deceiving such highly sophisticated computer programs required extensive knowledge and mastery

-11-

of market mechanics as well as specialized trading techniques. Seventh Circuit precedent supports applying the sophisticated means enhancement where, like here, the defendants employed "intricate maneuvers" to successfully defraud sophisticated victims. *See United States v. Rettenberger*, 344 F.3d 702, 708-09 (7th Cir. 2003) ("[f]ooling a skilled neurologist and 14 insurers requires intricate maneuvers"); *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) ("[defendant's] scheme required him to convince 21 lending institutions to extend grossly inflated mortgages to [his] buyers. We find that deceiving that many banks into financing over 150 fraudulent transactions to the tune of $7 million requires intricate maneuvers") (quotations omitted); *United States v. Redman*, 887 F.3d 789, 793 (7th Cir. 2018) ("[defendant's] conduct required planning and deception sophisticated enough to fool [owner of a medical clinic] and the clinic's patients").

The PSR states that the sophisticated means enhancement should not apply because the defendant traded manually as opposed to using an algorithm. PSR ¶ 50. However, the Seventh Circuit has clearly instructed that "the fact that [defendant] could have used even more elaborate mechanisms to conceal the fraud does not defeat a finding of sophisticated means." *United States v. Bickart*, 825 F.3d 832, 838 (7th Cir. 2016) (quotations omitted). Moreover, as described above, the defendant's sophisticated manual trading successfully tricked algorithmic traders for years. Accordingly, the two-level sophisticated means enhancement is appropriate and should be applied.

The government recognizes that, in *Bases*, Judge Lee recently determined that

-12-

the sophisticated means enhancement did not apply to traders who engaged in spoofing on the precious metals desk at Bank of America. *See Bases* Order at 41-45. As discussed above, the government believes that the weight of Seventh Circuit authority dictates that the enhancement is appropriate in this case given that, among other things, the defendant was able to deceive highly sophisticated algorithmic traders over the course of a number of years. That said, given the split between Judge Lee in *Bases* and Judge Tharp in *Vorley*, the government recognizes that the application of this enhancement is a closer call than the loss calculation or other aspects of the Guidelines calculation.

Accordingly, the government submits that the correct Guidelines calculations for the defendant is as follows:

| | |
|---|---|
| Base Offense Level | 7 |
| Loss Amount | +12 |
| 10 or More Victims | +2 |
| Specialized Skill/Sophisticated Means | +2 |
| Obstruction | +2 |
| **Total Offense Level** | **25** |
| **CHC Category II** | **(63-78 months)** |

## II. The Court Should Impose a Term of Imprisonment for the Defendant

A below-Guidelines custodial sentence would reflect the seriousness of this offense, provide just punishment, and afford general deterrence. As detailed below, such a sentence would align with the sentences imposed in other spoofing cases in this District that involved similar loss levels and relevant trading periods, but also would be greater than the non-custodial sentences received by two cooperators sentenced to date in the government's broader case, John Edmonds and Christian

Trunz. Finally, ███████████████████████████████████

███████████████████, those facts ██████████████████████████

██████████████████ do not justify a non-custodial sentence.

## A. The Nature and Circumstances of the Offense Warrant Imprisonment

With respect to the seriousness of the offense, the defendant manipulated the precious metals markets for years while he worked as a trader at two global financial institutions, JPMorgan and Credit Suisse. As Supervisory Special Agent Luca testified, when he met with the defendant in November 2018 and asked him about his trading, the defendant told Agent Luca that "he placed those orders in order to mislead the market, to outperform the algorithms, and to make – and to get the best possible fills for his boss." Tr. at 506. Ultimately, the defendant admitted to Agent Luca that "he was placing fake trades with the intent to cancel them in order to mislead the market into believing there was a false sense of supply or demand." *Id.* at 507. The impact of the defendant's fraudulent trading was serious and the manner in which he executed the scheme was aggravating given the size of the orders he placed in the market. At certain times, the defendant's false orders dominated the marketplace. For example, on October 15, 2009, the defendant placed a spoof order in silver that comprised 81.6% of the entire visible order book. *See* GX 75 at 73.

The defendant's fraudulent trading harmed other futures traders and caused over $300,000 in calculable loss. In addition to the harm suffered by individual traders, the defendant's fraudulent trading also undermined the integrity of core U.S. financial markets. This is a significant aggravating factor. As Judge Lee recently

explained in the *Bases* sentencing, "[the] injection of false information into commodity futures trading markets undermined the very integrity of those markets. Such fraudulent activity, writ large, erodes the public's confidence and trust in our markets. Markets that undergird much of our nation's economy." Sentencing Tr. at 54:18-23, *United States v. Bases*, 18 CR 48, ECF No. 740 (N.D. Ill. Mar. 9, 2023) (the "*Bases* Sentencing Tr."). As Judge Tharp commented in another spoofing sentencing, this type of offense "threatens the integrity of the financial markets because it prompts people to question the lawfulness of the conduct and the good faith of the participants that operate the financial system and perpetuate the kind of thought process that says this system is rigged. It's rigged in favor of insiders and people who know how to manipulate it. That's the kind of crime that calls -- you know, undermines confidence of the public in the integrity of the markets." *See* Sentencing Tr. 27-28, *United States v. Zhao*, No. 18 CR 24, ECF No. 74 (N.D. Ill. Feb. 4, 2020). Further, because "so much of our economic welfare depends on capital markets and their efficient functioning . . . the economy suffers tremendously" when "people don't have confidence in the reliability of those markets." *Id.* The sentencing court in *United States v. Coscia*—the first criminal spoofing case—emphasized the same point: "well-functioning markets depend on accurate information, and that's the information concerning supply and demand. Inaccurate information skews the market." Sentencing Tr. 47, No. 14 CR 551, ECF. No. 162 (N.D. Ill. July 13, 2016). And the sentencing court in *United States v. Sarao* also explained that the defendant's "actions contribute to abusing the integrity of the market, which is

something that is essential to maintaining a healthy economy" and observed that the defendant's spoofing "has very significant economic impact. And, therefore, it's a serious offense." Sentencing. Tr. 35, No. 15 CR 75, ECF No. 121 (N.D. Ill. Jan. 28, 2020).

The government recognizes that, under the Guidelines, a downward departure may be warranted in cases involving "relatively small loss amounts suffered by a relatively large number of victims." U.S.S.G. § 2B1.1 cmt. n.21(C). But nearly *every* market manipulation case involves diffuse losses. That is precisely why criminal enforcement, and meaningful sentences, are necessary. The harms are diffuse, and because financial markets tend to be anonymous, victims typically lack the information and means to pursue redress themselves. And the Guidelines also provide for an upward departure where, as here, the "offense involved a risk of substantial loss beyond the loss determined for purposes of subsection (b)(1), such as a risk of a significant disruption of a national financial market." U.S.S.G. § 2B1.1 cmt. n.21(A)(iv). The CME is the world's largest financial derivatives exchange and a critical part of the U.S. and global financial systems, which only underscores the seriousness of the defendant's crimes.

The defendant's spoofing also was profitable and done to get the best prices for his boss. As Supervisory Special Agent Luca testified, the defendant told Agent Luca that one of the reasons he spoofed was to "get the best possible fills for his boss." Tr. at 506. In *Bases*, Judge Lee recognized that profits accruing from retaining client business can be a significant motivation for fraud. *See* Sentencing Tr. at 48, *United*

*States v. Pacilio*, 18 CR 48, ECF No. 741 (N.D. Ill. Mar. 9, 2023) ("Although Mr. Pacilio may not have received direct monetary benefit from his illegal trading activity, the testimony at trial established that part of what made a good trader -- ones that clients would seek out time and time again -- were those traders that could execute trades on the client's terms, on favorable terms. By using spoof orders, Mr. Pacilio was able to do this, benefitting his clients and the trading desk as a whole, therefore benefitting himself in the process.").

Finally, the seriousness of the defendant's crimes is compounded by his false statements made to the CFTC, in which he denied ever engaging in this type of trading. In 2010, the defendant lied when asked if he ever engaged in trading at JPMorgan for purpose of influencing the price. *See* GX 56 at 4-5. Similarly, when asked, "Did you ever show a bid or offer on Globex that you didn't intend to execute," the defendant replied, "Only if it, I would only cancel something if I changed my mind or it was put in in error, but, no." *See* GX 56 at 9.

## B. A Custodial Sentence Will Promote Respect for the Law and Afford Adequate General Deterrence

In addition to reflecting the seriousness of the offense, a sentence of imprisonment is necessary to promote respect for the law. While the government acknowledges that there is little need to specifically deter the defendant from future criminal conduct related to the financial markets, general deterrence, however, is an especially significant consideration in a case like this. As Judge Lee explained in the *Bases* sentencing:

> The need for general deterrence is significant. The United

States financial markets form one of the cornerstones of the domestic and international economies. It is imperative that participants in those markets, as well as the public at large, have confidence in the integrity and transparency of those markets.

Furthermore, violators and cheaters are often difficult to detect, and when they are and the violators are convicted, their sentences must be sufficient to deter others from trying similar schemes to defraud the market and gain an illegal and unfair advantage.

*Bases* Sentencing Tr. at 58.

Similar to his co-defendants who also worked at JPMorgan, the defendant was a prominent figure in the precious metals markets; therefore, it is critical that the sentences imposed by the Court serve as a general deterrent to others who may manipulate, or are considering whether to manipulate, the nation's commodities markets. Market manipulation (whether by spoofing or otherwise) is difficult to detect and would-be manipulators know this and likely consider the low prospects of apprehension in deciding whether to engage in abusive trading practices. *See United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018), (noting that "high sentences" were necessary to alter the calculus "that insider trading 'was a game worth playing'"); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (observing that, where a crime is hard to detect, "others similarly situated to the defendant must therefore be made to understand that when you get caught, you go to jail"). Therefore, a custodial sentence for the defendant is necessary to meaningfully alter the calculus for other traders in the industry. *See United States v. Fechete*, 497 Fed. Appx. 626 (7th Cir. 2012) (affirming 262-month sentence for wire fraud, recognizing that the

"type of fraud committed by Fechete was difficult to detect and difficult to prosecute, necessitating a higher sentence for general deterrence purposes").

### C. A Custodial Sentence Would Avoid Unwarranted Sentencing Disparities

A below-Guidelines custodial sentence would avoid unwarranted sentencing disparities between the defendant and spoofing cases where similarly situated defendants received the same sentence. In recent spoofing cases in this District, four non-cooperating defendants—James Vorley, Cedric Chanu, Edward Bases, and John Pacilio—were convicted at trial and sentenced to one year and one day. Several key facts of this case closely mirror those cases. First, the defendant's loss amount—which is between $337,332 and $349,381—is comparable with the losses for Bases/Pacilio ($300,000) and Vorley/Chanu ($1 million). Moreover, like the defendant, the vast majority of offense conduct in both *Vorley* and *Bases* occurred prior to the enactment of the Dodd-Frank Act. A sentence that includes a term of imprisonment, therefore, is sufficient but not greater than necessary to provide just punishment and afford adequate deterrence.

A non-custodial sentence, however, would create an unwarranted sentencing disparity because it would impose a sentence on the defendant that is substantially similar to the non-custodial sentences received by the government's two cooperating witnesses in the broader JPMorgan spoofing investigation, John Edmonds and Christian Trunz.[3] Specifically, on June 13, 2023, Edmonds received a sentence of time

---

[3] The third cooperating witness, Corey Flaum, is scheduled for sentencing on August 23, 2023.

served, one year of supervised release, a $25,000 fine, and 100 hours of community service. *See* Judgment, *United States v. Edmonds*, 18 CR 239, ECF No. 57 (D. Conn. June 15, 2023). Similarly, on June 27, 2023, Trunz received a sentence of time served, with no fine or period of supervised release. *See* Judgment, *United States v. Trunz*, 19 CR 375, ECF No. 27 (E.D.N.Y. June 29, 2023). A non-custodial sentence for the defendant would create an unwarranted disparity between him—a more senior trader on the desk who was convicted at trial—and Edmonds and Trunz who accepted responsibility, pleaded guilty before indictment, provided exceptional cooperation over a five-year period, and endured multiple days of testimony at trial.

**D.    The Defendant's Personal Characteristics Do Not Undermine the Need for a Custodial Sentence**



### III.    Restitution

Restitution is mandatory in this case. *See* 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii).

Regarding the defendant's unlawful trading while a precious metals trader at

JPMorgan, the defendant's restitution obligations have been fully satisfied. Namely, pursuant to the corporate resolution between the JPMorgan and the United States, the bank has already paid the full amount of money necessary to compensate any victims in this case arising from the defendant's unlawful trading at JPMorgan. Accordingly, both the first sentence of paragraph 32, and the last sentence of paragraph 154, in the PSR should be corrected to read, ". . . full restitution has been made available to victims *of Jordan's offense conduct while at JPMorgan* through a corporate resolution between the United States and *Jordan's* former employer, JPMorgan."

Regarding the defendant's unlawful trading while a precious metals trader at Credit Suisse, however, there is no similar corporate resolution that would satisfy any restitution obligation. The government respectfully submits that restitution should not be ordered related to the defendant's unlawful trading at Credit Suisse given that determining complex issues of fact related to the amount of victim's losses—including identifying the individual market participant victims—"would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). More specifically, while Prof. Venkataraman has conducted his loss analysis for Guidelines purposes, given the limitations in the CME trade data—which contains Tag50s and account numbers, but not the names, addresses, and contact information of market participants—the government is not in a position to definitively confirm the identity of the specific individual or entity associated with

the Tag50 or account number that executed at a worse price during a given spoofing sequence. *See United States v. Allen*, 529 F.3d 390, 396-97 (7th Cir. 2008) (noting that "the determination of loss for a defendant's sentencing range is different than that for his restitution obligations").

## IV. Conclusion

For the foregoing reasons, the government respectfully submits that the Court impose a sentence that involves a term of imprisonment, to be followed by a period of supervised release.

Dated: July 25, 2023                Respectfully submitted,

                                    GLENN S. LEON
                                    Chief, Fraud Section
                                    Criminal Division
                                    U.S. Department of Justice

                        By:         */s/ Matthew F. Sullivan*
                                    Matthew F. Sullivan, Trial Attorney
                                    Christopher Fenton, Trial Attorney
                                    Lucy B. Jennings, Trial Attorney
                                    (202) 578-6583
                                    matthew.sullivan2@usdoj.gov

## **CERTIFICATE OF SERVICE**

I, Matthew F. Sullivan, hereby certify that on July 25, 2023, I caused the foregoing filing to be electronically filed with the Clerk of Court by using the Court's electronic filing system, which will automatically send a notice of electronic filing to the parties who have entered an appearance in this case.

/s/ *Matthew F. Sullivan*
Matthew F. Sullivan