# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER JORDAN,<br><br>Defendant | No. 19 CR 669 |

**DECLARATION OF KUMAR VENKATARAMAN**
**March 30, 2023**

**TABLE OF CONTENTS**

I. Introduction ..... 1
A. Qualifications ..... 1
B. Background ..... 2
C. Assignment ..... 4
D. Summary of Conclusions ..... 4
II. Analysis of Market Loss ..... 6
A. Relevant Trading Activity ..... 6
B. Defining Market Harm ..... 10
C. Unadjusted Market Loss Calculation ..... 11
D. Adjustment for But-For Cost of Trading Using a Matched Control Period ..... 15
1. Methodology ..... 15
2. Calculation and Results ..... 16
E. Alternative Adjustment Method: Rate of Spread-Crossing ..... 20
1. Methodology ..... 20
2. Calculation and Results ..... 21
F. Summary of Market Loss Calculations ..... 25
G. Additional Components of Market Loss ..... 26

# I. INTRODUCTION

## A. Qualifications

1. I am a Professor of Finance and hold the Maguire Chair in Energy Management at the Edwin L. Cox School of Business at Southern Methodist University (SMU). I have a Ph.D. degree in Business Administration from Arizona State University, with a major in Finance, and an undergraduate degree in Business Administration (M.M.S.) from the Birla Institute of Technology and Science (BITS-Pilani, India).

2. I served as the Chairman of the Finance Department at SMU between 2012 and 2015. I have taught graduate and undergraduate courses on Financial Management, International Finance, Portfolio Theory, Hedge Funds, Energy Finance and customized finance modules in the Executive Education programs.

3. My research interests lie primarily in the area of market microstructure. I have studied financial market design, measurement of trading cost, evaluation of trading strategies, performance measurement of trading desks and the impact of regulatory reform on financial markets. My research has been published in top-tier academic journals, featured in industry publications, textbooks, and the business press, including the Wall Street Journal, the Economist, Bloomberg News and the Financial Times. I serve on the Editorial Board of several journals.

4. I have presented my research at leading academic conferences, universities, and at regulatory bodies. I served as a member of the U.S. Securities and Exchange Commission's (SEC) Fixed Income Market Structure Advisory Committee between 2017 and 2021. I have served as a visiting economist at Financial Industry Regulatory Authority (FINRA) since

2016 and have previously held a similar position at the Commodity Futures Trading Commission (CFTC). I have received multiple teaching and research awards, including best paper awards at international conferences. Notably, I was named among "The Best 40 B-School Profs Under the Age of 40" in the 2011 Poets & Quants ranking of Business School professors.

5. A copy of my curriculum vitae is included as **Appendix A**.

### B. Background

6. In financial markets, "spoofing" describes the practice of placing an order with the intent to cancel the order before execution. Spoof orders are placed in such a way to create the false appearance of a change in supply or demand, and therefore to trigger a response from other market participants.

7. On December 9, 2022, a federal jury convicted Christopher Jordan (the "Defendant") of wire fraud affecting a financial institution in connection with his trading of gold and silver futures contracts on commodities exchanges operated by the CME Group, Inc. ("CME").

8. Prior to trial, I was engaged by the United States Department of Justice ("DOJ") to analyze the Defendant's relevant trading activity. In that capacity, I reviewed trading sequences identified by the DOJ of the Defendant's trading. I also analyzed the Defendant's broader trading, including submission patterns and execution outcomes of the larger orders and opposite-side smaller orders.

9. At trial, I provided testimony describing how and why 68 trading sequences that the DOJ identified (the "68 Episodes") were not consistent with an economically rational trading strategy aimed at executing the larger, fully displayed orders observed in these sequences.

I also testified that the observed trading patterns were consistent with the larger fully displayed orders helping the opposite-side smaller orders obtain executions.[1] I further testified that the Defendant's broader trading activity in the gold and silver futures markets over the period of September 30, 2009 to May 5, 2010 was consistent with the patterns observed in the 68 Episodes. Specifically, the Defendant's larger fully displayed orders of certain types and sizes exhibited different order submission patterns and execution outcomes when compared with the Defendant's smaller orders opposite the larger visible orders.[2]

10. I understand that, at trial, the DOJ introduced evidence that the Defendant executed a four-step spoofing scheme. The DOJ presented to the jury numerous specific examples of such sequences,[3] including 68 trading sequences for the Defendant, which involved the following steps:

a. The Defendant placed one smaller limit order.

b. After the Defendant placed the smaller order, the Defendant placed one[4] relatively larger fully displayed limit order on the opposite side of the smaller order. The smaller order and the larger order were active in the market at the same time.

c. The smaller order received executions while the larger fully displayed order was active.

---

1 *See, e.g.,* Trial Transcript, pp. 1064-1069, 1081, 1086-1089.

2 *See* Trial Transcript, pp. 1073-1089. The smaller orders opposite the larger visible orders include both fully visible orders and iceberg orders. Iceberg orders are limit orders where only a portion of the total order size is visible in the order book at any one time. *See* Trial Transcript, pp. 1063-1064.

3 *See* Government Exhibits ("GX") 75-76.

4 In one spoofing sequence, the Defendant placed two relatively larger fully displayed limit orders on the opposite side of the smaller order. *See* GX 75, Episode 35.

d. The Defendant then quickly canceled his larger fully displayed order before they were executed in full.[5]

### C. Assignment

11. I have been asked by the DOJ to calculate the amount of loss suffered by other market participants as a result of the Defendant's activity that follows the four-step process described above.[6]

12. In forming my opinion, I relied on my expertise and experience studying financial markets and market microstructure, as well as my analysis of data provided by the CME (the "CME Trading Data").[7]

### D. Summary of Conclusions

13. Based on my experience studying financial markets and my analysis of the CME Trading Data, I have reached the following conclusions:

- Spoofing distorts the visible supply and demand in the market, which can induce other market participants to raise/lower their bid/offer quotes or to cross the spread to obtain executions when they otherwise would not have absent the spoofing pressure. Therefore, market participants who trade on the same side as a spoof order while the

---

5 As summarized in GX 84, there were zero fills on the larger fully displayed orders for the 68 trading sequences for the Defendant. That is, the Defendant canceled the entire order quantity for all the larger fully displayed orders before they were executed.

6 Specifically, I have been asked to calculate the losses associated with the Spoofing Sequences summarized in GX 85. Additionally, the DOJ has instructed me to further limit my analysis to Spoofing Sequences summarized in GX 85 with a duration of 2.5 seconds or less. The longest duration of a Large-Side Order contained in GX 75 – 76 was 2.5 seconds.

7 This includes "RAPID," which provides data for each order message submitted to the CME, and "ARMADA," which provides data on the state of the market order book over time.

spoof order is active, and at a price that is worse than the prevailing price immediately before the spoof order was placed, are harmed to the extent they were induced to trade by the spoofing pressure.

- In my main approach, the harm to market participants that is attributable to the Defendant's spoofing activity was determined by comparing the observed cost of trading while the Defendant's spoof orders were active to the observed "but-for" cost of trading during a (control) period of equal length immediately before the spoof orders were placed. Implementing such an approach across the Defendant's approximately 1,976 spoofing sequences results in a total market loss attributable to the spoofing activity of **$349,381**.
- In my alternate approach, the impact of the Defendant's spoofing activity was measured by comparing the rate at which market participants on the same side as the Defendant's spoof orders crossed the bid-offer spread while the spoof orders were active to the rate of spread crossing in a control period immediately before the spoof orders were placed. The change in the rate of spread-crossing presents a conservative[8] estimate of the impact of the spoofing pressure on the trading activities of other market participants. Using this conservative approach results in a total market loss attributable to the spoofing activity of **$337,332**.

---

8 The spread crossing estimate is conservative because the approach accounts for the spoof order's impact on other traders' decision to place aggressively priced orders, but it does not account for inferior prices received by other traders during the Spoofing Sequence (relative to the control period) due to the price impact of spoof orders. As an example, large spoof orders on the buy side could increase the rate at which other traders place aggressively priced orders to buy, and in addition, the spoof order's price impact could move the price higher, thus causing other traders to buy at higher (*i.e.*, inferior) prices during the Spoofing Sequence. The alternate approach accounts for the spoof order's impact on the spread-crossing but not the price impact while the main approach accounts for both the effects.

- Both of these approaches likely understate the true harm to other market participants for reasons described in Section II.G below.

## II. ANALYSIS OF MARKET LOSS

14. In the following sections, I describe my calculation of market loss attributable to the Defendant's spoofing activity using the four-step pattern described at trial. First, I identify the universe of orders that are included in my analysis. I then explain the rationale underlying my approach to measuring market harm, and how the empirical methods that I present capture the incremental impact of the Defendant's spoofing activity and also account for normal market activity that would have otherwise occurred in the absence of the spoofing activity.[9] I conclude with a discussion that highlights why my analysis in all likelihood understates the true market harm associated with the Defendant's spoofing activity.

### A. Relevant Trading Activity

15. In assessing the market harm attributable to the Defendant's spoofing activity, I have been instructed to limit my analysis to certain trading sequences ("Spoofing Sequences").[10] These Spoofing Sequences are consistent with the four-step spoofing strategy described during trial, with the exception that they also include instances where the spoofing strategy

[9] In this declaration, I follow the same general methodology for calculating market harm that I performed in connection with the sentencings in three recent cases that involved spoofing in the precious metals futures markets, namely, *United States v. Vorley* (18 CR 35), *United States v. Bases* (18 CR 48), and *United States v. Smith and Nowak* (19 CR 669). The methodology is tailored to incorporate relevant information and patterns that are particular to the Defendant's spoofing activity.

[10] Specifically, I have been asked by the DOJ to limit my analysis to the Spoofing Sequences summarized in GX 85. At the request of the DOJ, I further limited the analysis to Spoofing Sequences with duration of large, fully displayed orders of 2.5 seconds or less. The longest duration of a Large-Side Order contained in GX 75 – 76 was 2.5 seconds.

does not result in any executions for the Defendant's smaller orders placed opposite the Defendant's large, fully displayed orders (*i.e.*, "unsuccessful" spoofing sequences). In other words, while the conduct discussed by the DOJ's witnesses at trial was focused on instances where the spoof orders directly benefited the Defendant by successfully triggering executions on his smaller orders, the Spoofing Sequences here also include spoof orders that caused harm to the rest of the market even though they did not directly benefit the Defendant's smaller orders.

16. More specifically, Spoofing Sequences are identified from the Defendant's trading activity for the following time period that reflects the window over which the DOJ episodes shown at trial occurred: September 30, 2009 to May 5, 2010 for gold and silver.

17. The Spoofing Sequences meet the following parameters:

- A Spoofing Sequence includes both resting and fully displayed order(s) ("Spoof Orders") that are placed by the Defendant and smaller limit order(s) on the opposite side of the market ("Opposite Orders").
- Spoof Orders must be resting orders placed within the top ten levels of the order book[11] and for the same lot sizes placed by the Defendant in the 68 Episodes.[12]
- Opposite Orders must be placed within the top ten levels of the order book.[13]

[11] Or, for dates on which the CME's ARMADA data is not available, within nine ticks of the best market price estimated using CME's RAPID data.

[12] Spoof Orders are limited to orders of 101-lot and 105-lot orders for gold and 51-lot, 55-lot, 101-lot, 105-lot, 305-lot, and 405-lot orders for silver.

[13] Or, for dates on which the CME's ARMADA data is not available, within nine ticks of the best market price estimated using CME's RAPID data.

- For Sequences with fully displayed limit orders on both sides of the market of the specified lot sizes included in the Spoof Orders, I require that the large side quantity is at least twice as large as the small side quantity.[14]

18. Overall, I identified 1,976 Spoofing Sequences[15] comprising 1,976 individual Spoof Orders whose aggregate notional value at placement equals approximately $19.2 billion.

19. Of the 1,976 identified Spoof Orders, 1,061 appear in the silver futures market and 915 appear in the gold futures market.

20. The Spoof Orders that comprise these Spoofing Sequences exhibit certain characteristics, such as large visible quantity, short duration, and resulting low fill ratios that are inconsistent with a strategy aimed at executing trades on these orders. First, the total number of visible Spoof Order contracts placed in a Spoofing Sequence, on average, is 99 contracts, which is larger than the average visible liquidity in the market available in the top five levels of the order book prior to the placement of Spoof Orders, which is 72 contracts. Thus, the placement of Spoof Orders significantly changes the imbalance in the top five levels of the visible order book.

21. Second, the Spoof Orders exhibit short order durations in comparison to the duration of the Opposite Orders. The median duration of Spoof Orders is only 1.0 second compared to 12.4 seconds for Opposite Orders. Third, the Spoof Orders exhibit lower execution ratios

---

[14] For example, if there is a fully visible 55-lot order on the buy side of the market and a fully visible 105-lot order on the sell side of the market at the same time, both orders are excluded from my analysis since 105 is not twice the size of 55. However, if there is a fully visible 55-lot order on the buy side of the market and a fully visible 405-lot order on the sell side of the market at the same time, then the 55-lot buy side order is included as an Opposite Order and the 405-lot sell side order is included as a Spoof Order in my analysis since 405 is more than twice the size of 55.

[15] For the 1,976 Spoofing sequences, the Spoof Orders do not overlap in time with each other. When Spoof Orders overlap with the same Opposite Orders, they are treated as separate Spoofing Sequences.

in comparison to Opposite Orders. The fill ratio, or percentage of total contracts ordered that were executed, is only 0.9% for Spoof Orders compared to 38.0% for Opposite Orders.

| Order Type | Number of Orders | Median Duration (Seconds) | Fill Ratio |
|---|---|---|---|
| Spoof Orders | 1,976 | 1.0 | 0.9% |
| Opposite Orders | 2,125 | 12.4 | 38.0% |

22. Finally, I also observed that more than three-quarters (84%) of the Defendant's Spoof Orders consisted of either 101-lot or 105-lot orders and the remaining consisted of 51-lot, 55-lot, 305-lot, and 405-lot orders. The distribution of order sizes and the cancelation characteristics of the Spoof Orders are consistent with the analysis of the Defendant's trading activity I discussed during trial.[16]

23. My analysis of the data confirms that the Spoofing Sequence selection criteria described above identify activity that, in my view, is inconsistent with an economically rational trading strategy aimed at obtaining fills for the identified Spoof Orders. Furthermore, the requirement that Spoof Orders be at least a certain number of contracts, fully displayed, and placed within the top ten levels of the order book ensures that these orders conveyed meaningful new information to other market participants. Further, I removed the sequences with fully displayed orders of the same lot sizes as the Spoof Orders on both sides of the market at the same time where one order is not at least twice as large as the order on the other side of the market. This screen ensures that the Defendant's trading activity created a visible order book imbalance to which market participants would be expected to react.

---

16 *See, e.g.,* Trial Transcript, pp. 1073- 1081.

### B. Defining Market Harm

24. In order to quantify the harm caused by the Defendant's Spoof Orders, I first identify transactions that occurred while the Spoof Orders were active in the visible order book. My objective is to calculate losses incurred by market participants who bought while the Defendant's Spoof Orders to buy were active (which increased the perception of buying interest) and participants who sold while Defendant's Spoof Orders to sell were active (which increased the perception of selling interest).[17]

25. Spoof Orders distort the visible buying and selling interest in the market. They can induce other traders to raise/lower their bid/offer price quotes or to cross the bid-offer spread when they otherwise would not have. For example, Spoof Orders placed on the buy side of the order book in the gold futures market create an artificial perception of buying interest and signal the likelihood that the gold futures price will rise in the future. The additional perceived buying pressure induces other market participants to raise the prices at which they are willing to buy and/or induces them to cross the bid-offer spread and accept the current best offer price, or even higher prices, in an attempt to buy quickly before the anticipated rise in the price of gold. The market participants who bought in reaction to artificial buying pressure created by the Spoof Orders are therefore harmed to the extent the Spoof Orders induced them to participate at a worse price than they would have otherwise. The Defendant correspondingly benefitted from artificial buying interest created by his Spoof Orders, because the incidences of market participants crossing the bid-offer spread increased the fill probability of the Defendant's Opposite Orders, beyond what the

---

[17] As I discuss later, while the Spoof Orders may have had a lasting impact on market dynamics even after they were canceled, my analysis only considers the impact while the Spoof Orders were active. This is one respect in which my analysis likely understates the true effect of the Spoof Orders.

Defendant otherwise would have been able to fill had he not placed the Spoof Orders.

### C. Unadjusted Market Loss Calculation

26. In order to calculate the loss incurred by market participants on the Spoof Order side of transactions, I compare the price at which market participants traded to the price at which they would have been able to trade in the absence of the Defendant's Spoof Orders ("But-For Trade Prices"). The best available indicators of But-For Trade Prices are the last observed bid and offer prices immediately before the placement of the Spoof Order in each Spoofing Sequence. The But-For Trade Price is therefore the last observed best bid price for buy-side Spoof Orders and the last observed best offer price for sell-side Spoof Orders.[18]

27. For each transaction that occurred while the Spoof Orders were active, I calculate the difference between the price at which the execution actually occurred ("Actual Trade Price") and the corresponding But-For Trade Price. This price difference is a measure of the additional mark-up, or the higher cost (or potentially, benefit) of trading for market participants on the Spoof Order side of the transaction while the Spoof Orders were active. Specifically, when the Actual Trade Price is "worse" (*i.e.*, higher for buyers and lower for sellers) than the But-For Trade Price, the participants incurred a higher cost relative to the state of the market before the Spoof Order was placed. Conversely, when the Actual Trade Price is "better" (*i.e.*, lower for buyers and higher for sellers) than the But-For Trade Price,

---

[18] For a trader interested in buying prior to a spoof, the last observed bid price immediately before the placement of the spoof orders, which reflects the highest purchase price among buying interest expressed in the visible book, is a reasonable estimate of the But-For Trade Price for the trader, absent the spoof. Along similar lines, for a trader interested in selling prior to the spoof, the last observed offer price immediately before the placement of the spoof orders, which reflects the lowest sale price among selling interest expressed in the visible book, is a reasonable estimate of the But-For Trade Price for the trader, absent the spoof.

the participants recognized a benefit. To arrive at the "Unadjusted Market Loss"[19] associated with an individual transaction, I multiply the price differential by the transacted quantity. I aggregate this measure across all transactions executed by market participants while Spoof Orders are active to arrive at a total Unadjusted Market Loss estimate across all Spoofing Sequences.

28. To illustrate this calculation, consider Episode #50 for the Defendant from the 68 episodes in GX 76, an episode in Gold futures with a 101-lot Spoof Order placed by the Defendant on the buy side. Immediately before the Spoof Order is placed, the prevailing best bid price is $1,145.40. Therefore, for this episode, the But-For Trade Price is $1,145.40. On the chart below, I have marked with an asterisk the executed trades during the pendency of the Spoof Order:

[19] In the unadjusted analysis, I assume that market participants on the Spoof Order side would all have otherwise traded at the But-For Trade Price. In subsequent sections of this declaration, I modify the Unadjusted Market Loss to account for the trading that occurs in normal market conditions (*i.e.*, without Spoof Orders).




- Market participant V crosses the bid-offer spread to buy six contracts (600 ounces) at an Actual Trade Price of $1,145.50 per ounce at 10:01:18.837 AM. The Unadjusted Market Loss for this trade is therefore calculated as: ($1,145.50 – $1,145.40) × 600 = $60.
- Market participant W crosses the bid-offer spread to buy one contract (100 ounces) at an Actual Trade Price of $1,145.50 per ounce at 10:01:18.845 AM. Market participant W subsequently crosses the bid-offer spread to buy an additional contract (100 ounces) at an Actual Trade Pride of $1,145.60 per ounce at 10:01:18.948 AM. This pattern of price movement is consistent with spoof orders exerting price pressure that raises the

bid and offer prices. The Unadjusted Market Loss for this trade is therefore calculated as: (($1,145.50 – $1,145.40) × 100) + (($1,145.60 – $1,145.40) × 100) = $30.

- Market participant X crosses the bid-offer spread to buy 16 contracts (1,600 ounces), of these 16 contracts two contracts are traded with Mr. Jordan, at an Actual Trade Price of $1,145.50 per ounce at 10:01:18.851 AM. The Unadjusted Market Loss for these trades is therefore calculated as: ($1,145.50 – $1,145.40) × 1,600 = $160.
- Market participant Y crosses the bid-offer spread to buy eight contracts (800 ounces), of these eight contracts six contracts are traded with Mr. Jordan, at an Actual Trade Price of $1,145.50 per ounce at 10:01:18.852 AM. The Unadjusted Market Loss for this trade is therefore calculated as: ($1,145.50 – $1,145.40) × 800 = $80.

29. Across all Spoofing Sequences, the total Unadjusted Market Loss for market participants on the Spoof Order side based on all transactions observed while the Spoof Orders are active is $384,900.[20] These market participants include 645 unique traders trading through 130 unique firms.[21]

30. Across the Spoofing Sequences, the median duration of the Spoofing Sequences is 1.0 second, the 75th percentile of the duration distribution is 1.4 seconds, and the 90th percentile of the duration distribution is 1.9 seconds. If I limit the loss calculation to trades that occur when the Spoofing Sequences are active, and in the case of the longer Spoofing Sequences to trades that occur within 0.5 seconds after the placement of the Spoofing Sequence, the

---

20 This aggregate figure includes instances where the resulting market loss calculation is negative, *i.e.*, where the Actual Trade Price is "better" than the But-For Trade Price.

21 I determined the number of unique traders using the "tag 50" variable in the CME Trading Data. I understand that the tag 50 represents each trader's unique operator ID. *See* Trial Transcript, pp. 379-380. I determined the number of unique firms using the "firm" variable in the CME Trading Data.

total Unadjusted Market Loss for market participants on the Spoof Order side is $325,360. If I limit the loss calculation to trades that occur when the Spoof Orders are active, and in the case of the longer Spoofing Sequences to trades that occur within 1 second after the placement of the Spoofing Sequence, the total Unadjusted Market Loss for market participants on the Spoof Order side is $363,435. That is, in effect, if I limit the duration of longer Spoofing Sequences to 0.5 seconds, I find that it still accounts for over 84% of both the overall contracts traded and of overall Unadjusted Market Losses.

| | Unadjusted Market Loss | Number of Affected Contracts Traded by Market Participants | Unique Traders Affected | Unique Firms Affected |
|---|---|---|---|---|
| Trades during the Spoof Duration | $384,900 | 20,059 | 645 | 130 |
| Trades within the minimum of [Spoof Duration, 1 second] | $363,435 | 18,998 | 555 | 126 |
| Trades within the minimum of [Spoof Duration, 0.5 seconds] | $325,360 | 16,869 | 386 | 116 |

31. I term this measure of market loss incurred by market participants as "unadjusted" because it does not account for the fact that some participants may have been willing to increase/decrease their order's limit price or cross the bid-offer spread to trade at a worse price even in the absence of Spoof Orders. In the next sections, I present two approaches that account for these scenarios and adjust my calculation of the market loss.

### D. Adjustment for But-For Cost of Trading Using a Matched Control Period

#### *1. Methodology*

32. One way to qualify the Unadjusted Market Loss is to recognize that, even absent pressure from Spoof Orders, not every market participant would have alternatively traded at the But-

For Trade Prices. Rather, some market participants may choose to cross the spread anyway to trade at a worse price, thereby incurring a mark-up, or a higher cost of trading, in exchange for immediate execution. Best prices may also move absent Spoof Order pressure, even within a short period of time, and generate additional cost of trading for the market participant, where the "cost" of trading is positive when the price moves in an unfavorable direction and negative when the price moves in a favorable direction.

33. I present an event study methodology to estimate the "Adjusted Market Loss" that is attributable to the Defendant's Spoof Orders.[22] For each Spoofing Sequence, the methodology identifies a matched control period of trading and estimates a But-For cost of trading for market participants on the Spoof Order side for trades observed in the control period. The But-For cost of trading in the matched control period is deducted from the Unadjusted Market Loss I calculated above for the Spoofing Sequences. The remaining amount is the "Adjusted Market Loss" and represents the abnormal cost of trading that is attributable to the Defendant's Spoof Orders. I describe this calculation in more detail in the following paragraphs.

*2. Calculation and Results*

34. For each Spoofing Sequence, I identify a matched control period of the same length as the duration of the Spoof Order in the visible order book,[23] and that immediately precedes the placement of the Spoof Order.

---

[22] Sarkar and Schwartz (2009, Journal of Finance) and Baruch, Panayides and Venkataraman (2017, Journal of Financial Economics) illustrate general event study methodology for trading patterns. Beschwiz, Keim and Massa (2020, Review of Asset Pricing Studies) provide an example of intraday implementation, showing that the market reacts to false information signals, with the reaction concentrated in the first five seconds after the false signal.

[23] The Spoof Order remains visible in the order book until it is either canceled, fully filled, or the market price moves such that the resting Spoof Order in the Spoofing Sequence is no longer in the first ten levels of the order book.

35. For the control period for each Spoofing Sequence, I calculate the cost of trading for market participants on the Spoof Order side using an identical approach that I described for the Unadjusted Market Loss for the Spoofing Sequence. Specifically, I identify all transactions that occurred during the control period, and for each transaction, I calculate the difference between the price at which the trade actually occurred (*i.e.*, the Actual Trade Price) and the corresponding But-For Trade Price for the control period. The But-For Trade Price for the control period is the best price available immediately prior to the control period – the last observed best bid price for buy-side Spoofing Sequences and the last observed best offer price for sell-side Spoofing Sequences.[24] For instance, in the case of a buy-side Spoofing Sequence, I calculate the difference between the prices at which market participants transacted during the control period (*i.e.*, Actual Trade Prices) and the best bid price available immediately prior to the control period (*i.e.*, But-For Trade Price). To arrive at the But-For cost of trading associated with an individual transaction during the control period, I multiply the price differential by the transacted quantity. Across all Spoofing Sequences, I then calculate the total But-For cost of trading during the control periods by aggregating the cost across all transactions executed by market participants during the control periods.

36. Since the control period immediately precedes the placement of the Spoof Order in a Spoofing Sequence, the methodology accounts for idiosyncratic market conditions that may differ across Spoofing Sequences and provides an estimate of the "normal" cost of

---

24 For roughly 5% of Spoofing Sequences, a preceding control period that has the same duration as the Spoof Orders is not possible because the control period would overlap with a previous Spoofing Sequence. In these situations, I calculate the cost of trading during this abbreviated control period, and then scale it up proportionally to match the duration of the Spoof Orders. For example, if the duration of the Spoof Orders in a Spoofing Sequence is 5 seconds, but the preceding control period is only 2 seconds until it overlaps with a prior Spoofing Sequence, I multiply the But-For cost of trading that I calculate for the control period by 2.5 (= 5 ÷ 2).

trading of market participants around the time of a Spoofing Sequence, absent the placement of the Spoof Order. To obtain an Adjusted Market Loss estimate, I calculate the difference between the total Unadjusted Market Loss of the Spoofing Sequences and the total But-For cost of trading during the control period. This measure accounts for both the prevailing market conditions and the normal trading behavior of market participants absent any spoofing activity.

37. To illustrate this calculation, I return to Episode #50 for the Defendant. In this episode, the Spoof Order is placed at 10:01:18.808 AM and the Spoof Order has a duration of 0.661 seconds, so the control period with matching duration for this episode is 0.661 seconds and begins at 10:01:18.147 AM and ends at 10:01:18.808 AM, the same time that the Spoof Order is placed. Immediately before the start of the control period, the prevailing best bid price is $1,145.40, so the But-For Trade Price for this control period is $1,145.40. During the control period, one market participant fills an order to buy (marked on the chart below with an asterisk):




- Market participant Z crosses the bid-offer spread to execute a buy order for one contract (100 ounces) at an Actual Trade Price of $1,145.50 per ounce at 10:01:18.370 AM. The control period But-For cost of trading for this trade is therefore calculated as: ($1,145.50 – $1,145.40) × 100 = $10.

38. Across all the identified Spoofing Sequences, the But-For cost of trading during the control periods adds up to $35,519. Deducting this cost of trading from the total Unadjusted Market Loss results in a total Adjusted Market Loss of $349,381, as shown in the table below.[25] The table below also shows the Adjusted Market Loss when I restrict my analysis in the

[25] This includes instances of Spoofing Sequences where the cost of trading in the control period exceeds the Unadjusted Market Loss, resulting in a negative Adjusted Market Loss for the given Spoofing Sequence.

case of the longer Spoofing Sequences to trades that occur during a short duration after the placement of Defendant's Spoof Order. Even were I to restrict my analysis to only the first 0.5 seconds after the Spoof Order placement, the Adjusted Market Loss is over $310,446.

| | Unadjusted Market Loss [A] | But-For Cost of Trading matched control [B] | Adjusted Market Loss [C]=[A]-[B] |
|---|---|---|---|
| Trades during the Spoof Duration | $384,900 | $35,519 | $349,381 |
| Trades within the minimum of [Spoof Duration, 1 second] | $363,435 | $30,404 | $333,031 |
| Trades within the minimum of [Spoof Duration, 0.5 seconds] | $325,360 | $14,914 | $310,446 |

39. The above describes the main approach, which adjusts for the But-For cost of trading using a matched control period. In the next section, I discuss an alternative approach, which presents a conservative estimate of the Adjusted Market Loss.

### E. Alternative Adjustment Method: Rate of Spread-Crossing

#### *1. Methodology*

40. Market participants incur trading costs primarily when they cross the bid-offer spread to trade. For example, a market participant who intends to buy gold futures contracts could place a resting limit order at the best bid. By crossing the spread to trade at the best offer, which is at a higher price, this market participant incurs a cost. As explained earlier, spoofing, and the misleading appearance of supply/demand it introduces, can induce market participants to cross the spread and incur the associated costs.

41. Under typical market conditions, some market participants will decide to cross the spread

to trade, even absent any pressure from spoofing activity. In other words, among the spread-crossing trades that take place while the Spoof Orders are active, some would have occurred anyway even in the absence of Spoof Orders. I make an adjustment for the spread-crossing trades that would have occurred anyway by comparing the rates of spread-crossing during the Spoofing Sequence and during a similar-duration control period. This approach provides another metric by which I can adjust the Unadjusted Market Loss to remove the trading costs that market participants would have likely incurred absent the Spoof Orders. I refer to this as the Alternative Adjusted Market Loss.

*2. Calculation and Results*

42. I calculate the "rate of spread-crossing" as the per-second number of contracts traded by market participants on the Spoof Order side who crossed the spread. I compare the spread-crossing rate during a control period immediately prior to the Spoofing Sequence to the spread-crossing rate during the Spoofing Sequence to measure the impact of the Spoof Orders on spread crossing activity.




43. To illustrate this calculation, I return to Episode #50 for the Defendant, an episode with a 101-lot Spoof Order placed by the Defendant on the buy side. Immediately before the Spoof Order is placed, the prevailing best bid price is $1,145.40. During the Spoofing episode, Market participants V, W, X and Y cross the prevailing bid-offer spread to buy six contracts, two contracts, 16 contracts, and eight contracts, respectively. The rate of spread-crossing during the Spoofing Sequence is 48.41 contracts per second (32 contracts divided by 0.661 seconds). In the control period with matching duration for this Spoofing Sequence, Market participant Z crosses the bid-offer spread to buy one contract. The rate of spread-crossing during the control period is 1.51 contracts per second (1 contract divided by 0.661 seconds).

44. Across all Spoofing Sequences, I calculate the spread-crossing rate for the Spoofing Sequence and for similar-duration control period immediately preceding the placement of the Spoof Order. I aggregate and present the results in the figure below. This figure shows that, compared to the control period before the placement of the Spoof Order, the rate of spread-crossing for orders on the Spoof Order side during the duration of Spoofing Sequences is almost eight times as high (8.58 contracts per second versus 1.06 contracts per second). This figure also shows that, compared to the control period before the placement of the Spoof Orders, the rate of spread-crossing for orders on the Spoof Order side increases in the first 0.5 seconds after the Spoof Orders are placed and remains elevated for the duration of the Spoof Orders.



45. The difference between the elevated rate of spread-crossing during the Spoofing Sequences and the normal rate of spread-crossing observed during the control period can then be reasonably attributed to the placement of the Spoof Orders. I therefore remove the portion represented by the normal rate of spread-crossing from the Unadjusted Market Loss to arrive at a measure of the Alternative Adjusted Market Loss.

46. As shown in the figure above and the table below, during the control period before the Spoof Orders are placed, an average of 1.06 contracts per second are traded by market participants on the Spoof Order side who crossed the spread. When Spoof Orders are active, the spread-crossing rate increases to 8.58 contracts per second. Therefore, I estimate that approximately 1.06 ÷ 8.58 = 12.4% of the spread-crossing contracts traded by participants on the Spoof Order side while the Spoof Orders are active would reasonably have occurred in the absence of the spoofing activity. The Unadjusted Market Loss of $384,900 is reduced by 12.4%, which results in $337,332 for the Alternative Adjusted Market Loss.

47. The figure above and table below also show that the spread-crossing rate is highest immediately after the Spoof Orders were placed, jumping from 1.06 contracts per second in the control period before the Spoof Orders were placed to 16.71 contracts per second in the 0.5 seconds immediately after the Spoof Orders were placed.

| | Unadjusted Market Loss [A] | Rate of Spread-Crossing (Contracts per Second) [B] | Percentage Adjustment [C] = [X] / [B] | Alternative Adjusted Market Loss [D] = [A] x (1 - [C]) |
|---|---|---|---|---|
| **[X] Control Period** | | **1.06** | | |
| **During the Spoof Duration** | **$384,900** | **8.58***** | **12.4%** | **$337,332** |
| Limit to the minimum of [Spoof Duration, 1 second] | $363,435 | **10.49***** | 10.1% | $326,713 |
| Limit to the minimum of [Spoof Duration, 0.5 seconds] | $325,360 | **16.71***** | 6.3% | $304,718 |

*** Denotes statistically significant in difference from Control Period at a 99.99% confidence level.
Note: [D] is based on a more precise percentage adjustment than is reported in [C].

48. The spread-crossing method provides a conservative estimate of the Adjusted Market Loss. This is because the method only accounts for other traders' decision to cross the spread at a higher rate during the Spoofing Sequence. Notably it does not account for the inferior prices received by other traders during the Spoofing Sequence relative to the control period due to the price impact of the Spoof Orders.

49. Additionally, I tested the difference between spread-crossing rates before and after the Spoof Order placement using a pair-wise t-test.[26] I find that the difference between the spread-crossing rates is statistically significant with a confidence level of over 99.99%. This statistical test confirms that the increase in the rate of spread-crossing estimated for the Spoofing Sequences relative to the control period is not due to random chance.

**F. Summary of Market Loss Calculations**

50. The table below summarizes my calculations of market loss for the Spoofing Sequences using both the But-For cost of trading approach and the alternative rate of spread-crossing approach.

[26] A pairwise t-test tests whether the average difference in spread-crossing rates before and during each Spoofing Sequence is statistically different from zero.

| Trader | Unadjusted Market Loss | Adjusted Market Loss (with But-For Cost of Trading) | Alternative Adjusted Market Loss |
|---|---|---|---|
| Christopher Jordan | $384,900 | $349,381 | $337,332 |

### G. Additional Components of Market Loss

51. The methodologies I used to quantify the market harm attributable to the Spoofing Sequences likely understate total market harm for the following reasons:

a. I only calculate the loss incurred by market participants on the Spoof Order side for their orders that were executed while the Spoof Orders are active. Put simply, even after a Spoof Order is canceled, it can take time for the market to return to its prior state. However, I did not attempt to capture the potential lingering effect of the Spoof Orders after they are canceled, when market participants may still be responding to the pressure created by the Spoof Orders.

- For example, the Defendant's Episode #4a, which is the 60-second zoom out chart for the Defendant's Episode #4 of GX 75, illustrates the extent to which market participants may have been harmed by the Defendant's Spoof Order even though they traded after the Spoof Order had already been canceled. In the 60 seconds after the Defendant canceled his 105-lot order, the best offer price remained below what the best offer price was prior to the placement of his 105-lot order. While the best offer price after the Spoof Order is canceled remains below what it was prior to the placement of the Spoof Order, my calculation only incorporates the losses incurred during the life of the Spoof Order and does not account for losses that occurred following the cancelation of the Spoof Order.

- Episode #58b of GX 76 similarly illustrates the potential lasting effect of Spoof Orders that is not captured by my methodology. In both the 10 minutes prior and the 10 minutes after the placement of the Spoof Order shown in Episode #58, the Defendant places additional sell-side Spoof Orders. While the best offer price continues to fall with each placement of the Defendant's Spoof Orders below what it was prior to the placement of the Defendant's first sell-side Spoof Order, I only calculate losses during the life of the first Spoof Order. Therefore, my calculation does not include any losses that occurred between the placement of the three Spoof Orders when the best offer price remained below what it had been prior to the placement of the Defendant's first Spoof Order during this time period.

b. I only calculate the loss incurred by market participants on the Spoof Order side for their orders that were executed. I do not account for orders that were resting on the Spoof Order side before the Spoof Orders were placed and that subsequently lost the opportunity to get fills due to the pressure created by the Spoof Orders. While Spoof Orders are active, the price is likely to move "away" in response to the spoofing pressure (*i.e.*, move higher for buy-side Spoof Orders and move lower for sell-side Spoof Orders). Therefore, orders that were resting on the Spoof Order side before the Spoof Orders were placed are less likely to get fills. My analysis does not attempt to quantify this opportunity cost of non-execution for these orders.

c. In calculating market loss only during Spoofing Sequences, I did not quantify the long-term effects of spoofing activity on financial markets. More broadly, and as I have previously testified, the practice of spoofing degrades market integrity by causing a loss of confidence among participants. Traders factor in the risk of being cheated by

reducing participation or withdrawing from the market, which has the potential to hurt market liquidity by decreasing the pool of available counterparties with whom to trade. False information regarding supply and demand lowers market participants' confidence that the observed futures prices are accurate. Thus, the practice of spoofing degrades the two primary functions of financial markets – liquidity and price discovery.[27] In other words, the Spoofing Sequences have lasting detrimental effects far beyond the periods covered by the Defendant's Spoofing Sequences and I have not attempted to quantify such an effect.

d. I do not consider other non-futures markets where prices correlate with Gold and Silver futures, such as exchange-traded funds ("ETFs"), options, or individual stocks whose performance is directly tied to precious metals.

Pursuant to 28 U.S.C. § 1746, I, Kumar Venkataraman, certify under penalty of perjury that the foregoing is true and correct.

______________________

Kumar Venkataraman, PhD

[27] *See* Trial Transcript, pp. 1055, 1160.